## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ANGELA LEDDY, as Personal Representative of the Estate of Christa Sullivan, Deceased, | ) ) ) | Attorney Lien Claimed Jury Trial Demanded |
| Plaintiff, | ) ) | |
| vs. | ) ) | CASE NO.:  23-cv-00295-HE |
| (1) OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY, (2) BOARD OF COUNTY COMMISSIONERS FOR OKLAHOMA COUNTY, (3) TURN KEY HEALTH CLINICS, LLC, (4) GABRIEL CUKA, M.D., (5) MARK WINCHESTER, M.D. (6) NANCY MEYER, (7) STEPHANIE WILLIAMS, ARNP-CNP | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

**COMES NOW**, the Plaintiff Angela Leddy ("Plaintiff"), as Personal Representative of the Estate of Christa Sullivan ("Ms. Sullivan"), deceased, and for her Amended Complaint against the above-named Defendants, states and alleges as follows:

## PARTIES

1.      Plaintiff Angela Leddy, as Personal Representative of the Estate of Christa Sullivan, deceased, is a citizen of the State of Oklahoma and Personal Representative of Ms. Sullivan's Estate. Plaintiff is also Ms. Sullivan's daughter.

2.      Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail Trust") is a public trust created for the furtherance of purported public functions pursuant to 60 Okla. Stat. § 176, *et seq.* OCCJA was created by a certain "Trust Indenture."  Under

the Trust Indenture, OCCJA is to "assist" Oklahoma County in its stated objective of operating the Oklahoma County "Jail Facilities", which includes the Oklahoma County Detention Center ("Oklahoma County Jail" or "Jail"). Under the Trust Indenture, OCCJA was delegated the responsibility of developing policies and procedures to address the administration of the Jail. However, the Trust Indenture specifically provides that the Oklahoma County Sheriff was to continue operating the Jail until such time as the OCCJA and Oklahoma County had entered into a lease agreement and/or funding agreement(s) that specifically provided for the OCCJA to commence responsibility for management and operation of the Jail. OCCJA did not take over responsibility for management and operation of the Jail until June 1, 2020. However, since June 1, 2020, OCCJA has remained the County entity with primary responsibility for the management and operation of the Jail. The Oklahoma County Sheriff and a member of the Oklahoma County Board of County Commissioners are permanent members / trustees of the OCCJA. OCCJA is sued under Plaintiff's municipal liability theory.

3.    Defendant Board of County Commissioners for Oklahoma County ("Board", "BOCC" or "Oklahoma County") is the legislative entity with non-delegable statutory responsibility for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe-keeping of inmates and detainees. *See* 57 O.S. § 41. As a matter of Oklahoma law, BOCC exercises the powers of the county. *See* 19 Okla. Stat. § 3. A suit brought against BOCC is the way Oklahoma law contemplates suing the county. *See* 19 Okla. Stat. § 4. BOCC is charged with ensuring that the Jail has adequate funding and resources to provide constitutionally sufficient conditions of confinement.

4.     Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Oklahoma County, Oklahoma.  Turn Key is a private correctional health care company that contracts with counties, including Oklahoma County, to provide medical professional staffing, supervision and care in county jails. Turn Key was, at times relevant hereto, responsible, in part, for providing medical services, supervision and medication to Ms. Sullivan while she was in custody at the Jail.  Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees.  Turn Key was endowed by Oklahoma County/OCCJA with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

5.     Defendant Gabriel Cuka, M.D. ("Dr. Cuka") is a citizen of Oklahoma. Dr. Cuka was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/OCCJA/Oklahoma County. Dr. Cuka was, in part, responsible for overseeing Ms. Sullivan's health and well-being, and assuring that Ms. Sullivan's medical/mental health needs were met, during the time she was in the custody of OCCJA/Oklahoma County. Dr. Cuka is being sued in his individual capacity.

6.     Defendant Mark Winchester, M.D. ("Dr. Winchester") is a citizen of Oklahoma. Dr. Winchester was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/OCCJA/Oklahoma County. Dr. Winchester was, in part,  responsible for overseeing Ms. Sullivan's health and well-being, and assuring

that Ms. Sullivan's medical/mental health needs were met, during the time she was in the custody of OCCJA/Oklahoma County. Dr. Winchester is being sued in his individual capacity.

7.      Defendant Stephanie Williams, ARNP-CNP, is a citizen of Oklahoma. ARNP Williams was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/OCCJA/Oklahoma County. ARNP Williams was, in part, responsible for overseeing Ms. Sullivan's health and well-being, and assuring that Ms. Sullivan's medical/mental health needs were met, during the time she was in the custody of OCCJA/Oklahoma County. ARNP Williams is being sued in her individual capacity.

8.      Defendant Nancy Meyer is a citizen of Oklahoma. Ms. Meyer was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/OCCJA/Oklahoma County. Ms. Meyer was, in part, responsible for overseeing Ms. Sullivan's health and well-being, and assuring that Ms. Sullivan's medical/mental health needs were met, during the time she was in the custody of OCCJA/Oklahoma County. Ms. Meyer is being sued in her individual capacity.

## **JURISDICTION AND VENUE**

9.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of State law.

10.     This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

11.     The acts complained of herein occurred in Oklahoma County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## FACTUAL BACKGROUND

### Facts Specific to Ms. Sullivan

12.     Paragraphs 1-8 are incorporated herein.

13.     Christa Sullivan had a documented history of mental illness, including schizoaffective disorder, bipolar type, anxiety, and depression.

14.     Typically, Ms. Sullivan's mental health disorders were controlled by her prescribed psychotropic medications, including Buspirone and Lorazepam (for anxiety), Duloxetine and Mirtazapine (for depression), and Lurasidone (for schizophrenia).

15.     In approximately December 2019, however, Ms. Sullivan began experiencing worsening symptoms from her mental health disorders, including hallucinations and psychosis.

16.     From December 2019-January 2020, Ms. Sullivan was hospitalized twice for harming herself and attempting to harm others, including her long-time husband. Ms. Sullivan's severe hallucinations caused her to attempt to harm herself or others.

