IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

ANGELA LEDDY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF CHRISTA SULLIVAN,

Plaintiff,

vs. No. CIV-23-0295-HE

TURN KEY HEALTH CLINICS, LLC, et al.,

Defendants.

VIDEOTAPED DEPOSITION OF GABRIEL CUKA, M.D.
TAKEN ON BEHALF OF THE PLAINTIFF
ON FEBRUARY 11, 2025, BEGINNING AT 10:18 A.M.
IN OKLAHOMA CITY, OKLAHOMA

APPEARANCES

On behalf of the PLAINTIFF:

Bryon D. Helm
SMOLEN & ROYTMAN
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667
bryonhelm@ssrok.com

On behalf of the DEFENDANTS:

Anthony C. Winter
Ryan S. Riddle
JOHNSON, HANAN, VOSLER, HAWTHORNE & SNIDER
9801 N. Broadway Extension
Oklahoma City, Oklahoma 73114
(405) 232-6100
awinter@johnsonhanan.com
rriddle@johnsonhanan.com

EXHIBIT
6

VIDEOTAPED BY: Jeremy Lamberton

REPORTED BY: Jane McConnell, CSR RPR RMR CRR

**safety."**

A Right.

**Q Is that meant to say that if someone is on Benadryl, they need to be single celled --**

MR. WINTER: Form.

**Q (BY MR. HELM) -- because they're sedated?**

A For safety, correct. Theoretically, if you're on SP1, you're supposed to be single celled already, but it wasn't always happening that way.

**Q Well, it say she's on mental health observation status. Could she have a cellmate there?**

A Yes, one or more.

**Q But if she was on mental health observation but was going to be needing Benadryl injections, would you then say she needed to be single celled --**

A Yes.

**Q -- in mental health?**

A Yes.

**Q Here you're noting that since she's been booked in, she's been SP1 or SP2; correct?**

A Pretty much the whole time. She went down to mental health observation once, maybe twice.

**Q And then you note, "This will continue for**

A A couple days.

**Q -- a couple pages.**

MR. WINTER: Bryon, just to speed this along a little bit, I think 1603 might be the page you're referencing.

A 1603.

**Q (BY MR. WINTER) Yes, sir. It's the vital signs.**

**If we go to 1612 first, we see her weight on April 27 of 2020 it was 142 pounds; correct?**

A Uh-huh. Yes, I see that.

**Q And then if we go to Page 1603, we see her weight is indicated as 125 pounds; correct?**

A Where is that? Yes. I see it now. That is a significant weight gain (sic). So I understand entirely why Dr. King was concerned. He had a right to be concerned.

**Q Do you understand that the 16-pound weight loss in a one-month period is indicative of malnutrition?**

MR. WINTER: Form.

A It's -- I don't know. It is probably she wasn't eating enough. She had Boost prescribed, but did she take it? I don't know.

**Q (BY MR. WINTER) When did the Boost get**

**prescribed?**

A I would have to -- it was right from the beginning, I think, pretty much.

**Q Does Ms. Sullivan request being switched from Haldol to Zyprexa?**

MR. WINTER: Form.

A As for an as-needed STAT type medication? If she did, I probably documented it.

**Q (BY MR. WINTER) Let's go to Page 137.**

A Okay.

**Q You state that June 22 in the morning she shows you her bandaged inner wrist; correct?**

A Yes.

**Q You write that you "encouraged her to ask for extra medication when she's starting to feel like she wants to hurt herself." Correct?**

A Correct.

**Q We know that she has asked for Haldol a couple times in the last 10 days, between 6-12 and 6-22; correct?**

A Correct.

**Q Is that -- is Haldol something that you would anticipate taking time to work?**

A When you give it for these acute cases, it works pretty fast, and five milligrams seemed to be

something that used air, but it had tubes and then she ultimately tried -- was wrapping those tubes around her neck.

