IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

ANGELA LEDDY, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF CHRISTA SULLIVAN,

Plaintiff,

vs. No. CIV-23-0295-HE

TURN KEY HEALTH CLINICS, LLC,
et al.,

Defendants.

VIDEOTAPED DEPOSITION OF MARK WINCHESTER, M.D.

TAKEN ON BEHALF OF THE PLAINTIFF

ON APRIL 18, 2025, BEGINNING AT 10:37 A.M.

IN OKLAHOMA CITY, OKLAHOMA

EXHIBIT
19

REPORTED BY: Karen Dauphin Albert, CSR, RPR

**her back; right? She was at the hospital for a week and a half; right?**

MR. WINTER: Form.

THE WITNESS: Four days.

**Q (By Mr. Helm) 3/2 to 3/11?**

MR. WINTER: Form.

THE WITNESS: With both admissions, yes.

**Q (By Mr. Helm) I mean, that's not an, "Oh, there's nothing wrong with her. Send her back to the jail."**

**Right?**

MR. WINTER: Form.

THE WITNESS: That's correct. I would certainly not argue that --

**Q (By Mr. Helm) And she was admitted into the hospital --**

A I certainly would not argue that there was nothing wrong with her. There was. This lady needed her depression addressed in a way that would make a difference.

They didn't address that. They hydrated her and made a note that she had muscle damage, because they were talking about rhabdo, because she was laying on a floor that was cold and hard and had muscle damage from pressure, and that's significant.

But you watch her and hydrate her and put her in a different frame and then you wait a few days and then send her back to us. That's, at best, a temporary solution.

And I was talking about -- I was crusading for her, trying to get her out of there and speeding up her going to Vinita or some other long-term care psychological, psychiatry facility.

She needed that in addition to the physical medicine to make a difference in her outcome. That's -- and I was doing everything but screaming it.

We were talking to Cuka. We were talking to Cooper. I was talking to anybody that would listen, that I was very concerned about this lady.

And so emergency rooms don't do very good with chronic condition patients, and St. Anthony's had a tendency that if I didn't give them a real reason why she was there, that would get their attention some, they would just send her back and give her some tests and some IV fluids and send her back.

I could give you -- I mean, she didn't -- they didn't on these two admissions before, but she was there three days for rhabdo -- and rhabdo is a

big deal -- and she was there for a laceration on her scalp because she was falling.

But they didn't address that she was falling over and over and over. They just Band-aided her and sent her back.

So I'm not sure what I could have accomplished for her by sending her -- they weren't going to put her in their psychiatric hospital. They had had plenty of opportunities, but they didn't do that.

**Q (By Mr. Helm) Did you refer her for that?**

A You know, I personally didn't. I don't know that either Cuka or King didn't.

**Q And as far as getting, you know, hydration while at the hospital, you would admit that's better than not getting hydration; correct?**

A That's true.

**Q If she's not drinking or eating at the jail, that's a better setting; correct?**

MR. WINTER: Form.

THE WITNESS: She was drinking fluids.

**Q (By Mr. Helm) She was?**

A (Nods head)

**Q How often?**

A I would have to look. Do you want me

**Q Okay.**
A I don't know that it wasn't done in the year before I was there.
**Q And so around March 18th, it appears from the note you're kind of throwing your hands up as far as what can be done at the jail?**
A I was trying to express how strong my concern was. If the wording wasn't perfect, what I wanted to express was that this woman was not doing well, and I didn't see that there was an intervention that we could do that would solve the problem to the point where it would change her outcome.
**Q And so you and Dr. Cuka, the psychiatrist, go and have a meeting in your cell about this. And what do you decide to do?**
A I don't know. We had Dr. Cooper in on that, also. So I don't remember the conversation content exactly, but it was in the same theme.
I was reassured -- I was told that she was on the list to go to Vinita; and that they weren't taking her because they didn't have a bed or they didn't have room; and discussing if there was any way that we could speed up the process, and I don't remember getting an answer that was encouraging.

accurate.

