IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

ANGELA LEDDY, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF CHRISTA SULLIVAN,

Plaintiff,
vs. No. CIV-23-0295-HE

TURN KEY HEALTH CLINICS, LLC,
et al.,

Defendants.

VIDEOTAPED DEPOSITION OF GABRIEL CUKA, M.D.
TAKEN ON BEHALF OF THE PLAINTIFF
ON FEBRUARY 11, 2025, BEGINNING AT 10:18 A.M.
IN OKLAHOMA CITY, OKLAHOMA

APPEARANCES

On behalf of the PLAINTIFF:

Bryon D. Helm
SMOLEN & ROYTMAN
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667
bryonhelm@ssrok.com

On behalf of the DEFENDANTS:

Anthony C. Winter
Ryan S. Riddle
JOHNSON, HANAN, VOSLER, HAWTHORNE & SNIDER
9801 N. Broadway Extension
Oklahoma City, Oklahoma 73114
(405) 232-6100
awinter@johnsonhanan.com
rriddle@johnsonhanan.com

VIDEOTAPED BY: Jeremy Lamberton

REPORTED BY: Jane McConnell, CSR RPR RMR CRR

EXHIBIT
3

A Uh-huh.

**Q And you were working for Turn Key from July 2018 through April of 2022?**

A That sounds about right.

**Q Were you working for Turn Key at any other facility other than the Oklahoma County Detention Center?**

A No.

**Q At the Oklahoma County Detention Center, during the time that you were there, was there any other psychiatrist assigned to the Oklahoma County Detention Center?**

A No, no board certified psychiatrist. I think you're asking -- I did have some help. There was initially a resident was assigned to be there, but that eventually changed to having a nurse practitioner.

**Q So when you began in 2018, is that when you had a resident?**

A Correct.

**Q And when did that change to a nurse practitioner?**

A I don't recall exactly. I'm going to say about a year, a year into it.

**Q Approximately mid 2019?**

A Yeah.

**Q So during the time period of April 2020 through April of 2021, you had a nurse practitioner that was working under you?**

A Right.

**Q And who was that?**

A That's Stephanie Williams.

**Q And were you Stephanie Williams' supervisor?**

A Yes, more or less.

**Q Was there anyone else that could be considered Stephanie Williams' supervisor?**

MR. WINTER: Form.

A I can't answer that. I don't know.

**Q (BY MR. HELM) Are you aware of anyone else that she was reporting to?**

A No.

**Q You had just said you were more or less her supervisor.**

A Yeah.

**Q If you were not providing supervision, was there anyone else that was in that role over her?**

A If the medical director had asked her to do something, that would be entirely within his

**Services?**
A Board certified psychiatrist.
**Q And who were your patients?**
A Direct patient care of the psychiatric patients.
**Q During the few years that you were working as a psychiatrist for Hope Community Services, did you ever diagnose any patients as catatonic?**
A At Hope, no.
**Q Do you recall at Griffin Memorial Hospital ever diagnosing a patient as catatonic?**
A Maybe once or twice.
**Q Do you remember any details about those?**
A No.
**Q Are you aware of any patient complaints made against you at Hope Community Services?**
MR. WINTER: Form.
A I can't answer that.
**Q (BY MR. HELM) Why is that?**
MR. WINTER: You still have to answer. I can object. I'm not telling you not to answer unless I tell you directly not to answer. If you can answer Mr. Helm's question, you should.
A I apologize, Mr. Helm. Can you repeat that question.

July 1, 2003.

**Q What did you do as part of your residency at Griffin Memorial Hospital?**

A In-patient psychiatry, outpatient psychiatry, just all the rotations that psychiatrists do in training.

**Q Were you successful in that program?**

A Yes.

**Q Were there any rotations that you didn't do well in?**

MR. WINTER: Form.

A Not that I'm aware of.

**Q (BY MR. HELM) And when did you complete that program?**

A 2006.

**Q Between 2006 and when you began around 2010 or '11 at Griffin Memorial as the clinical director, where were you practicing?**

A I transitioned -- after my graduation I transitioned on to the staff there and started working as a staff psychiatrist.

**Q Were you a staff psychiatrist from 2006 to 20 --**

A '11, yeah.

