IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

ANGELA LEDDY, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF CHRISTA SULLIVAN,

Plaintiff,

vs. No. CIV-23-0295-HE

TURN KEY HEALTH CLINICS, LLC,
et al.,

Defendants.

VIDEOTAPED DEPOSITION OF MARK WINCHESTER, M.D.

TAKEN ON BEHALF OF THE PLAINTIFF

ON APRIL 18, 2025, BEGINNING AT 10:37 A.M.

IN OKLAHOMA CITY, OKLAHOMA

EXHIBIT
4

REPORTED BY: Karen Dauphin Albert, CSR, RPR

**Q Did your current employer ask you to continue getting the testing?**
A No, they didn't.
**Q Is your current employer aware that you had been receiving the testing?**
A Absolutely.
**Q After you're terminated as the medical director of PACE, what is your next employment?**
A I went back to Variety Care. I worked there for about six months and then took the Oklahoma County Detention Center job. Yeah.
So, yeah. I went to work for Oklahoma County in 2021.
**Q When you began working -- well, what role were you hired on as at the detention center?**
A The physician -- and there was only one that was doing, you know, medical medicine.
And so I was -- the title, I was the medical director, but I was director over me and two nurse practitioners.
**Q Were you recruited for this position?**
A Yes.
**Q Who recruited you?**
A A Dr. Cooper. William Cooper was the chief medical officer for Turn Key at the time.

Q And were you employed by Turn Key, or were you employed by the county?

A Initially, Turn Key.

Q It sounds like, at some point, you became an employee of the county?

A Right.

Q And when was that?

A When the contract with Turn Key and that particular clinic, detention center, was not renewed. So they left, and I was asked to stay on.

Q Approximately when was that?

A I think Turn Key, their last day there was the like the 8th of October or the 10th of October. I would have to look on when that was.

Q And was that of what year?

A '24.

Q So for --

MR. WINTER: Bryon --

MR. HELM: We're about to take a break.

MR. WINTER: I was going to say, as soon as you get through the employment stuff, I would like a quick comfort break.

MR. HELM: Yeah. Anytime.

Q (By Mr. Helm) Are you still serving as medical director?

**describing the job to you, what do you -- how do you recall him describing that job?**

A He said it was mostly just straight patient care; that there wasn't a lot of administrative to do. He described good parts of it, that I wouldn't have to deal with appeals and denials from insurance; that that was a good side of that job. And he described it as being interesting because of the patients that we see and their circumstances.

And to use his words -- I asked him why he got into it, and he said, "Well, along with everything else, it's just fun." He goes, "I like it. I've met some interesting people."

**Q And how does this conversation end as far as --**

A I told him I would talk to my boss, my wife, and say, "Do we do this?"

And we did discuss it for a day or two and kind of pros and cons, and we agreed that I would try it for six months and go do something else if it was not a good fit. So I did.

**Q Do you recall what your first day of employment for Turn Key was?**

A I could look it up, but it was in February

of '21. '21.

**Q When you began work as the medical director, do you know how long the role had been open?**

A I don't.

**Q You don't know when King was transferred?**

A No. I made assumptions, but that was probably not based on fact.

**Q What were your assumptions?**

A That it hadn't been too long.

**Q Like maybe a month or two?**

A I couldn't really imagine, the things that were needed to be done and people to be seen, that it could go very long. So it was based on that. So I don't know an actual time frame.

**Q Was anyone in the role of physician or medical director at the Oklahoma County Detention Center between the time that King was no longer in that role and when you began?**

MR. WINTER: Form.

THE WITNESS: I don't know that. I wasn't there. In my knowledge of what was given to me, there was not a medical director. There was an interim.

**Q (By Mr. Helm) Do you know if there was an**

**to Ms. Sullivan's situation.**

**When you become the medical director in February of 2021, we had kind of gotten into that. I mean, did you immediately start in in the physician role?**

A Pretty immediately, yeah. Now, I don't -- yeah. By the second half of the first day, I was seeing patients.

**Q And I was looking again. Do you have the -- do you know what your start date was?**

A I don't. I don't know that I've got anything that's got the actual date on it.

I mean, I could look up Paycom and find like an original pay stub, but that would take me about 20 minutes to find it.

**Q That's fine.**

A So if you really need it, I could.

**Q In preparation for your deposition today, did you review any documents?**

A I did kind of a brief overview of some of the notes toward the end of the second volume.