17.     On or about February 1, 2020, Ms. Sullivan was involved in an altercation at a Walgreens in Oklahoma City. Officers from the Oklahoma City Police ("OCPD")

Department responded to the scene and took Ms. Sullivan to St. Anthony Hospital's ("St. Anthony") Emergency Room for evaluation, as it was clear she was in the middle of a mental health crisis. The two people involved in the altercation with Ms. Sullivan reported that they did not wish to press charges against Ms. Sullivan, and she was not criminally charged.

18.     Providers at St. Anthony evaluated Ms. Sullivan and determined that she needed to be admitted to an inpatient mental health facility for "safety and stabilization." Ms. Sullivan was transferred to Oakwood Springs ("Oakwood"), a behavioral health hospital in Oklahoma City, later on February 1, 2020.

19.     During her stay at Oakwood, Ms. Sullivan participated in regular cognitive behavioral therapy ("CBT"), group therapy, and had her medications slightly altered.

20.     On March 10, 2020, Oakwood discharged Ms. Sullivan.

21.     Upon discharge, providers at Oakwood reported that Ms. Sullivan had improved her coping skills, achieved better insight into her illness, stabilized her mood, and was no longer considered suicidal, homicidal, or unsafe in any other way.

22.     Between March 11, 2020 and April 27, 2020, Ms. Sullivan received regular outpatient treatment at Oakwood.

23.     Unfortunately, on April 27, 2020, Ms. Sullivan had another mental health crisis while retrieving medicine at her husband's house.

24.     Ms. Sullivan had an altercation with her husband while in the midst of the mental health crisis and OCPD officers were called and arrested her.

25.     The officers transported Ms. Sullivan to the Oklahoma County Jail ("Jail") on April 27, 2020, where she was booked.

26.     This was Ms. Sullivan's first time in a detention facility / jail.

27.     During Ms. Sullivan's intake at the Jail, Turn Key employee/agent Kylie Beck ("Nurse Beck") performed a medical intake screening.

28.     During intake, Ms. Sullivan weighed 142 pounds. There are other reports that she weight 148 pounds when brought to the Jail.

29.     Ms. Sullivan reported that she had been diagnosed with: anxiety, schizophrenia, insomnia, mitral valve prolapse, high cholesterol, hypertension, and fatty liver disease.

30.     Ms. Sullivan told Nurse Beck that she was prescribed Ativan, Remeron, Abilify, Cymbalta, and Buspar.

31.     Ms. Sullivan also reported that she had a history of auditory hallucinations and was currently experiencing them. She further reported that she had a history of suicide attempts.

32.     Ms. Sullivan further notified Nurse Beck of her history of inpatient mental health treatment at both Oakwood and St. Anthony Hospital.

33.     Nurse Beck placed Ms. Sullivan on suicide watch "for safety and to be evaluated by [Mental Health]."

34.     On April 28, 2020, a Turn Key mental health provider, Deborah Chesser, saw Ms. Sullivan during Mental Health rounds.

35.     Ms. Chesser, a Licensed Professional Counselor ("LPC"), noted in Ms. Sullivan's chart that she appeared to be "stable enough to move to MHO status" and would be seen by Mental Health staff weekly.

36.     Ms. Chesser also charted that Ms. Sullivan was to take the following medications: Aripiprazole (for psychosis), Mirtazapine (for anxiety), Venlafaxine (for anxiety), Atorvastain, and Propranolol.

37.     On April 30, 2020, it was reported that Ms. Sullivan had self-harmed by cutting her wrists on her metal bed until they bled. Ms. Sullivan was placed on suicide precaution 2 ("SP2") status so that she could be monitored regularly by mental health professionals.

38.     On May 1, 2020, it was reported that Ms. Sullivan was attempting to commit suicide by "drowning herself in the toilet." She was subsequently seen by Defendant Gabriel Cuka, MD.

39.     Dr. Cuka charted that Ms. Sullivan was not oriented to situation and did not understand questions he asked her about her medication. He noted that Ms. Sullivan's affect was "sad" and that her mental health symptoms were "severe." Ms. Sullivan was also moved to SP1 status, which requires a higher level of care and monitoring than SP2 status.

40.     On or about May 18, 2020, Ms. Sullivan was moved back to SP2 precautions, as it was determined she was no longer actively suicidal. Ms. Sullivan was, however, still disoriented and unable to accurately state what time of day it was. She also continued to display anxiety and an inability to properly take care of herself. She was often found in her cell naked and disheveled.

8

41.     Ms. Sullivan was also regularly incontinent.

42.     Over the next few weeks, Ms. Sullivan oscillated between SP2 and SP1 precautions because she continued to periodically self-harm and report suicidal ideation and severe depression. She also began losing weight due to not eating and developed bed sores / pressure ulcers from lying in her cell all day. On information and belief, Ms. Sullivan would lie in one position, for extended periods of time, in a state of catatonia.

43.     In another manifestation of her severe psychosis, Ms. Sullivan was incontinent and required the use of adult diapers.

44.     Ms. Sullivan's state of catatonia and incontinence, as well as her bed sores/pressure ulcers, were well known, obvious and readily apparent to all Turn Key and OCCJA/County staff who encountered her at the Jail.

45.     On June 30, 2020, Jail staff found Ms. Sullivan in her cell "trying to use bed cords to self-harm." She told Dr. Cuka she had attempted suicide the previous night. As a result, her bed frame and cords were removed from her cell. Dr. Cuka noted that he was concerned about Ms. Sullivan's excessive weight loss and bed sores / pressure ulcers.

46.     In the early morning hours of July 3, 2020, Turn Key Charge Nurse Mandy Jones was notified by a detention officer that Ms. Sullivan was lying on the floor of her cell with her adult diaper around her neck. Nurse Jones told Ms. Sullivan to remove it from her neck and put it back on, so she did. Ms. Sullivan asked why her heart rate was so high and stated "I want to die." Nurse Jones notified Dr. Cuka.