**Q It says, "Dr. Ostermeyer and myself are urgently requesting a third-party transfer to a mental health facility."**

**Did you support the decision to transfer Ms. Sullivan to a mental health facility?**

MR. WINTER: Form.

A Yes.

**Q (BY MR. HELM) And why did you believe that Ms. Sullivan needed to be transferred to a mental health facility in June of 2020?**

A It is my contention that if she got to a therapeutic environment she would improve. The incarceration, in my opinion, is what led to the decline in her mental status and increasing her depression or the frank onset of depression, and then that led to her deterioration of her physical condition. So, yes, I was all for it.

**Q We know Ms. Sullivan had been prescribed psychiatric medicine before she came into the jail; correct?**

A Yes.

**Q We know that this was the first time that**

A Uh-huh.

**Q And did you, in fact, write a strong letter requesting the court to move Ms. Sullivan into a hospital?**

A Yes. I feel I did. I wrote a letter.

(Exhibit 56 marked for identification.)

**Q (BY MR. HELM) I'll hand you Exhibit 56. This is TK 145 through 148. Do you recall there being disagreements between security staff and Turn Key medical staff regarding how to house Ms. Sullivan?**

A Well, modifying the suicide precaution Level 1 to allow a mattress was kind of an issue. It's understandable. That's the way -- they want to have one way of doing things and they're right. It is safer. However, her medical needs became dominant.

**Q Do you recall Sergeant Hardin requesting modification be made to suicide precautions to allow a mattress and you responding that she would just try to hurt herself with it?**

A No.

**Q Around October of 2020 is there a discussion of getting Ms. Sullivan to Griffin Memorial?**

**stand by and watch people deteriorate?**

MR. WINTER: Form.

**Q (BY MR. HELM) While folks were wanting to have meetings or court delays?**

MR. WINTER: Same.

A No.

**Q (BY MR. HELM) Did you feel as though the inability to get Ms. Sullivan transferred out of the facility was causing you to have to stand by and watch her deteriorate?**

A We did our job. I just wanted to keep her safe for one. That's why we ended up having her on chronic suicide precaution Level 1. We changed her meds around a little bit. That's what we could do, and then we wrote these letters.

It was frustrating having to watch her deteriorate and the slow progress or lack of progress, but I had no idea what was going on with her case. I don't know. I was surprised when she went to court. I didn't know when those days were. I didn't know for anybody.

**Q You don't dispute she was deteriorating; correct?**

A That is correct.

**Q And you don't dispute that you felt if she**

**got into a therapeutic environment that she could -- that the deterioration could stop?**

A That was my intention. I anticipated that if we could get her to a therapeutic environment, they could probably even just continue the same meds we were doing and she would be better.

**Q Dr. King states, "It has been very ineffective at this jail for years."**

**Do you agree with that statement?**

MR. WINTER: Form.

A I don't know what he's talking about.

**Q (BY MR. HELM) Now, we saw at the top of this thread where general counsel for the county was writing general counsel for Turn Key and one of the executives saying, "I would caution everyone about using email as a form of communicating regarding sensitive topics." Correct?**

A I see it, yes.

**Q Had you ever been told that by Oklahoma County?**

A I don't recall.

**Q Had you ever been told that by Turn Key?**

A I think there was something that was sent around, a general communication, "Hey, try to be respectful in emails," something to that effect.

remain naked in her cell and is laying down almost all day and night to the extent that she has developed severe pressure ulcers that have become infected, placing her at high risk of systemic infection (sepsis) and death." Correct?

A Yes.

Q Is that all true?

A Yeah.

Q It says, "Ms. Sullivan requires imminent transfer to an inpatient psychiatry unit for stabilization."

Did I read that correctly?

A Yes.

Q And did you believe that when you wrote it?

A It was my contention it was probably the only thing that was really going to help her at that point.

Q "Without such transfer, she is at very high risk of further demise and death."

Is that a true statement?

A Right.

Q By October of 2020, did you believe that if Ms. Sullivan was not imminently transferred to an inpatient psychiatry unit for stabilization, that