**Q I mean, upon receiving a 103.8, what would you expect the medical staff to do?**

MR. WINTER: Form.

THE WITNESS: Report that to me but probably check it a second time in a different location first so that I wouldn't jump up and down and think they were septic.

It would be alarming. That's probably a better way to say that.

**Q (By Mr. Helm) Under "Assessment," Nurse Eastman writes, "Had Dr. Winchester see patient. New orders for antibiotics."**

A Yes.

**Q "UA in possible."**

**Do you know what that means?**

A I don't know what the "in possible" means. It looks kind of like a typo because it doesn't exactly fit together.

So she was anticipating that I was going to order antibiotics based on a UA, and I would think that that should have been "if possible." Sometimes it's not easy to get a UA.

**Q Okay. And it says, "Encourage extra fluids. Give extra Boost for calories. Patient's**

**skin breaking down more. Talked with Deborah, SHA."**

**What does "SHA" mean?**

A It's actually supposed to be HSA.

**Q Health services administrator?**

A Yeah. So I think Sinead is British.

**Q They're going to get an air mattress for the patient. It says, "Helped patient up to bathroom, and she was unable to void. Ordered a straight cath patient. Unable to get in and cath."**

A Yeah. So, again, I think there is a word left out. It should be "unable to get in and out cath," in and out. It would be a quick cath or an in-and-out cath, but not putting in a Foley catheter that would remain there after we obtain the UA.

**Q Okay.**

A I'm guessing, but I think that's what that means.

**Q "Straight cath," does that mean --**

A It means --

**Q What does the "straight" refer to?**

A It means it doesn't have a balloon on the end of it. So it keeps the catheter positioned with the tip in your bladder so that it continues to drain.

Generally, a catheter like that will drain

into a Foley bag, where a straight cath is meant for putting in once, draining the bladder of urine, and then taking back out.

**Q Do you know what happened with this catheter on 4/13?**

MR. WINTER: Form.

THE WITNESS: All I recall is they came back and told me that they couldn't get the -- they couldn't get her cathed.

**Q (By Mr. Helm) So if we add "out," to make it say "unable to get in and out cath," do you know whether that means like they were unable to get the physical catheter they needed versus just we were unable to get it to successfully straight cath?**

A Usually "unable" should mean we tried and we weren't able.

**Q It then says, "Helped back to bed and let rest."**

**Is that Rocephin?**

A Rocephin.

**Q R-O-C-E-P-H-I-N.**

**"One gram intramuscular given in" --**

A That would be probably gluteal.

Where is it?

**Q The left, maybe, gluteus maximus?**

A Gluteus maximus, yeah.
**Q And started on Bactrim DS?**
A Yes.
**Q Okay. What is Rocephin?**
A Rocephin is an injectable antibiotic. Usually we give one to two doses, either 500 or one gram, which is twice that.
And it covers for a number of infections that, early on, are hard to see or detect on an exam. And so empiric medicine says that you can take a safe decision and treat because there isn't any testing that would give you an answer right then. So you make a judgment call.
Rocephin treats pyonephritis, which is a kidney infection that would be hard to find on an exam.
An early pneumonia would come across with a low-grade fever and generalized weakness, mentation changes, maybe some breathing difficulties, but early on, the symptoms wouldn't be necessarily pronounced enough to go, "Aha, yes, it's that."
When you've got Ms. Sullivan, she's not very mobile. So her having sticky, abnormal sounds in her lungs from immobility would be common, and so

it would be difficult on an exam to tell the difference between a pneumonia infiltrate in her lung and just the consequences of lying down too much and being immobile.

Your bladder infections in elderly patients often first manifest with mentation changes. They get confused or lethargic. So it's a subtle change, but if you think that it might be -- and she had had urinary tract infections before, it's the acceptable thing to do, to treat with a single dose of Rocephin and then start sulfa drug, the Bactrim.