**Q -- '11? And then clinical director from**

**under oath?**

A Yes, sir.

**Q Are you ready to proceed?**

A Yes, sir.

**Q During the break did you think of anything that you want to add or change from your previous testimony?**

A No.

**Q As a psychiatrist at the Oklahoma County Jail, do you see all patients or all inmates?**

A No.

**Q What has to happen for you to see an inmate for the first time?**

MR. WINTER: Form.

A Typically two different scenarios. Number one, the patient will come in. They have a list of psychiatric medications, and those will be sent to us as a task in the electronic medical record, and we'd go ahead and start those medications or the ones that we could. Sometimes we had to make substitutions. And then we'd go see them in a week, put them on the schedule for next week.

The other way is sometimes in the jail people came in not on medications, but at some point it became clear they had kind of a problem, and the

**safety."**

A Right.

**Q Is that meant to say that if someone is on Benadryl, they need to be single celled --**

MR. WINTER: Form.

**Q (BY MR. HELM) -- because they're sedated?**

A For safety, correct. Theoretically, if you're on SP1, you're supposed to be single celled already, but it wasn't always happening that way.

**Q Well, it say she's on mental health observation status. Could she have a cellmate there?**

A Yes, one or more.

**Q But if she was on mental health observation but was going to be needing Benadryl injections, would you then say she needed to be single celled --**

A Yes.

**Q -- in mental health?**

A Yes.

**Q Here you're noting that since she's been booked in, she's been SP1 or SP2; correct?**

A Pretty much the whole time. She went down to mental health observation once, maybe twice.

**Q And then you note, "This will continue for**

A A couple days.
**Q -- a couple pages.**
MR. WINTER: Bryon, just to speed this along a little bit, I think 1603 might be the page you're referencing.
A 1603.
**Q (BY MR. WINTER) Yes, sir. It's the vital signs.**
**If we go to 1612 first, we see her weight on April 27 of 2020 it was 142 pounds; correct?**
A Uh-huh. Yes, I see that.
**Q And then if we go to Page 1603, we see her weight is indicated as 125 pounds; correct?**
A Where is that? Yes. I see it now. That is a significant weight gain (sic). So I understand entirely why Dr. King was concerned. He had a right to be concerned.
**Q Do you understand that the 16-pound weight loss in a one-month period is indicative of malnutrition?**
MR. WINTER: Form.
A It's -- I don't know. It is probably she wasn't eating enough. She had Boost prescribed, but did she take it? I don't know.
**Q (BY MR. WINTER) When did the Boost get**

**prescribed?**

A I would have to -- it was right from the beginning, I think, pretty much.

**Q Does Ms. Sullivan request being switched from Haldol to Zyprexa?**

MR. WINTER: Form.

A As for an as-needed STAT type medication? If she did, I probably documented it.

**Q (BY MR. WINTER) Let's go to Page 137.**

A Okay.

**Q You state that June 22 in the morning she shows you her bandaged inner wrist; correct?**

A Yes.

**Q You write that you "encouraged her to ask for extra medication when she's starting to feel like she wants to hurt herself." Correct?**

A Correct.

**Q We know that she has asked for Haldol a couple times in the last 10 days, between 6-12 and 6-22; correct?**

A Correct.

**Q Is that -- is Haldol something that you would anticipate taking time to work?**

A When you give it for these acute cases, it works pretty fast, and five milligrams seemed to be

**cardiovascular and chronic care - gastrointestinal and SP1." Correct?**

A Right. I see it. Yes.

**Q Under the "Summary" he reports that, "Her known chronic medical problems include mitral valve prolapse, fatty liver and severe psychosis and major depression." Correct?**

A I see it. Yes.

**Q Would you agree that by June 25 of 2020, based on your observations of and experiences with Ms. Sullivan, that she was in severe psychosis?**

MR. WINTER: Form.

A I wouldn't call this psychosis. This is more -- this is more what I call -- I'll call it depression.

**Q (BY MR. HELM) What's the difference between psychosis and catatonia?**

A Catatonia can be a feature or a symptom of a psychotic disorder.