**Q And when you say -- you're referring to the medical records; correct?**

A Yes. Uh-huh. Yes.

**Q Other than pages from her medical records,**

**well.**

**Do you believe that --**

A Is that Sinead? Is that right?

**Q Yeah.**

A Okay.

**Q S-I-N-E-A-D?**

A Yeah. A nice Cockney British accent. Yes.

**Q Is that a male or female?**

A Female.

**Q Female. And do you recall having any interactions with Ms. Sullivan at any time before March 2, 2021?**

A Yes. At the time that I started, it was -- the predominant number of patients that I was seeing were being brought to my office cell area, because I have a cell, not an office.

And so Ms. Sullivan was not easily mobilized because her behavior was kind of unpredictable, and she was most often in suicide precautions which makes it harder to bring her out of the cell.

So I would go by the cell and ask how she was doing because she was -- her cell was maybe -- I don't know -- 100 feet down the hallway from where

my office was.

Q We talked to Dr. Cuka a little bit about this. There were no offices built on the floor; correct?

A That's correct.

Q And so there were a couple of cells that were converted --

A Yeah.

Q -- for you to have a cell office and Cuka to have a cell office?

A I wouldn't say "converted," but they're just cells.

Q Okay. Yeah.

A I've got an old metal desk and my military green and gray walls.

Q And so anytime that you would go by and speak with her, would you document that?

A At that point, no. It was for my peace of mind that I wasn't missing something.

I had heard about her from Cuka and had poked my head in down at the bean hole, is what they call it, to talk to her and just check on her.

And most of the time, she was lucid, and she would talk to me about what was on her mind.

Q Okay. And I want to work through these

**her back; right? She was at the hospital for a week and a half; right?**

MR. WINTER: Form.

THE WITNESS: Four days.

**Q (By Mr. Helm) 3/2 to 3/11?**

MR. WINTER: Form.

THE WITNESS: With both admissions, yes.

**Q (By Mr. Helm) I mean, that's not an, "Oh, there's nothing wrong with her. Send her back to the jail."**

**Right?**

MR. WINTER: Form.

THE WITNESS: That's correct. I would certainly not argue that --

**Q (By Mr. Helm) And she was admitted into the hospital --**

A I certainly would not argue that there was nothing wrong with her. There was. This lady needed her depression addressed in a way that would make a difference.

They didn't address that. They hydrated her and made a note that she had muscle damage, because they were talking about rhabdo, because she was laying on a floor that was cold and hard and had muscle damage from pressure, and that's significant.

But you watch her and hydrate her and put her in a different frame and then you wait a few days and then send her back to us. That's, at best, a temporary solution.

And I was talking about -- I was crusading for her, trying to get her out of there and speeding up her going to Vinita or some other long-term care psychological, psychiatry facility.

She needed that in addition to the physical medicine to make a difference in her outcome. That's -- and I was doing everything but screaming it.

We were talking to Cuka. We were talking to Cooper. I was talking to anybody that would listen, that I was very concerned about this lady.

And so emergency rooms don't do very good with chronic condition patients, and St. Anthony's had a tendency that if I didn't give them a real reason why she was there, that would get their attention some, they would just send her back and give her some tests and some IV fluids and send her back.

I could give you -- I mean, she didn't -- they didn't on these two admissions before, but she was there three days for rhabdo -- and rhabdo is a

big deal -- and she was there for a laceration on her scalp because she was falling.

But they didn't address that she was falling over and over and over. They just Band-aided her and sent her back.

So I'm not sure what I could have accomplished for her by sending her -- they weren't going to put her in their psychiatric hospital. They had had plenty of opportunities, but they didn't do that.

**Q (By Mr. Helm) Did you refer her for that?**

A You know, I personally didn't. I don't know that either Cuka or King didn't.

**Q And as far as getting, you know, hydration while at the hospital, you would admit that's better than not getting hydration; correct?**

A That's true.

**Q If she's not drinking or eating at the jail, that's a better setting; correct?**

MR. WINTER: Form.

THE WITNESS: She was drinking fluids.

**Q (By Mr. Helm) She was?**

A (Nods head)

**Q How often?**

A I would have to look. Do you want me

**Q Okay.**

A I don't know that it wasn't done in the year before I was there.