47.     Ms. Sullivan put her diaper around her neck two additional times throughout the early morning hours of July 3. When Dr. Cuka arrived at the Jail, he ordered stat doses

of a "considerable amount" of antipsychotic/antianxiety medications, which Ms. Sullivan allegedly reported "helped a little."

48.     On July 25, 2020, Licensed Clinical Social Worker ("LCSW") Kerry Bond charted that Ms. Sullivan was only partially compliant with her Boost Nutritional Supplement, prescribed for weight gain. Ms. Bond noted that "most of the missed reflect 'missing' data – unable to discern if this is pt non-adherence or staff charting error)."

49.     Ms. Bond also noted that Ms. Sullivan was "depressed, low motivation, increased sleep…"

50.     On August 25, 2020, Ms. Sullivan again engaged in self-harm and reported to mental health staff that she attempted suicide and had a panic attack. She also reported experiencing auditory hallucinations.

51.     In early-mid October 2020, Ms. Sullivan's symptoms worsened. Jail staff reported to Dr. Cuka that Ms. Sullivan had expressed increased insomnia due to stress about her legal problems. Jail staff also reported that Ms. Sullivan would spend most of the day lying down in her cell to the point that her bed sores / pressure ulcers returned.

52.     Ms. Sullivan remained on SP1 precautions throughout October and November 2020.

53.     On October 20, 2020, Ms. Sullivan reported to Turn Key employee/agent Christi Howell that she was having difficulty swallowing and felt like she had a nodule on the left side of her thyroid. Ms. Sullivan told Howell that she had a biopsy on her thyroid approximately a year prior and never found out the results.

54.     Ms. Sullivan underwent an ultrasound on her thyroid, which indicated thyroiditis 2.

55.     On November 30, 2020, Ms. Sullivan again engaged in self-harm. She told Turn Key Nurse Practitioner Stephanie Williams that she didn't know why she did it. She also told NP Williams she didn't like one of her medications, Haldol, because it affected her heart rate.

56.     In December 2020, Ms. Sullivan's mental health symptoms worsened. She spent most of her days laying in her cell and would only communicate with Jail and Jail medical personnel minimally.

57.     Tragically, Ms. Sullivan's severe symptoms – depression, anxiety, insomnia, incontinence, catatonia, weight loss, malnutrition, dehydration, lethargy, and pressure ulcers or "bed sores," would only continue to worsen in the following months, culminating in her death at the Jail.

58.     On December 23, 2020, Dr. Cuka noted that Ms. Sullivan was laying in the exact same place and position in her cell as she had been when he saw her the day before. When asked about her activity, Ms. Sullivan told Dr. Cuka that she would get up to use the restroom in her cell. Dr. Cuka told her that she needed to move around more.

59.     On December 24, 2020, Dr. Cuka noted that Ms. Sullivan was "in a different position today!" Sadly, it was a surprise that Ms. Sullivan had actually moved around her cell, as her severe depression and anxiety were causing her severe state of catatonia. Nevertheless, Ms. Sullivan refused to go to the cell door to talk to Dr. Cuka or even look at him.

60.     On December 31, 2020, Dr. Cuka noted that Ms. Sullivan did "not move to look at me. Denies any changes."

61.     Ms. Sullivan's condition remained essentially the same in January 2021. She was seen daily by mental health providers, who charted that every time they saw her, she was lying down in her cell. She rarely even looked up at the provider but would verbally respond when they spoke to her.

62.     Of note, however, is that on January 13, 2021, Kent King, a member of Turn Key's medical staff, charted that Ms. Sullivan's thyroid-stimulating hormone ("TSH") was low and on a downward trend. King noted that her TSH levels in conjunction with her complaint in October 2020 and history of thyroid issues possibly indicated hyperthyroidism.

63.     Ms. Sullivan engaged in another instance of self-harm on January 29, 2021, by digging her fingernails into her skin to the point that she drew blood.

64.     On February 25, 2021, Ms. Sullivan was found to be acutely distressed. Nursing staff reported that she had a "negative verbal interaction" with Jail staff the previous night. She was found walking around her cell naked and screaming intermittently.

65.     The following day, Turn Key nursing staff reported to Dr. Cuka that Ms. Sullivan had not eaten food or consumed her Boost nutritional supplement "in several days."

66.     Ms. Sullivan's bed sores / pressure ulcers were also worsening. She complained of pain on her hips where she had bed sores from lying in the same spot, in a state of catatonia, on her bed all day.

67.     On March 1, 2021, Ms. Sullivan complained to Dr. Cuka that she was dizzy.

68.     On March 2, 2021, Turn Key Nurse Sinead Eastman ("Nurse Eastman") called Defendant Mark Winchester, M.D. to report Ms. Sullivan's recent decline.

69.     Nurse Eastman charted that Ms. Sullivan had "rapidly declined in both mental and physical condition. Pt is refusing to eat and has not slept in 2 or 3 days. Pt is unable to stand unaided without falling and is failing to thrive. Dr. Winchester agrees pt needs to be evaluated and treated in ER setting."

70.     Dr. Cuka was also called and he examined Ms. Sullivan on March 2, 2021. **_Dr. Cuka reported that he saw bruising and "open sores" on all of Ms. Sullivan's extremities due to her lying in the same position for weeks. Staff reported again that Ms. Sullivan had been refusing to eat and not cooperating with wound care._**

71.     The decision was made to send Ms. Sullivan to St. Anthony's ER for an evaluation on or about March 2, 2021.

72.     Ms. Sullivan was treated at St. Anthony's for Rhabdomyolysis[1], acute kidney injury, dehydration, vitamin D deficiency, and a thyroid nodule.

73.     When Ms. Sullivan was returned to the Jail on March 5, 2021, she was put on 23 hour/day observation, as her condition was dire.