**Q Did you think it was possible she had pneumonia?**

A You know, at this point, I didn't see on the exam or feel on the exam a pneumonia, but from experience, I know that it was possible.

**Q Was there any concern that Ms. Sullivan had sepsis?**

A At this point, no. I mean, again, it could develop into anything. She's got wounds. She's not mobile. There is a lot of things that it could be. But going on what I saw on the exam and the history and the physical findings and the bigger picture, I didn't see a way to call it sepsis at

that point.

**Q Did you hear anyone questioning whether it might be sepsis?**

A No, I didn't hear that.

**Q I asked because when jail staff ultimately responds to the kind of medical emergency where she is unresponsive, they report that they heard she was septic, and I didn't know if you knew where that may have come from.**

MR. WINTER: Form.

THE WITNESS: I don't. That would have been a different shift of nurses than what I was working with at the time that I saw her.

**Q (By Mr. Helm) When you go down to see Ms. Sullivan on the 13th and she's saying that her left leg hurts and she can't get up, did you do anything to assess her left leg?**

A Yeah. I looked at her leg to see if I saw anything that would be suspicious for cellulitis, which was an infection of her like subcutaneous tissue; a DVT, which is a bloods clot. And, again, I saw that she had varicose veins that were kind of distended, but I didn't see the cording that you see with a clot in a vein. You can kind of feel it, like it's underneath there. So I didn't feel

cording. That's what that's called.

So, yeah. And I always tease that God gave two people two legs so that I would have something to compare to. And so unilateral swelling and pain is different than bilateral, as far as the differential diagnosis. But I didn't see anything that was strongly indicative of any of those things.

And she had had, as we've talked about, had multiple falls, and she had complaints of leg pain that went back for weeks. And so I didn't take it as a necessarily new thing, just that she had fallen a few days before, and she did have bruises and scrapes essentially all overhear body. So it was just as likely that it was pain from an injury.

**Q I'm sorry. I wrote the wrong page number down here.**

**Okay. If you will go to page 758 for me.**

A Okay.

**Q And this is a -- the bottom half of the page is a provider note that you entered on April 14th at around 9:00 a.m. or -- well, I'm going to have you explain this note to me.**

**So about halfway through, 4/14/2021, 9:08 a.m., we see you began a provider note. It says, "Allergies Coding."**

**"This is also appropriate initial treatment for pneumonia and other possible infection sources."**

**Correct?**

A (Nods head)

MR. WINTER: Is that a "yes," Doc?

THE WITNESS: Yes. I'm sorry. It is. I'm nodding my head.

**Q (By Mr. Helm) "Lethargy" says, "Will hold Ativan for now as it could add to fall risk."**

**Correct?**

A That's correct.

**Q So you are going to order that she does not receive Ativan?**

A I would have asked that they hold the Ativan for then.

**Q The order to hold the Ativan, was that ever entered into medical record before Ms. Sullivan's death?**

MR. WINTER: Form.

THE WITNESS: I would have -- I would have given the order as a verbal order while we were in her room. So in short, when the nurse that I talked to would have written the order as a verbal order, I'm not sure.

So, in short, I don't know that the order

disorder have any impact in the care and treatment you provided to Ms. Sullivan from February 2021 until her death in April of 2021?
A No.
Q Okay. Doctor, I'm going to hand you what has already been marked as Plaintiff's Exhibit 59. I think you've got it in front of you, or if not, I'll hand you my copy.
Do you remember reviewing this? It's the email from Dr. Cuka.
A Yes.
Q All right. And in there, Dr. Cuka communicates that it's his professional recommendation that Ms. Sullivan be transported to an inpatient psychiatric facility; true?
A True.
Q Was that consistent with your belief as to what type of treatment Ms. Sullivan needed to be successful or to have any sort of recovery?
MR. HELM: Object to the form.
THE WITNESS: I certainly lobbied, believed, and wrote and communicated with everybody that I could that she needed that.
Q (By Mr. Winter) And so it's your -- just so we're clear, Doc, your professional

recommendation for Ms. Sullivan's treatment would have been, "This patient needs to be transported to an inpatient psychiatric facility."