**Q And you think that her hallucinating a man in her toilet is more indicative of severe depression than psychosis?**

A No. That would be more of a -- along the lines of her psychotic disorder. She was carrying a diagnosis of schizophrenia. Probably what would

**her mental state and incarceration. Given her age and severe mental illness, she is at very high risk for sudden death."**

**Did I read that correctly?**

A Yes. That's bolded.

**Q And do you agree with that statement?**

A Yes.

**Q It says, "Dr. Ostermeyer and myself have requested one-to-one security staffing as she needs a modified SP status." Correct?**

A Yes.

**Q It says, "This could include a hospital bed, floating air mattress, etc." Correct?**

A Yes.

**Q Was Ms. Sullivan ever provided with a hospital bed?**

A Yes. I read in the notes, there was a modified SP1 to include the mattress, the mat. Let me tell you, it's not a mattress. It's like one of these -- something you use on a camping trip, that you can roll up into a cylinder.

**Q Right.**

A It's not much. It wouldn't be much help for anybody. They did get ahold of a floating mattress, as he calls it here, or some sort of

something that used air, but it had tubes and then she ultimately tried -- was wrapping those tubes around her neck.

**Q It says, "Dr. Ostermeyer and myself are urgently requesting a third-party transfer to a mental health facility."**

**Did you support the decision to transfer Ms. Sullivan to a mental health facility?**

MR. WINTER: Form.

A Yes.

**Q (BY MR. HELM) And why did you believe that Ms. Sullivan needed to be transferred to a mental health facility in June of 2020?**

A It is my contention that if she got to a therapeutic environment she would improve. The incarceration, in my opinion, is what led to the decline in her mental status and increasing her depression or the frank onset of depression, and then that led to her deterioration of her physical condition. So, yes, I was all for it.

**Q We know Ms. Sullivan had been prescribed psychiatric medicine before she came into the jail; correct?**

A Yes.

**Q We know that this was the first time that**

**she had been arrested and brought to the jail; correct?**

MR. WINTER: Form.

A To my knowledge, yes.

**Q (BY MR. HELM) I mean, it would seem to indicate that she was not completely treatment resistant; would you agree?**

A I don't know how to answer that. Inside the jail she was treatment resistant. Outside the jail she -- I would go out on a limb and say she was stabilized, although she was stabilized and still did her crime. So I wonder how stable she was.

**Q Was Ms. Sullivan ever convicted of a crime?**

A No, not to my knowledge.

**Q She was charged with a crime; correct?**

A Yes.

**Q But the conditions of her confinement you felt related to her -- or to the treatments not working?**

A I don't think they could work. We were battling the jail. I can't give enough medicine for a bad job or a bad marriage or bad living conditions.

**Q How much are you and Dr. King discussing**

on my radar really.

**Q I mean, you were watching Ms. Sullivan decline physically and mentally in segregation; correct?**

A Yes.

**Q And indicated that you felt treatment could not work because of that condition; correct?**

MR. WINTER: Form.

A I don't attribute it to the segregation. I tended it to being in the jail in that non-therapeutic environment, anti-therapeutic.

**Q (BY MR. HELM) And an otherwise healthy person may not just die from the segregation alone; correct?**

A She was not healthy. But even someone going to jail, yeah, it would be a shock to anyone.

**Q And, I mean, it was not a secret that she was rapidly declining, was it?**

A No.

**Q Do you agree with that last underlined statement that she was at high risk of death?**

A Yes.

**Q And near the end of the letter she writes or the end of this email she says, "Dr. Cuka, please prepare a very strong letter requesting the court to**

A Uh-huh.
Q **And did you, in fact, write a strong letter requesting the court to move Ms. Sullivan into a hospital?**
A Yes. I feel I did. I wrote a letter.
(Exhibit 56 marked for identification.)
Q **(BY MR. HELM) I'll hand you Exhibit 56. This is TK 145 through 148. Do you recall there being disagreements between security staff and Turn Key medical staff regarding how to house Ms. Sullivan?**
A Well, modifying the suicide precaution Level 1 to allow a mattress was kind of an issue. It's understandable. That's the way -- they want to have one way of doing things and they're right. It is safer. However, her medical needs became dominant.
Q **Do you recall Sergeant Hardin requesting modification be made to suicide precautions to allow a mattress and you responding that she would just try to hurt herself with it?**
A No.
Q **Around October of 2020 is there a discussion of getting Ms. Sullivan to Griffin Memorial?**

**stand by and watch people deteriorate?**

MR. WINTER: Form.