**Q And so around March 18th, it appears from the note you're kind of throwing your hands up as far as what can be done at the jail?**

A I was trying to express how strong my concern was. If the wording wasn't perfect, what I wanted to express was that this woman was not doing well, and I didn't see that there was an intervention that we could do that would solve the problem to the point where it would change her outcome.

**Q And so you and Dr. Cuka, the psychiatrist, go and have a meeting in your cell about this. And what do you decide to do?**

A I don't know. We had Dr. Cooper in on that, also. So I don't remember the conversation content exactly, but it was in the same theme.

I was reassured -- I was told that she was on the list to go to Vinita; and that they weren't taking her because they didn't have a bed or they didn't have room; and discussing if there was any way that we could speed up the process, and I don't remember getting an answer that was encouraging.

**Q I'll hand to you what has been marked as Exhibit 58.**

(Plaintiff's Exhibit 58 marked for identification)

MR. WINTER: Thank you, sir.

**Q (By Mr. Helm) Go ahead and take a second and read it to yourself.**

A Okay.

**Q This is an email that was sent by Dr. Cuka to --**

A Dr. Lewis.

**Q Dr. Lewis. And that's Jawaun Lewis; correct?**

A I believe so, yes.

**Q And he's kind of the director of mental health at Turn Key?**

A I believe he was supervising Dr. Cuka.

**Q Dr. Cuka. Okay.**

**It says, "Regarding Christa Sullivan; she is chronic SP 1. Dr. Winchester is recommending that we restart a low dose benzodiazepine regimen for this challenging patient."**

**Is that a true statement?**

A Yes.

**Q The starting of the benzodiazepine was**

**your idea?**

A Yes.

**Q Okay. Dr. Cuka states, "I actually agree with him. In short, her symptoms are textbook catatonia and the treatment for catatonia is low dose benzodiazepine."**

**Do you see that?**

A I see it.

**Q When you were meeting with Dr. Cuka to rediscuss options, did he give you some pushback on the benzodiazepine at first?**

A I believe standardly he would. He was very conservative on prescribing any drug that had any abuse potential within the detention center.

**Q And how did you get him to come around on that?**

A Just discussion. I believe Ms. Sullivan was, actually in a conversation through the bean hole, the one that asked or suggested it. She said that she had been on it before she came to jail and that she felt that it had helped her as far as the anxiety and the mood problems. And so I told her that I didn't necessarily think that was a bad idea and that I would talk to Dr. Cuka about it.

**Q Did you understand that Dr. Cuka had taken**

accurate.

**Q I mean, upon receiving a 103.8, what would you expect the medical staff to do?**

MR. WINTER: Form.

THE WITNESS: Report that to me but probably check it a second time in a different location first so that I wouldn't jump up and down and think they were septic.

It would be alarming. That's probably a better way to say that.

**Q (By Mr. Helm) Under "Assessment," Nurse Eastman writes, "Had Dr. Winchester see patient. New orders for antibiotics."**

A Yes.

**Q "UA in possible."**

**Do you know what that means?**

A I don't know what the "in possible" means. It looks kind of like a typo because it doesn't exactly fit together.

So she was anticipating that I was going to order antibiotics based on a UA, and I would think that that should have been "if possible." Sometimes it's not easy to get a UA.

**Q Okay. And it says, "Encourage extra fluids. Give extra Boost for calories. Patient's**

**skin breaking down more. Talked with Deborah, SHA."**
**What does "SHA" mean?**
A It's actually supposed to be HSA.
**Q Health services administrator?**
A Yeah. So I think Sinead is British.
**Q They're going to get an air mattress for the patient. It says, "Helped patient up to bathroom, and she was unable to void. Ordered a straight cath patient. Unable to get in and cath."**
A Yeah. So, again, I think there is a word left out. It should be "unable to get in and out cath," in and out. It would be a quick cath or an in-and-out cath, but not putting in a Foley catheter that would remain there after we obtain the UA.
**Q Okay.**
A I'm guessing, but I think that's what that means.
**Q "Straight cath," does that mean --**
A It means --
**Q What does the "straight" refer to?**
A It means it doesn't have a balloon on the end of it. So it keeps the catheter positioned with the tip in your bladder so that it continues to drain.
Generally, a catheter like that will drain

into a Foley bag, where a straight cath is meant for putting in once, draining the bladder of urine, and then taking back out.

**Q Do you know what happened with this catheter on 4/13?**

MR. WINTER: Form.