---

[1] Rhabdomyolysis, or "Rhabdo," is the breakdown of damaged muscle which results in the release of muscle cell contents into the blood. The proteins and electrolytes released into the blood can cause organ damage, including kidney damage or failure, dangerous heart rhythms, seizures, nausea and vomiting, permanent disability, and death. Centers for Disease Control and Prevention, "Rhabdomyolysis," https://www.cdc.gov/niosh/topics/rhabdo/default.html. Last accessed April 5, 2023.

74.     On March 6, 2021, Ms. Sullivan reported to Turn Key LPC Michael Hanes that she was suicidal.

75.     Hanes noted that Ms. Sullivan:

**Did not appear to be completing activities of daily living…Sleep and appetite was [sic] poor. Eye contact poor. Client presented as high risk for self harm at time of interview due to her inability to take care of herself. Security stated she has been picking at her sores, is not eating well, and her balance has been poor. Security stated the patient will try to harm herself when give[n] a paper spoon.**

76.     On March 7, 2021, Turn Key Nurse Jeri Fitzpatrick noted that Ms. Sullivan had a new condition: a "fall laceration at posterior right cranium raised 6cm diameter [and] contusion at thoracic spine area. Multiple abrasions with extremities x 4."

77.     Ms. Sullivan was sent back to St. Anthony's on March 7 via ambulance. She was treated for injuries to her head and back, including stitches and staples in her head, and sent back to the Jail.

78.     On March 8, 2021, Turn Key nurse Randell Johnson charted that **Ms. Sullivan had attempted suicide and "due to oxygen levels at 20% was placed on a bipap for positive oxygen flow. Patient is incontinent of bowel and bladder at this time with cause unknown."**

79.     Upon information and belief, Ms. Sullivan was completely incontinent for approximately two months prior to her death on April 13, 2021.

80.     On March 11, 2021, Dr. Cuka assessed Ms. Sullivan. She was lying naked on her mattress and did not move to look at Dr. Cuka. She reported her recent fall that she had had to go to the hospital to treat her injuries. Dr. Cuka reviewed her St. Anthony

records and merely noted that he would "consider asking [Ms. Sullivan] if she prefers trial of Cymbalta over the Prozac."

81.     Dr. Winchester also assessed Ms. Sullivan on March 11. He noted that she was "VERY DEPRESSED…RETURNED FROM HOSP STAY FOR WT LOSS[.] NOT EATING[.] LOW BMI."

82.     Dr. Winchester also noted that Ms. Sullivan was fatigued, was found naked and lying on her side, had poor hygiene, and had bed sores all over her body.

83.     On March 14, 2021, Ms. Sullivan's vitals were taken. Her blood pressure was 111/51, her pulse was 58, and her oxygen saturation was 92%, all of which are concerningly low. No additional treatment was provided, however.

84.     On March 18, 2021, Dr. Cuka noted that Ms. Sullivan would be left on SP1 precautions until her release "due to severity of her condition and repeated suicide attempts."

85.     Later on March 18, 2021, Dr. Winchester assessed Ms. Sullivan. He noted that she "APPEARS TO CONTINUE TO DETERIORTE PHYSICALLY. SLEEPS MUCH OF THE TIME. INTERACTS VERBALLY MINIMALLY."

86.     Dr. Winchester also noted, with respect to Ms. Sullivan:

***DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.***

87.     It was abundantly obvious, by at least March 18, 2021, that the Jail was not equipped to handle Ms. Sullivan's severe and worsening medical and mental health conditions. As made clear by Dr. Winchester's note, the mental health team, nursing team, wound care team, and the Jail's physicians all agreed that Ms. Sullivan required care that that the Jail could not provide.

88.     On March 22, 2021, ARNP Stephanie Williams noted that Ms. Sullivan was seen lying on her bunk naked. She sat up and told ARNP Williams that she was suicidal over the weekend. Williams ordered a stat dose of antipsychotic/antianxiety medication in response, but did nothing more.

89.     On March 23, 2021, Nurse Eastman charted that Ms. Sullivan was pacing in her cell, was refusing to take drink her Boost nutritional supplement, was highly agitated, and was picking at her bed sores.

90.     On March 23, 2021, Community Care Coordinator Bryan Little noted that Ms. Sullivan had a "Community Mental Health Provider mental health competency need" at the Oklahoma Forensic Center ("OFC") in Vinita, OK.

91.     Mr. Little noted that Ms. Sullivan advised that she was awaiting an open bed at OFC for a competency review and that she had a court hearing for determination of competency on May 5, 2021.

92.     Later on March 23, 2021, ***Dr. Cuka noted that Ms. Sullivan was catatonic***. He and Dr. Winchester "discussed a small medication change to address" her catatonia.

93.     Ms. Sullivan's chart also reflects that, as of March 23, 2021, she weighed 115 pounds, meaning she had lost as much as 33 pounds during her time at the Jail. Ms. Sullivan's chart contains a note stating "pt cont. to loose [sic] wt." None of Ms. Sullivan's other vital signs were taken on March 23.

94.     On March 26, 2021, Turn Key nurse Rebecca Cargill, LPN, observed Ms. Sullivan pacing around her cell and then falling on the floor. Nurse Cargill took her vital signs and noted that her blood pressure was 139/82 and her pulse was 133. Ms. Sullivan requested to go back to the hospital, but Nurse Cargill told her that her blood pressure was ok.

95.     Ms. Sullivan's vital signs were not taken between March 27 and April 13, 2021, despite the fact that she was barely eating or drinking, catatonic, and spent nearly every day lying on her bed in the same spot.

96.     On March 26, 2021, Dr. Cuka noted that Ms. Sullivan had fallen the previous day. Ms. Sullivan confirmed the fall and stated that she "has lots of falls like this."

97.     On March 31, 2021, Dr. Cuka again noted that Ms. Sullivan was lying on her mattress in her normal spot, not moving and barely responding to his questions.

98.     On April 6, 2021, Ms. Sullivan was seen by Terry Deason for an "annual dental exam." Deason noted that Ms. Sullivan exhibited areas of gingivitis and had several missing teeth. ***Deason also charted that Ms. Sullivan was "too unstable to start complex work."***

99.     On April 8, 2021, Dr. Cuka encountered Ms. Sullivan "in her usual position, laying on mattress facing the wall; does not move to look at me." Dr. Cuka noted that Ms. Sullivan had not been moving from her bed according to nursing and Jail staff.