Right?

A Yes.

Q And it was your understanding that Turn Key medical providers who shared the same opinion made efforts to make that happen; true?

MR. HELM: Object to the form.

THE WITNESS: Yes.

(Defendant's Exhibit 1 marked for identification)

Q (By Mr. Winter) Okay. I'm going to hand you what has been marked as Defendant's Exhibit 1. And, Doc, I will represent to you -- actually, let me just ask it up there.

Do you see at the top right-hand corner the admission date that's listed?

A Is it the 3/7/21?

MR. WINTER: (Indicating)

Q (By Mr. Winter) Correct. Do you see up at the top left where this record came from?

A St. Anthony's.

Q And so if you can think back to earlier today when we were talking about the two times Ms.

**Did I read that correctly?**

A You did.

**Q So if we are to accept what Mr. Shavor says on its face that's true that St. Anthony can't place a patient in a psych unit if they're an inmate, would sending her to the hospital, Ms. Sullivan to the hospital, have done any good in getting her the treatment you believe she needed?**

MR. HELM: Object to the form.

THE WITNESS: In my opinion, no.

**Q (By Mr. Winter) And, in fact, you could have sent her daily to the hospital, and if St. Anthony or OU or any of the facilities in Oklahoma could not have taken her for inpatient psychiatric care, would that have done any good?**

MR. HELM: Object to the form.

THE WITNESS: No, not -- it would be no good for Ms. Sullivan, and it might annoy people at St. Anthony's.

**Q (By Mr. Winter) Doctor, can a Turn Key medical provider unilaterally release a patient for inpatient psychiatric care?**

MR. HELM: Object to the form.

THE WITNESS: No.

**Q (By Mr. Winter) Okay. Doc, I would like**

for the inmates up there, and truly, I was -- of all of the different aspects of Turn Key, I was impressed with that one.

**Q (By Mr. Winter) Doctor, just so it's clear on the record, is it your testimony that you entered Mrs. Sullivan's cell on April 13th to perform your assessment and evaluation?**

A Yes.

**Q Okay. And the documentation you made regarding your findings and your plan, even though they were dated April 14th, is it fair for me to assume that that was your plan and your assessment from the day before, April 13th?**

MR. HELM: Object to the form.

THE WITNESS: Yes. Yes. As closely as I could write it down with all accuracy.

**Q (By Mr. Winter) Doctor, it was your understanding, as the medical director at the Oklahoma County Jail, during this period of time that we've been talking about in 2021, that Ms. Sullivan had been accepted to Vinita; correct?**

MR. HELM: Object to the form.

THE WITNESS: That's what I was told on several occasions, yes.

**Q (By Mr. Winter) What is your understanding**

**as to why she was not transported to Vinita during that time period while you were the medical director?**

A They had no room, no beds. So they were waiting. But we were not ever really given a time frame that we could expect her to be moved to Vinita. It was pretty vague.

MR. WINTER: I will pass the witness.

REDIRECT EXAMINATION

BY MR. HELM:

**Q Who do you recall telling you that they believed Ms. Sullivan had been accepted to Vinita but that was waiting for a bed?**

A I think that was Cuka. I mean, that's -- I'm not sure that anybody else would know with any certainty. Cuka would.

**Q You, Dr. Cuka, other medical staff, you weren't acting under kind of a presumption or belief that Ms. Sullivan was going to be transferred in the next week or so; correct?**

A No. I don't know if they would give us that information, but, no. I was never told a time frame that I could expect her to be transferred to Vinita; only that she had been accepted and that we were waiting on a bed.