**Q (BY MR. HELM) While folks were wanting to have meetings or court delays?**

MR. WINTER: Same.

A No.

**Q (BY MR. HELM) Did you feel as though the inability to get Ms. Sullivan transferred out of the facility was causing you to have to stand by and watch her deteriorate?**

A We did our job. I just wanted to keep her safe for one. That's why we ended up having her on chronic suicide precaution Level 1. We changed her meds around a little bit. That's what we could do, and then we wrote these letters.

It was frustrating having to watch her deteriorate and the slow progress or lack of progress, but I had no idea what was going on with her case. I don't know. I was surprised when she went to court. I didn't know when those days were. I didn't know for anybody.

**Q You don't dispute she was deteriorating; correct?**

A That is correct.

**Q And you don't dispute that you felt if she**

**got into a therapeutic environment that she could -- that the deterioration could stop?**

A That was my intention. I anticipated that if we could get her to a therapeutic environment, they could probably even just continue the same meds we were doing and she would be better.

**Q Dr. King states, "It has been very ineffective at this jail for years."**

**Do you agree with that statement?**

MR. WINTER: Form.

A I don't know what he's talking about.

**Q (BY MR. HELM) Now, we saw at the top of this thread where general counsel for the county was writing general counsel for Turn Key and one of the executives saying, "I would caution everyone about using email as a form of communicating regarding sensitive topics." Correct?**

A I see it, yes.

**Q Had you ever been told that by Oklahoma County?**

A I don't recall.

**Q Had you ever been told that by Turn Key?**

A I think there was something that was sent around, a general communication, "Hey, try to be respectful in emails," something to that effect.

remain naked in her cell and is laying down almost all day and night to the extent that she has developed severe pressure ulcers that have become infected, placing her at high risk of systemic infection (sepsis) and death." Correct?

A Yes.

Q Is that all true?

A Yeah.

Q It says, "Ms. Sullivan requires imminent transfer to an inpatient psychiatry unit for stabilization."

Did I read that correctly?

A Yes.

Q And did you believe that when you wrote it?

A It was my contention it was probably the only thing that was really going to help her at that point.

Q "Without such transfer, she is at very high risk of further demise and death."

Is that a true statement?

A Right.

Q By October of 2020, did you believe that if Ms. Sullivan was not imminently transferred to an inpatient psychiatry unit for stabilization, that

**Q And how long -- well, at what point do you believe Ms. Sullivan became catatonic?**
MR. WINTER: Form.
A Right from the beginning.
**Q (BY MR. HELM) Early on you were questioning brain lesion, fabrication, but now looking back is it clear to you that it was catatonia the whole time?**
MR. WINTER: Form.
A It was depression. That's what I wanted to treat was her depression.
**Q (BY MR. HELM) And was catatonia a symptom of the depression?**
A Yes, at that point.
**Q What are the potential treatments for catatonia?**
A The only treatments that are out there, well, treating the underlying mental disorder or physical disorder is the preferable thing to do.
But as a symptom, the benzodiazepines have been used. Some sources say Ativan is the best. Other benzodiazepines should not be ruled out.
**Q Did you consider any medication at the time in March other than the Ativan?**
A No. Well, I think Dr. Winchester -- no,

A No.
**Q (BY MR. HELM) What is your understanding of what dosage is typically required to cause catatonia to go into remission?**
A Typically you start low and go slow. This is an elderly patient. She's over 50. So a little more fragile than usual. She is -- I simply restart her on outpatient on the understanding that it was for catatonia. I learned later it wasn't for catatonia at all.
**Q But for anxiety?**
A Yes. But still...
**Q Catatonia was not an issue outside of the jail; correct?**
A Apparently. Although she told me it was for catatonia.
**Q What is Tranxene, T-r-a-n-x-e-n-e?**
A It's another one of the controlled substances, the benzodiazepine. What is Tranxene? I believe that's a brand name. I cannot recall the other name.
**Q And what is Librium?**
A Librium, that's another benzodiazepine, controlled substance as well. It's my preference to use Librium for alcohol detoxification as opposed to

**Q So what would you have to do? I guess first what wasn't available?**

A Electroconvulsive therapy, hospitalization. Ideally she would -- if we could have gotten her to someplace that did that, they could have.