THE WITNESS: All I recall is they came back and told me that they couldn't get the -- they couldn't get her cathed.

**Q (By Mr. Helm) So if we add "out," to make it say "unable to get in and out cath," do you know whether that means like they were unable to get the physical catheter they needed versus just we were unable to get it to successfully straight cath?**

A Usually "unable" should mean we tried and we weren't able.

**Q It then says, "Helped back to bed and let rest."**

**Is that Rocephin?**

A Rocephin.

**Q R-O-C-E-P-H-I-N.**

**"One gram intramuscular given in" --**

A That would be probably gluteal.

Where is it?

**Q The left, maybe, gluteus maximus?**

A Gluteus maximus, yeah.
**Q And started on Bactrim DS?**
A Yes.
**Q Okay. What is Rocephin?**
A Rocephin is an injectable antibiotic. Usually we give one to two doses, either 500 or one gram, which is twice that.
And it covers for a number of infections that, early on, are hard to see or detect on an exam. And so empiric medicine says that you can take a safe decision and treat because there isn't any testing that would give you an answer right then. So you make a judgment call.
Rocephin treats pyonephritis, which is a kidney infection that would be hard to find on an exam.
An early pneumonia would come across with a low-grade fever and generalized weakness, mentation changes, maybe some breathing difficulties, but early on, the symptoms wouldn't be necessarily pronounced enough to go, "Aha, yes, it's that."
When you've got Ms. Sullivan, she's not very mobile. So her having sticky, abnormal sounds in her lungs from immobility would be common, and so

it would be difficult on an exam to tell the difference between a pneumonia infiltrate in her lung and just the consequences of lying down too much and being immobile.

Your bladder infections in elderly patients often first manifest with mentation changes. They get confused or lethargic. So it's a subtle change, but if you think that it might be -- and she had had urinary tract infections before, it's the acceptable thing to do, to treat with a single dose of Rocephin and then start sulfa drug, the Bactrim.

**Q Did you think it was possible she had pneumonia?**

A You know, at this point, I didn't see on the exam or feel on the exam a pneumonia, but from experience, I know that it was possible.

**Q Was there any concern that Ms. Sullivan had sepsis?**

A At this point, no. I mean, again, it could develop into anything. She's got wounds. She's not mobile. There is a lot of things that it could be. But going on what I saw on the exam and the history and the physical findings and the bigger picture, I didn't see a way to call it sepsis at

that point.

**Q Did you hear anyone questioning whether it might be sepsis?**

A No, I didn't hear that.

**Q I asked because when jail staff ultimately responds to the kind of medical emergency where she is unresponsive, they report that they heard she was septic, and I didn't know if you knew where that may have come from.**

MR. WINTER: Form.

THE WITNESS: I don't. That would have been a different shift of nurses than what I was working with at the time that I saw her.

**Q (By Mr. Helm) When you go down to see Ms. Sullivan on the 13th and she's saying that her left leg hurts and she can't get up, did you do anything to assess her left leg?**

A Yeah. I looked at her leg to see if I saw anything that would be suspicious for cellulitis, which was an infection of her like subcutaneous tissue; a DVT, which is a bloods clot. And, again, I saw that she had varicose veins that were kind of distended, but I didn't see the cording that you see with a clot in a vein. You can kind of feel it, like it's underneath there. So I didn't feel

**"This is also appropriate initial treatment for pneumonia and other possible infection sources."**

**Correct?**

A (Nods head)

MR. WINTER: Is that a "yes," Doc?

THE WITNESS: Yes. I'm sorry. It is. I'm nodding my head.

**Q (By Mr. Helm) "Lethargy" says, "Will hold Ativan for now as it could add to fall risk."**

**Correct?**

A That's correct.

**Q So you are going to order that she does not receive Ativan?**

A I would have asked that they hold the Ativan for then.

**Q The order to hold the Ativan, was that ever entered into medical record before Ms. Sullivan's death?**

MR. WINTER: Form.

THE WITNESS: I would have -- I would have given the order as a verbal order while we were in her room. So in short, when the nurse that I talked to would have written the order as a verbal order, I'm not sure.

So, in short, I don't know that the order

that was kind of her target where she hurt herself, would kind of come and go. So I don't know that I was focusing there.

And she's got lividity, but I don't see any -- it would be difficult to see any rashes on there.