100.    As a result of Ms. Sullivan's lack of movement, her severe bed sores were not improving and covered most of her body. This was a continuing emergent situation, which Turn Key and Jail staff clearly could not handle in a correctional setting. By April 8, 2021, it obvious that Ms. Sullivan needed a higher level of care and was at excessive risk of harm if she remained at the Jail.

101.    Despite Ms. Sullivan's severe decline in the previous weeks and emergent need of higher level of care, Dr. Cuka charted, "Continue existing treatment plan without change." This was deliberate indifference to Ms. Sullivan's serious medical needs.

102.    On April 9, 2021, ARNP Williams noted that Ms. Sullivan's symptoms were severe and had a ***marked impact on inmate's ability to function satisfactorily in current setting.*** ARNP Williams also noted that Ms. Sullivan was found lying on her bunk covered with a smock and wouldn't look up to talk to her.

103.    Yet again, however, there was no change in the treatment plan for Ms. Sullivan. This was deliberate indifference to a serious medical need.

104.    On April 10, 2021, LPC Michael Hanes witnessed Ms. Sullivan lying in the same spot on her bunk -- in an obvious state of catatonia -- covered by her smock. She "appeared frail and under weight." Hanes simply charted that Ms. Sullivan would be seen by mental health again the following day.

105. Hanes returned the following day, April 11, and observed Ms. Sullivan in the exact same spot she had been in the previous day and in the exact same condition. He again did nothing but chart that mental health would follow up the next day.

106. On April 12, 2021, Dr. Cuka found Ms. Sullivan "***distressed in her cell walking around naked, not making the usual screams, however. She requests increased dose of Ativan so she may have a problem, as dose is already reasonable for catatonia.***"

107. At approximately 1:48 a.m. on April 13, 2021, Ms. Sullivan complained to Turn Key nurse Nancy Meyer that her leg hurt and that she couldn't walk or sit down comfortably. Nurse Meyer did nothing for Ms. Sullivan.

108. At approximately 12:21 p.m. on April 13, 2021, ARNP Williams observed Ms. Sullivan in the same spot on her bunk that she had spent most of the previous weeks, in an obvious state of catatonia. Williams did nothing further for Ms. Sullivan. This was deliberate indifference.

109. At approximately 5:21 p.m. on April 13, Nurse Eastman noted that Ms. Sullivan was "having difficulty getting up and down." Eastman took Ms. Sullivan's temperature on her forehead, which was 99.8. Her temperature on her body was 103.8. Ms. Sullivan's blood pressure was 108/50, her pulse was 50, and her oxygen saturation was 93.

110. Nurse Eastman reported these concerning vitals to Dr. Winchester, who came to see Ms. Sullivan.

111.    Dr. Winchester noted that Ms. Sullivan had "more lethargy, weakness," and was "not as talkative." Dr. Winchester also noted that Ms. Sullivan had fallen more than once in the past two days and had been complaining of lower leg pain. Despite all of these alarming and emergent symptoms, along with the fact that Ms. Sullivan had been catatonic for weeks, Dr. Winchester did not send Ms. Sullivan to a hospital. This was deliberate indifference to Ms. Sullivan's serious medical needs.

112.    At approximately 10:55 p.m. on April 13, 2021, Turn Key nurse Butch Brock was told by housing monitor Mike Stenz to see if Ms. Sullivan was breathing. Nurse Brock looked through the bean hole of Ms. Sullivan's cell and did not observe noticeable respirations. Nurse Brock called an officer to unlock the cell and medical was called. Medical staff began CPR and EMSA was called.

113.    EMSA arrived at approximately 11:12 p.m. and continued CPR until 11:20 p.m. Ms. Sullivan never resumed breathing and her death was called at 11:40 p.m.

114.    An autopsy revealed Ms. Sullivan's death was caused by atherosclerotic coronary artery disease, cardiomegaly, pulmonary congestion with aspiration, and focal pyelonephritis (kidney infection). The pathologist also noted that Ms. Sullivan had multiple skin lesions and was significantly underweight.

115.    Additionally, Ms. Sullivan's post-mortem toxicology report indicated that she tested positive for codeine, to which she was allergic. Turn Key's charts repeatedly indicated Ms. Sullivan's codeine allergy prior to her death.

116.    Long before Ms. Sullivan's death, it was obvious, even to a layperson, that her life was in danger and she needed emergent medical care that was not being provided

at the Jail. Yet, with deliberate indifference, Turn Key medical and detention staff alike disregarded the known, obvious and substantial risks to her health and safety.

117.   "[Ms. Sullivan] went from 148 when she got here to … ***she looks like a skeleton,"*** Kevin Wagner, a captain, would later tell an investigator. Captain Wagner told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that ***medical (in the Jail) wasn't providing her care enough."***

118.   Another staff member, Karen Walker, a housing monitor, told the investigator Sullivan deteriorated ***"to a bag of bones."***

119.   Ezekiel Holloway, a senior detention officer, stated to the that the Jail's "would ***treat [Ms. Sullivan] like shit.*** I've witnessed that."

120.   Based on her stark deterioration, including her extreme loss of weight and "skeleton"-like appearance, open sores and incontinence, it would have been apparent to each and every staff member who came into contact with Ms. Sullivan in the spring of 2021, including Dr. Cuka, Dr. Winchester, ARNP Williams and Ms. Meyer, that Ms. Sullivan was at excessive risk of harm, and needed a level of care that could not be, and was not being, provided at the Jail. The obvious and excessive risks to Ms. Sullivan's health and safety were disregarded by these staff members, including Dr. Cuka, Dr. Winchester, ARNP Williams and Ms. Meyer.