**Q Could you have taken her to the hospital to have that done --**

A No.

**Q -- and brought her back to the jail?**

A No, not that I'm aware of.

**Q And your inmates are able to have outside doctor appointments; correct?**

A They can have ER visits. Okay. I think someone went for surgery once. Okay.

**Q Are you aware of anything that would stop you from saying this patient needs ECT, electroconvulsive therapy, to treat the catatonia?**

MR. WINTER: Form.

A Outside of it being just not available, not an option, no.

**Q (BY MR. HELM) That's what I'm saying. When you're saying it's not an option, have you ever asked anyone if it's an option?**

A No. No one ever told me it was.

Doc, it seems clear from your testimony today that in your professional medical opinion the treatment that Ms. Sullivan needed was to be transported out to an inpatient hospitalization for psychiatric care; true?
A True.
Q And you made efforts to get that effectuated or accomplished; right?
A Yes.
Q And to your knowledge, not only did you make those efforts, other providers associated with Turn Key also made those efforts; right?
A Yes.
Q But at the end of the day, can you unilaterally release someone from custody?
MR. HELM: Object to the form.
A No.
Q (BY MR. WINTER) Can you unilaterally release someone who is in custody to go to inpatient psychiatric care at Vinita or anywhere else in the state?
MR. HELM: Object to the form.
A No.
Q (BY MR. WINTER) By the same token, you can't unilaterally allow or mandate that a patient

**get ECT treatment, can you?**

MR. HELM: Object to the form.

A No.

**Q (BY MR. WINTER) Doc, based on the review of the records and our extensive deposition here today, it appears that Ms. Sullivan encountered a mental health provider almost every day she was incarcerated at the Oklahoma County Jail; right?**

MR. HELM: Object to the form.

A Yes.

**Q (BY MR. WINTER) And during those times had Ms. Sullivan made any sort of complaints or concerns about her physical condition, would you if they were reported to you convey that to the medical team?**

A Yes. Our -- yes.

**Q And you guys worked despite the fact that you might have treated different sides or different things of the body, you guys worked together in conjunction; fair?**

MR. HELM: Object to the form.

A Right. They let me know when she was more distressed, needed extra medicine, that sort of thing.

**Q And vice versa?**

without a placebo response, for instance.

**Q But she really didn't have an opportunity to refuse that medication; correct?**

MR. WINTER: Form.

A No.

**Q (BY MR. HELM) It was hidden inside a Boost shake; right?**

MR. WINTER: Object to form.

A Or float on water.

**Q (BY MR. HELM) Within one day she's fallen and has staples in her head; correct?**

A Yeah.

**Q If you ordered a patient to get electroconvulsive therapy, who would tell you, "Hey, you're not allowed to do that"?**

A Well, first of all, I don't know how -- there was no mechanism to order it.

**Q Can't you just write an order?**

A What I could have done probably is petitioned a judge, write a letter to the judge saying, "Hey..."

**Q Why would you need a judge's permission to get medical treatment?**

A Because she would have to leave the facility.

**Q And she had to leave the facility to go to the ER; correct?**
A Uh-huh.
**Q And so you don't have to get a judge's order just to send her to the ER, did you?**
A No.
**Q And so why do you believe you would have to get a judge's order for her to go receive ECT?**
A Because it wouldn't be just one event. It would be probably three times a week for four weeks initially, four to six.
**Q And is that -- to your understanding, is that the kind of standard catatonia treatment using ECT?**
MR. WINTER: Form.
A Well, for schizophrenia or major depression, plus or minus catatonic features.
**Q (BY MR. HELM) So you do acknowledge that ECT is a recognized treatment of catatonia features?**
A Well, not specifically for that. It's for the underlying condition. But when the condition resolves, the catatonia resolves. That's how you know the condition is resolved.
**Q So you would agree that ECT is a recognized therapy for resolving catatonia that is**