**Q (By Mr. Helm) What would you have to do, as the medical director, to obtain -- I'm drawing a blank on the...**

A That's okay. I've had to struggle for it, too. We're getting kind of late in the day.

**Q -- kind of elctroshock treatment?**

MR. WINTER: In the jail?

THE WITNESS: We wouldn't do ECT.

**Q (By Mr. Helm) ECT. That's what I was trying to --**

A Yeah.

**Q And is that electro-compulsion therapy?**

A Yeah. Yeah. Yeah, it is. But I've never seen it done at Oklahoma County. There would probably be a big article in the 10:00 news about that.

So, no, that's not a procedure that we would do at the jail.

**Q Do you understand it to be the --**

A It wouldn't --

**Q -- kind of highest success treatment of severe catatonia?**

MR. WINTER: Form.

THE WITNESS: Again, I'm not an expert on psychiatric catatonia or the efficacy of ECT on it. I know it's used for severe, unimproving with conventional therapy, depression.

**Q (By Mr. Helm) You would agree that's something that Ms. Sullivan had; correct?**

A Yeah. She had bad depression. I don't know that ECT would cause or be mixed in with those kind of wounds.

**Q As the medical director at the jail, did you have a policy against the use of ECT?**

MR. WINTER: Form.

THE WITNESS: No. It's more just common sense. That's not a nice place, and it's not made for medical procedures like doing ECT where it causes people to convulse.

I wouldn't consider the jail an appropriate or stable place to do ECT, but --

**Q (By Mr. Helm) Could a patient --**

A -- both the policy --

**Q -- be transferred elsewhere --**

A Yeah, it could.

**Q -- for the therapy?**

A That could happen, but certainly not on premises.

**Q If Dr. Cuka had come to you and said, "Research shows ECT, you know, could take care of this catatonia," and requested to have her transported, is that something that you would be able to do as the jail administrator?**

MR. WINTER: Form.

THE WITNESS: Well, he --

MR. WINTER: Go ahead, Doctor.

THE WITNESS: He would be the higher-ranking authority on whether or not ECT, in her case, had a chance of being effective and whether or not the risks of it were offset by the potential for improvement.

**Q (By Mr. Helm) As far as you know, there is no just blanket prohibition of using ECT when appropriate?**

MR. WINTER: Form.

THE WITNESS: I know of none.

MR. HELM: That's all my questions for you today. Thank you.

THE WITNESS: Right offhand, I've never

seen it done, either in the jail or otherwise. So, again, I'm pretty much not an expert on ECT or catatonia.

MR. WINTER: I have a few questions. I need a quick bathroom break, maybe five minutes, at most.

Does that sound okay with everybody in the room?

disorder have any impact in the care and treatment you provided to Ms. Sullivan from February 2021 until her death in April of 2021?

A No.

Q Okay. Doctor, I'm going to hand you what has already been marked as Plaintiff's Exhibit 59. I think you've got it in front of you, or if not, I'll hand you my copy.

Do you remember reviewing this? It's the email from Dr. Cuka.

A Yes.

Q All right. And in there, Dr. Cuka communicates that it's his professional recommendation that Ms. Sullivan be transported to an inpatient psychiatric facility; true?

A True.

Q Was that consistent with your belief as to what type of treatment Ms. Sullivan needed to be successful or to have any sort of recovery?

MR. HELM: Object to the form.

THE WITNESS: I certainly lobbied, believed, and wrote and communicated with everybody that I could that she needed that.

Q (By Mr. Winter) And so it's your -- just so we're clear, Doc, your professional

recommendation for Ms. Sullivan's treatment would have been, "This patient needs to be transported to an inpatient psychiatric facility."

Right?

A Yes.

Q And it was your understanding that Turn Key medical providers who shared the same opinion made efforts to make that happen; true?

MR. HELM: Object to the form.

THE WITNESS: Yes.

(Defendant's Exhibit 1 marked for identification)

Q (By Mr. Winter) Okay. I'm going to hand you what has been marked as Defendant's Exhibit 1. And, Doc, I will represent to you -- actually, let me just ask it up there.

Do you see at the top right-hand corner the admission date that's listed?

A Is it the 3/7/21?

MR. WINTER: (Indicating)

Q (By Mr. Winter) Correct. Do you see up at the top left where this record came from?

A St. Anthony's.

Q And so if you can think back to earlier today when we were talking about the two times Ms.