■ **Turn Key's Policy and Custom of Inadequate Medical Care**

121.   Paragraphs 1-120 are incorporated herein.

122.   It is believed that Defendant Turn Key is the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain

contracts in a number of counties, including Oklahoma County, Creek County, Tulsa County, Muskogee County, Garfield County and Creek County.

123.    To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

124.    Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail up to a certain, predetermined limit. If the annual pharmaceutical costs exceed this limit, OCCJA/Oklahoma County is responsible for the excess costs.

125.    Similarly, Turn Key is responsible to pay the costs for all off-site medical services and hospitalizations up to a certain limit, and OCCJA/Oklahoma County is responsible for any excess costs of inmate hospitalizations and off-site medical care.

126.    The Contract provides that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed-upon limit.

127.    These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail and to avoid off-site medical costs.

128.    These financial incentives create risks to the health and safety of inmates like Ms. Sullivan who have complex and serious medical and mental health needs, such as bipolar disorder, schizophrenia, catatonia, kidney disease/failure, dehydration, malnutrition, hyperthyroidism, and heart disease.

129.    Turn Key provides inadequate guidance, training and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical and/or mental health needs.

130.    Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

131.    Additionally, Turn Key has an established practice of failing to adequately assess inmates with complex and serious medical and mental health needs, including a failure to regularly take vital signs.

132.    Even when Turn Key staff takes vital signs from inmates with complex and serious medical and mental health needs, like Ms. Sullivan, Turn Key has an established practice of failing to train medical and mental health staff on what constitutes alarming vital signs; when to report alarming vital signs to a physician; and failing to send inmates with complex and serious medical and mental health needs to an outside medical facility for an adequate assessment and treatment.

133.    These failures stem from financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs.

134.    Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

135.   Turn Key's corporate policies, practices, and customs, as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Ms. Sullivan.

136.   In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

137.   On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

138.   An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

139.   Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016.  Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment

after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He was forced to lay in his own urine and feces because staff told Smith he was faking paralysis and refused to help him.

140.    In November of 2016, Turn Key staff disregarded, for days, the complaints and medical history of James Douglas Buchanan while he was an inmate in the Muskogee County Jail. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in <u>jail</u>, he deteriorated significantly and his <u>clinical</u> <u>deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u> until he was nearly completely quadriplegic.***

141.    In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

142.    Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

143.    By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was

refusing meal trays. These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

144.   ***From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,*** despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

145.   On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

146.   Mr. White died on July 30, 2022.

147.   There is an affirmative link between the aforementioned unconstitutional acts and/or omissions of Dr. Cuka, Dr. Winchester, Ms. Meyer, and ARNP Williams, and policies, practices and/or customs which Turn Key promulgated, created, implemented and/or possessed responsibility for.

148.   Ms. Sullivan displayed alarming symptoms for months prior to her death, including bipolar disorder, schizophrenia, catatonia, kidney disease/failure, incontinence, dehydration, malnutrition, hyperthyroidism, and heart disease. In deliberate indifference to these serious medical needs, neither Dr. Cuka, Dr. Winchester, Ms. Meyer, ARNP Williams, nor any other Turn Key employee/agent adequately treated Ms. Sullivan's symptoms and conditions. When her health deteriorated to the point that she looked like a "skeleton", was covered in sores and was incontinent, she was kept at the Jail for an

extended period of time, when it was obvious she needed a higher level of care. This was callous and reckless indifference. Indeed, the only time that Ms. Sullivan's vital signs were taken the three weeks preceding her death was the evening that she ultimately passed away. Even when her vitals were dangerously low, Ms. Sullivan was not sent to the hospital, suffering another five hours until she died alone in her cell.

149.    It was obvious that Ms. Sullivan's conditions could not be effectively treated in a correctional setting. Yet, despite the obvious and excessive risks to her health and safety, Dr. Cuka, Dr. Winchester, Ms. Meyer, ARNP Williams, and the other Turn Key employees/agents referenced above, refused to send her to the hospital or other facility with a higher level of care.

150.    To the extent that no single Turn Key employee/agent violated Ms. Sullivan's constitutional rights, Turn Key is still liable under a theory of a systemic failure of  its policies and procedures as described herein. There were such gross deficiencies in the medical delivery system at the Jail that Ms. Sullivan was effectively denied constitutional medical care.

■  **BOCC/Jail Trust's Policy/Custom of Inadequate Medical Care**

151.    Counties may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources

and training, chronic delays in care and indifference toward medical needs at the Tulsa County Jail. *See Burke,* 935 F.3d at 999-1001.[2]

152.  From its inception in 1991, the Jail has been systemically deficient. Overcrowding, under staffing, inadequate security and supervision have been constant.

153.   Following a lengthy investigation, in 2008, the U.S. Department of Justice issued a report on conditions of confinement at the Jail. The DOJ found woefully inadequate supervision and staffing at the Jail, a lack of basic medical and mental health care, overcrowding and a high rate of inmate assaults and deaths.

154.   A copy of this DOJ Report was sent to Defendant BOCC or Jail Trust, in their official capacity by sending it to John Whetsel, Oklahoma County Sheriff in 2008, as well as the Oklahoma County District Attorney and the United States Attorney for the Western District. As such, Defendants BOCC and Jail Trust were on notice and aware of the constitutional deficiencies addressed by the DOJ Report.

155.   In 2013, the Tenth Circuit Court of Appeals held that the County was not entitled to summary judgment in a Jail suicide case involving an inmate named "Holdstock". *See Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.,* 512 F. App'x 861, 872 (10th

---

[2] *See also v. Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1192 (10th Cir. 2020) (finding that a county may face liability based on "theory [of] systemic failure of medical policies and procedures"); *Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.").

Cir. 2013). In so holding, the *Layton* Court relied on the DOJ Report and reports from

Oklahoma State Department of Health ("OSDH"), as follows:

> The DOJ Report—the product of four separate inspections of the jail—concluded that "certain conditions at the Jail violate the constitutional rights of detainees confined there." Aplt. App., Vol. I, at 155 (DOJ Investigation of the Okla. Cnty. Jail, dated July 31, 2008). The report stated that four years had passed between the DOJ's first three tours of the jail and its most recent one, but "[d]espite this opportunity to improve conditions at the Jail, ... [the DOJ] did not observe improved conditions." Id. at 154.