**Sullivan was transported out to an outside emergency room, does this appear to be a record from one of those two presentations?**

MR. HELM: Object to the form.

The complete record or just a page from the records?

MR. WINTER: Thank you, Bryon.

**Q (By Mr. Winter) An excerpt of the records from one of those two presentations?**

A Yes, it does.

**Q Okay. I would like to direct your attention down there to, it looks like an LPC Shavor's note.**

**Do you see that?**

A Yes.

**Q First off, Doctor, can you tell the jury, LPC, what type of care does an LPC provide? Is it physical health care or mental health care?**

A That would be a mental health worker.

**Q Mr. Shavor documents that, "The patient is in custody of jail."**

**Do you see that in his note?**

A I do.

**Q Right. And then a few words later, it says, "Unable to place inmates in a psych unit."**

**Did I read that correctly?**

A You did.

**Q So if we are to accept what Mr. Shavor says on its face that's true that St. Anthony can't place a patient in a psych unit if they're an inmate, would sending her to the hospital, Ms. Sullivan to the hospital, have done any good in getting her the treatment you believe she needed?**

MR. HELM: Object to the form.

THE WITNESS: In my opinion, no.

**Q (By Mr. Winter) And, in fact, you could have sent her daily to the hospital, and if St. Anthony or OU or any of the facilities in Oklahoma could not have taken her for inpatient psychiatric care, would that have done any good?**

MR. HELM: Object to the form.

THE WITNESS: No, not -- it would be no good for Ms. Sullivan, and it might annoy people at St. Anthony's.

**Q (By Mr. Winter) Doctor, can a Turn Key medical provider unilaterally release a patient for inpatient psychiatric care?**

MR. HELM: Object to the form.

THE WITNESS: No.

**Q (By Mr. Winter) Okay. Doc, I would like**

for the inmates up there, and truly, I was -- of all of the different aspects of Turn Key, I was impressed with that one.

**Q (By Mr. Winter) Doctor, just so it's clear on the record, is it your testimony that you entered Mrs. Sullivan's cell on April 13th to perform your assessment and evaluation?**

A Yes.

**Q Okay. And the documentation you made regarding your findings and your plan, even though they were dated April 14th, is it fair for me to assume that that was your plan and your assessment from the day before, April 13th?**

MR. HELM: Object to the form.

THE WITNESS: Yes. Yes. As closely as I could write it down with all accuracy.

**Q (By Mr. Winter) Doctor, it was your understanding, as the medical director at the Oklahoma County Jail, during this period of time that we've been talking about in 2021, that Ms. Sullivan had been accepted to Vinita; correct?**

MR. HELM: Object to the form.

THE WITNESS: That's what I was told on several occasions, yes.

**Q (By Mr. Winter) What is your understanding**

**as to why she was not transported to Vinita during that time period while you were the medical director?**

A They had no room, no beds. So they were waiting. But we were not ever really given a time frame that we could expect her to be moved to Vinita. It was pretty vague.

MR. WINTER: I will pass the witness.

REDIRECT EXAMINATION

BY MR. HELM:

**Q Who do you recall telling you that they believed Ms. Sullivan had been accepted to Vinita but that was waiting for a bed?**

A I think that was Cuka. I mean, that's -- I'm not sure that anybody else would know with any certainty. Cuka would.

**Q You, Dr. Cuka, other medical staff, you weren't acting under kind of a presumption or belief that Ms. Sullivan was going to be transferred in the next week or so; correct?**

A No. I don't know if they would give us that information, but, no. I was never told a time frame that I could expect her to be transferred to Vinita; only that she had been accepted and that we were waiting on a bed.

**Q Being accepted by Vinita did not make her no longer your patient; correct?**

A It did not.

**Q Even though she was waiting for a bed, she was still your patient?**

A Yes.

**Q And Dr. Cuka's patient; correct?**

A Correct.

**Q An LPC is a licensed practical counselor?**

A A licensed something counselor or something. I don't know what the "P" stands for, but it's a licensed mental health provider.

**Q It's kind of like an LPN in the mental health world?**

A They've got all kinds of initials behind their name, but when you see them, I don't really recognize. I just think they're a therapist at some level.

**Q I mean, LPCs didn't go to medical school; correct?**

A No.

**Q They didn't go to nursing school; correct?**

A That's correct.

**Q Did anyone from St. Anthony ever tell you that they were unable to place inmates in a psych**