> More specifically, the DOJ report stated that ***"actual direct supervision of detainees at the Jail is virtually non-existent [and the] facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety."*** Id. at 157. It further found that: (1) ***conditions at the jail make it "difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees,"*** id. at 158; (2) the crowded conditions "tax numerous areas of Jail operations and create circumstances that contribute to unconstitutional conditions," id. at 157 n. 4; (3) ***"detention officers have little time to actually monitor detainees [and] detainees are often left unsupervised for extended periods of time,"*** id. at 158; (4) while surveillance cameras have been installed in many areas of the jail, "***blind spots exist*** within the housing units, ***such as in ... the inside of the cells, which cannot be monitored with cameras,"*** id.; and (5) "[c]ompounding the lack of adequate detainee supervision within the housing units is limited visibility into the individual cells," id.

> During the DOJ's tours of the jail, they "uncovered instances where detainees were not provided access to medical care, specifically acute services—with dire results." Id. at 166. While the jail has a "sick call system for detainees to access routine medical care services, detainees' serious medical needs are not adequately met." Id. (emphasis added). Again noting problems with non-routine care, the report included the finding that the jail ***"has had some problems providing appropriate access to medical care during emergencies."*** Id. at 167. The report described an incident where the medical care that the jail furnished to a detainee was, in the DOJ's opinion, "'unconscionable' during the hours she was in critical need of access to medical care." Id.

> The report outlined several recommended remedial measures, which, in the DOJ's view, should "at a minimum" be implemented "to address the

constitutional deficiencies identified ... and protect the constitutional rights of detainees." Id. at 173. Among these, the ***DOJ recommended that the jail "implement policies and procedures to allow adequate supervision of detainees. This should include[ ] conducting adequate staff rounds ... and promptly responding to medical or other emergencies."*** Id. Within a general admonishment to "ensure the timely assessment, identification and treatment of detainees' medical ... needs," the report outlined a need to "[p]rovide timely and appropriate treatment for detainees with serious medical ... conditions," and provided that "detainees with chronic diseases [should] receive screening, testing, treatment, and continuity of care," and that the jail should "[p]rovide medications ... in a timely manner." Id. at 174. Further, according to the DOJ, the jail should "[p]rovide medical and mental health staffing sufficient to meet detainees' serious medical and mental health needs ... includ[ing] staffing to provide timely ... medical care." Id. at 175.

*Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 864–65 (10th Cir. 2013) (emphasis added).

156.    Ultimately, the *Layton* Court held and found that "a reasonable jury could find that the County and [the Oklahoma County Sheriff] were on notice as to the problems with the jail's medical-care system, and that had they taken any number of possible remedial actions—many of which were explicitly identified by the DOJ and OSDH—Mr. Holdstock's condition would not have deteriorated and his death could have been avoided by timely medical intervention." *Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 872 (10th Cir. 2013).

157.    It is clear that systemic deficiencies identified by DOJ and the *Layton* Court – including understaffing and other conditions at the Jail that make it "difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees" – were never reasonably addressed by the County or the Jail Trust and persisted and continued through April of 2021.

158.    On June 4, 2016,  Bruno Elias Bermea was arrested by OCPD and taken to the Jail.

159.    Mr. Bermea reported to Jail staff and Jail medical staff, who, at the time, were employed by the Jail's previous medical provider, Armor Correctional Health Services ("Armor"), that he lacked kidney function and needed dialysis. Mr. Bermea's mother also called the Jail and informed Jail staff about Mr. Bermea's serious kidney problems.

160.    Mr. Bermea repeated his dire need for care in the days following his arrival at the Jail, but never received any treatment. He died at the Jail three days later.

161.    Mr. Bermea's estate filed suit, under § 1983, against, *inter alia*, BOCC and Armor, alleging that Armor and County policies/practices/customs were the moving force behind a violation of Mr. Bermea's Fourteenth Amendment right to adequate medical care.

162.    In denying Armor's and BOCC's motions to dismiss, this Court found that Mr. Bermea's estate had "sufficiently pled alleged a § 1983 against the Board." *See Hernandez v. Board of County Commissioners of Oklahoma County, et al.,* 2019 WL 3069430, at *6 (W.D. Okla. 2019).

163.    On February 2, 2021, another inmate at the Jail, Parker Stephens, who had a significant history of mental illness, suffered an apparent seizure according to his cellmate, Ismael Ruiz. The cellmate reported the seizure to Detention Officer William Cunningham.

164.    DO Cunningham took no action to ensure that Mr. Stephens was checked on or otherwise received any medical attention. And, despite having a report that an inmate in Cell C36 was likely having a seizure, ***Officer Hamilton never went to check on Mr. Stephens the night of February 2.***  He never called for a physician or nurse. He

did not dial "911". With deliberate indifference to Mr. Stephens' health and safety, Officer Hamilton did absolutely nothing.

165.    The following morning, February 3, 2021, Inmate Ruiz left cell C36 to go to court.

166.    In the early morning of February 3, around 5:00 a.m., an inmate trustee, "Ponce", went to cell C36 to provide breakfast trays. Inmate Ponce entered the cell and put a tray on the desk. Inmate Ponce yelled "Trays out!" It was at this time that Inmate Ponce noticed that Mr. Stephens' leg was hanging off the bunk in an odd position. Mr. Stephens was not moving or responding. Normally, Mr. Stephens was eager to get his tray in the morning. Inmate Ponce found it concerning that Stephens was not getting up or responding.

167.    Inmate Ponce immediately told Officer Hamilton, who was still on shift from the night before, that he should check on Mr. Stephens as something was not right. Even at this point, Officer Hamilton did not check on Mr. Stephens. Rather, Hamilton blithely stated "Oh, he's alright", and went on about his other duties on the Second Floor.

168.    At around 8:40 a.m. on February 3, Cpl. Francis entered C-pod (also known as "2 Charlie") on the Second Floor to begin "med pass". He started med pass from cell 24 to cell 1 in the bottom tier. He then went to the top tier of the pod and started med pass and recreation from cell 26-50. When he opened cell C36, Cpl. Francis called a couple of times for Mr. Stephens to come out for recreation. Cpl. Francis noted that Mr. Stephens was not breathing or moving. Cpl. Francis then called for a nurse and a gurney.

169.   LPN "Kali" entered the cell and felt for a pulse on Mr. Stephens' leg. There was no pulse. LPN Kali then attempted to get detect a pulse from his neck and wrist. There was no pulse. LPN Kali next told officers in the cell to secure the area as a crime scene.

170.   It was far too late to save Mr. Stephens. Shortly after cell C36 had been declared a crime scene, the Medical Examiner arrived and advised that Mr. Stephens was in "rigor" and had been dead "for hours".

171.   Since 2008, the Department of Justice has been identifying deficiencies at the OCDC including: a. overcrowding; b. physical layout of the facility prohibiting adequate sight and sound supervision; c. an inordinately high risk of violence due to inability to properly supervise; and d. inadequate staffing numbers.

172.   In 2012, the DOJ cited that the OCDC was still short-staffed and compromising inmate health and safety.

173.   From at least 2008 to present, BOCC has failed to provide sufficient oversight and funding of the Jail. Due to the documented dangers at the Jail, including DOJ's finding of inadequate supervision and staffing and a high rate of inmate deaths, in 2009, BOCC entered into a Memorandum of Understanding with the federal government. Under this Memorandum of Understanding, Oklahoma County was to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance.

174.   As of April 2021, Oklahoma County had plainly not complied with the requirements of Memorandum of Understanding with the Department of Justice.

175.   In May 2021, the National Institute of Corrections provided a report to the BOCC and Jail Trust finding: a. an incomplete staffing plan; b. that new hires receive

limited training; c. "[c]lear and convincing present level of staffing was insufficient for a safe and secure jail"; d. it was "[i]mpossible to effectively manage inmate population when they are so short-staffed;" e. that officers were coming to work without proper training; and f. a lack of policies and procedures posted.

176.    Numerous news and internet articles also made Defendants BOCC and Jail Trust aware well prior to April 2021 of the unreasonable conditions at the Jail. For example, Business Insider reported that "Over the past 15 years, the 13-story jail, in Oklahoma City has had many alleged problems, from unsanitary conditions to negligent care of inmates, poor medical care, and outright abuse of inmates. A clerical worker at the Jail posted a YouTube video claiming inmates had been beaten right in front of her." (BUSINESS INSIDER, The stories coming out of this Oklahoma jail are horrifying, February 25, 2015).

177.    The County/BOCC/Jail Trust have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies, including severe deficiencies in its medical delivery system, that have plagued the Jail for well over 10 years. Its failure to do so has resulted in injury to multiple detainees, including Ms. Sullivan. Its failure to take reasonable measures to alleviate known and substantial risks to inmates like Ms. Sullivan constitutes deliberate indifference at the municipal level.

## **CAUSES OF ACTION**

### **VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)**

178.    Paragraphs 1-177 are incorporated herein by reference.

## A.    Individual Liability and Underlying Violation of Constitutional Rights

- **Failure to Provide Adequate Medical Care**

179.    Ms. Sullivan had obvious, severe, and emergent medical and mental health needs made known to BOCC/Jail Trust and Turn Key, including Defendants Cuka, Winchester, Meyer, and Williams, prior to her death.

180.    Nonetheless, BOCC/Jail Trust and Turn Key, including Dr. Cuka, Dr. Winchester, Ms. Meyer, and ARNP Williams, disregarded the known and obvious risks to Ms. Sullivan's health and safety.

181.    In deliberate indifference to her serious medical needs, health, and safety, Defendants failed to provide Ms. Sullivan with, *inter alia*, timely or adequate medical or mental health treatment; proper monitoring and supervision; or reasonable access to outside medical providers who were qualified and capable of evaluating and treating her while she was placed under their care.

182.    As a direct proximate result of Dr. Cuka, Dr. Winchester, Ms. Meyer, and ARNP Williams' unlawful conduct, Ms. Sullivan suffered actual and severe physical injuries, physical pain and suffering, and emotional and mental distress and death.

## B. Municipal Liability

183.    Paragraphs 1-182 are incorporated herein by reference.

184.    The unconstitutional aforementioned acts or omissions of Dr. Cuka, Dr. Winchester, Ms. Meyer, and ARNP Williams are causally connected with customs,

practices, and/or policies which Oklahoma County/OCCJA/BOCC and Turn Key promulgated, created, implemented and/or possessed responsibility for.

185.    To the extent that no single individual violated Ms. Sullivan's constitutional rights, Oklahoma County/OCCJA and Turn Key are still liable under a theory of a systemic failure of Oklahoma County/OCCJA/Turn Key policies, procedures, and customs as described herein. There were such gross deficiencies in training, supervision, facilities, practices, and procedures that Ms. Sullivan was effectively denied constitutional medical and mental health care.

186.    Those customs, practices, and/or policies are outlined in Paragraphs 122-177, *supra.*

187.    Oklahoma County/OCCJA/BOCC and Turn Key knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Ms. Sullivan were at substantial risk of harm.  Nevertheless, Oklahoma County/OCCJA/BOCC and Turn Key failed to take reasonable measures to alleviate the risk of harm.

188.    Oklahoma County/OCCJA/BOCC and Turn Key, through their failure to take reasonable remedial measures has been deliberately indifferent to citizens', including Ms. Sullivan's, health and safety.

189.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ms. Sullivan suffered injuries and damages as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant her the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for Dr. Cuka, Dr. Winchester, Ms. Meyer, and ARNP Williams' reckless disregard of Ms. Sullivan's federally protected rights, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiff***

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of May 2023, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel who have entered an appearance in this action.

/s/Daniel E. Smolen