**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ANGELA LEDDY, as Personal Representative of the Estate of Christa Sullivan, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| -vs- | ) ) | NO. CIV-23-0295-HE |
| OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY, et al., | ) ) ) | |
| Defendants. | ) | |

<u>**ORDER**</u>

This case arises out of the death of Christa Sullivan, who was a pretrial detainee housed at the Oklahoma County Detention Center. Sullivan's daughter, Angela Leddy, as personal representative of Sullivan's estate, commenced this 42 U.S.C. § 1983 action against Dr. Gabriel Cuka and Dr. Mark Winchester, two of Sullivan's health caregivers, alleging deliberate indifference to her serious medical needs in violation of the Eighth Amendment or the Fourteenth Amendment to the U.S. Constitution. In addition, Leddy alleged a municipal liability claim against Turn Key Health Clinics, LLC, the employer or principal of Dr. Cuka and Dr. Winchester.[1] Defendants have each filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 and LCvR56.1. Upon review, the court concludes the motions should be granted.

---

[1] *Leddy also brought claims against Oklahoma County Criminal Justice Authority, Board of County Commissioners for Oklahoma County, Nancy Meyer, and Stephanie Williams, ARNP-CNP. All claims were either dismissed by court order or by stipulation of the parties. See [Doc. Nos. 31, 33, 34, and 90].*

*Standard of Review*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"'The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.'" Thao v. Grady County Criminal Justice Authority, 159 F.4th 1214, 1227 (10th Cir. 2025) (quoting Thom v. Bristol-Myers Squibb Co., 353 F.3d 848, 851 (10th Cir. 2003)). If the movant does not bear the burden of persuasion at trial, the prima facie demonstration need not negate the nonmovant's claim. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Rather, the "'movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" Thao, 159 F.4th at 1227 (quoting Thorn, 353 F.3d at 851). "The nonmovant must then bring forth 'specific facts showing a genuine issue for trial.'" *Id*. (quoting Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005)). "These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment." *Id*. (citing Mitchell v. City of Moore, 218 F.3d 1190, 1197 (10th Cir. 2000)).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of a claim." *Id*.

At the summary judgment stage, the court reviews the entire record "in the light most favorable to the non-moving party." Thao, 159 F.4th at 1227.

*Factual Background*

Given the court's disposition, the court sets forth a detailed factual background derived from the evidentiary record. The evidence as to the general course of Ms. Sullivan's condition and treatment is set forth in the records of Turn Key and other providers and is substantially undisputed. The adequacy of defendants' actions and, in some circumstances, the inferences to be drawn from the underlying facts, is disputed by plaintiff. There is also deposition testimony from the medical and other personnel, as well as plaintiff's expert.

Arrest and Detention

Sullivan was arrested on April 27, 2020, and transported to the Oklahoma County Detention Center (jail) for booking. At the time of her arrest, she was 64 years old and weighed approximately 142 pounds. She was ultimately charged with a felony offense of domestic assault and battery with a dangerous weapon in violation of Okla. Stat. tit. 21, § 644.1.[2] This was Sullivan's first incarceration.

Turn Key had a contract with the Oklahoma County Criminal Justice Authority and the Board of County Commissioners for Oklahoma County to provide certain medical and

---

[2] *The court takes judicial notice of publicly filed records in the state court criminal case involving Sullivan.* U.S. v. Ahidley, *486 F.3d 1184, 1192 n. 5 (10th Cir. 2007).*

mental health care and treatment to detainees housed at the jail.  During Sullivan's detention, Dr. Cuka, a board-certified psychiatrist, oversaw her mental health care.  Dr. Kent King, Turn Key's medical director, oversaw Sullivan's medical care until February of 2021.  At that time, Dr. Winchester replaced Dr. King as medical director and oversaw Sullivan's medical care until her death.

During her booking, Sullivan reported to Turn Key's medical staff that she had mental health diagnoses for anxiety, schizophrenia, and insomnia.  She reported she was not currently thinking of killing or hurting herself, but she had tried multiple times over her lifetime to kill herself, mostly by way of cutting herself.  She reported she had attempted to kill herself a month and half ago by cutting her left wrist.  When asked if she was currently hearing voices or noises that others cannot hear, Sullivan answered affirmatively stating: "Like today it told me to get a knife and to stab my husband, I thought he was cheating on me.  The voice told me that he was cheating on me so that's why I grabbed the knife to stab him."  [Doc. #74-8, ECF p. 3].

Sullivan reported she was under psychiatric care and had been recently admitted to Oakwood Springs in Oklahoma City for anxiety and a suicide attempt.  She also reported that she had been admitted as a patient at SSM Health St. Anthony Hospital (behavioral health) in January of 2020.

Plaintiff's expert, Dr. Justin Berk, a board-certified internist working in the field of correctional medicine, opined that at the time of her intake evaluation, plaintiff "had active psychosis, reporting command auditory hallucinations" and "endorsed suicidal ideation." [Doc. #88-1, ECF pp. 1, 5].

In addition to mental health diagnoses, Sullivan reported medical diagnoses for mitral valve prolapse, high cholesterol, "HTN," and fatty liver disease. [Doc. #74-8, ECF p. 5].

Medical staff confirmed that Sullivan had been recently prescribed medications including Ativan 0.5 mg, Remeron 45 mg, Abilify 30 mg, Cymbalta 60 mg, Buspar 10 mg, Lipitor 10 mg, and Propranolol 20 mg. [Doc. #74-8, ECF p. 5]. Sullivan reported to have a known allergy to Codeine. *Id*. at ECF p. 4.

For housing purposes at the jail, Sullivan was placed on the next to highest level of suicide watch—SP2 status—for safety (due to auditory hallucinations and suicide attempts). She was referred for evaluation by mental health personnel.

April 28 through June 2020

Mental health personnel evaluated Sullivan the following day, April 28, 2020. Personnel determined she was stable enough to move to a lower jail housing status—mental health observation (MHO), and she would have follow-ups by mental health personnel on weekly rounds. Medications ordered for Sullivan by medical and mental health staff were Aripiprazole 30 mg (brand name - Abilify) for psychosis, Mirtazapine 45 mg (brand name – Remeron) for anxiety, Venlafaxine ER 75 mg (brand name - Effexor XR) for anxiety, and Atorvastatin 10 mg (brand name – Lipitor), and Propranolol HCL 10 mg (brand name – Inderal). [Doc. #73-8, ECF pp. 58-61]. Ativan 05 mg, a benzodiazepine and a controlled substance, was not included as part of her medications. It was not in Turn Key's psychiatric formulary. According to Turn Key's records, Sullivan was to be monitored by staff for possible withdrawal from Ativan, which she reported as taking for a couple of months.

In deposition, Dr. Berk testified Ativan is not commonly prescribed, as a chronic medicine, in a correctional setting because of a concern for diversion or recreational use of the drug.  He testified there must be additional considerations before prescribing it.  He agreed that persons can have an addiction to the drug.  [Doc. #73-23, ECF p. 7].

In the early morning hours of April 29, 2020, medical staff conducted as assessment of Sullivan for drug and alcohol withdrawal.  She reported having a panic attack.  Staff contacted Dr. Cuka, who ordered by phone a Benadryl 50 mg injection for immediate administration.  Medical staff continued for several days to assess Sullivan for drug and alcohol withdrawal.

On April 30, 2020, three days after her arrival, medical staff referred Sullivan to mental health personnel after she was observed in the cell cutting her wrist on metal and dunking her head in the toilet to drown herself.  Mental health personnel observed Sullivan having visible scratches on her wrist that were actively bleeding.  Sullivan reported she was not suicidal, but she was detoxifying off Ativan.  The individual decided Sullivan should be placed on SP2 status for safety and observation and she would be seen daily by mental health personnel.  Shortly thereafter, Dr. King approved, by phone, Seroquel 150 mg and Diphenhydramine (Benadryl) to be given to Sullivan.  In deposition, Dr. Cuka testified that Seroquel is a psychiatric medication—a second generation antipsychotic agent.  According to Dr. Cuka, it was probably given for sedation or distress Sullivan may have had at the time.  [Doc. #87-4, ECF p. 5].

In the early morning hours of May 1, 2020, Sullivan was observed by medical staff to be very agitated and anxious and was shouting out at various intervals. She also had

some bruising on the back of her legs and on the bottom of her buttocks. She complained of having a panic attack. Dr. Cuka approved, by phone, the administration of Vistaril 50mg for anxiety. Later that day, Sullivan reported to Dr. Cuka that she tried to kill herself by drowning in the cell toilet. She told him she was detoxing off Ativan. He "discourage[d] Ativan's use." [Doc. #74-8, ECF p. 41]. She reported having anxiety and he noted she was amendable to the administration of Lexapro. Dr. Cuka thereafter added Escitalopram 10 mg (Lexapro) to her medications. Sullivan was placed on the highest level of suicide watch by jail staff—SP1 status—with 24 hours observation (via an open "bean hole") and daily visits from mental health personnel.

On May 3, 2020, Sullivan was seen for anxiety by mental health personnel upon urgent referral by the medical staff again conducting a drug and alcohol withdrawal assessment. Mental health personnel determined she presented as a low risk of self-harm at that time. The next day, May 4, 2020, Sullivan reported to Dr. Cuka that she was not suicidal, but she was detoxifying off from Ativan. She requested to be placed at a lower housing status, and he recommended she be placed on SP2 status. On May 5, 2020, Vitamin D3 capsules were added by medical staff to Sullivan's medications.

On May 6, 2020, Sullivan was placed on SP1 status for putting her head in the cell toilet to drown herself. She reported to medical staff that her medication was not effective in controlling her thoughts and behaviors. She later reported to Dr. Cuka that she did not know why she had put her head in the toilet. He noted in the records she needed to give more time for her medications to establish effectiveness. He recommended she continue SP1 status. Like previous visits with Sullivan, he marked her symptoms as "[s]evere" and

7

"[m]arked impact on [her] ability to function satisfactorily in the current setting." [Doc. #74-8, ECF p. 61]. In deposition, Dr. Cuka testified it was not common to have patients for whom he documented the severity of their symptoms as "severe." [Doc. #88-4, ECF p. 6]. He also testified that individuals on SP1 status have behavior that is a problem and which impacts their ability to function. *Id*.

Sullivan was seen by Dr. Cuka over the next two days and was lowered to SP2 status for housing. He reported that the detoxification from Ativan was well managed by the medicine team. On May 8, 2020, a one daily vitamin tablet was added by medical staff to Sullivan's medications.

On May 11, 2020, Sullivan was seen by mental health personnel after making suicidal statements. She reported that she had had a fight with her cellmate and needed something to calm her down. When asked if she was having suicidal thoughts, she stated she wanted to die. Thereafter, she stated she was not suicidal. She remained on SP2 status. Later that night, medical staff provided wound care to Sullivan resulting from pressure ulcer formation on her right thigh and upper right arm/shoulder and received phone orders to start the administration of Bactrim DS.

On May 12, 2020, medical staff again provided wound care to Sullivan. The same day, medical staff made an urgent referral to mental health personnel because Sullivan had requested medication for anxiety. Mental health personnel observed Sullivan lying naked on her metal bunk using her smock for a pillow. She reported feeling depressed and anxious. She remained on SP2 status. She reported anxiety the next day, May 13, 2020. The following day, May 14, 2020, she reported no mental health symptoms and wanted to

move to MHO status. When jail staff attempted to move Sullivan as she requested, she then reported she was having suicidal thoughts. She also put her head in the toilet and stated she wanted to die. She was placed back on SP1 status.

On May 15, 2020, Sullivan reported to Dr. Cuka that she was still suicidal, but after discussing her medications, no changes were made.

On May 16, 2020, mental health personnel observed Sullivan lying naked on her metal bunk and reported that she appeared to be depressed. The next day, mental health personnel observed her sitting naked on the metal bunk and again reported that she appeared to be depressed. She also reported hallucinations and delusional thoughts, and she stated she was only a little suicidal. Personnel recommended that Sullivan be considered for modified SP1 status to allow for a mat/mattress because of her wounds and her age.

In the early morning hours of May 18, 2020, Sullivan was observed having a visual hallucination of seeing a man in her toilet. Later that day, she denied hallucinations to Dr. Cuka, but when he requested clarification, she reported seeing a man in the toilet. He noted she was not distressed by the hallucination, but she was disoriented as to time. She was later placed on modified SP2 status (with mat/mattress due to bed sores on thigh/hip and shoulder and with clothes). She continued to be seen by mental health personnel on a daily basis. She was also seen by medical staff for wound care. It was noted in Turn Key's records that Sullivan had a mat/mattress as of May 23, 2020. Dr. Cuka testified in deposition the mat/mattress was like "something you use on a camping trip, that you can

9

roll up into a cylinder. . . It is not much.  It wouldn't be much help for anybody."  [Doc. #73-3, ECF p. 7].

On May 26, 2020, after reporting to mental health staff she was feeling better and medications were starting to work, Sullivan cut herself with a plastic cup.  Staff reported it to mental health personnel and cleaned the wound.  Sullivan remained on SP1 status.

On May 28, 2020, Sullivan reported to Dr. Cuka that she wanted to die because she had nothing to live for.  She declined changes to her medications and reported the man in the toilet had been gone for a while.  She remained on SP1 status, but with modification to allow a mat/mattress due to her wounds on thigh/hip and arm/shoulder.  She continued to have daily visits by mental health staff and continued to have wound care by medical staff.  She reported to Dr. Cuka, on June 1, 2020, she was still a little bit suicidal and preferred to stay on SP1 status.  He noted, "secondary gain not clear." [Doc. #74-8, ECF p. 99].  In deposition, Dr. Cuka testified that "secondary gain" was "what does she get out of it?" [Doc. #88-4, ECF p. 8].  It was not clear to him what she was getting out of being on SP1 status.  *Id*.

On June 2, 2020, jail staff reported to Dr. Cuka that Sullivan slept all day.  He noted she responded to him when prompted so it seemed to him that she was awake but just not moving much during the day, which he noted was consistent with her bed sores.  He noted she should be placed on SP2 status but should also have a mattress for bed sore prevention.

On June 5, 2020, Sullivan reported to mental health personnel that she did not want to hurt herself.  Personnel discussed with Sullivan about the possibility of moving to MHO status, but she reported she was afraid to do that because of having previously been beaten

10

up by her cellmate.  Thereafter, she was placed on modified SP1 status for attempting to cut her wrist on the edge of her desk.  Dr. Cuka approved Haldol, Benadryl injections to be administered to Sullivan.  The next day, mental health personnel observed her lying naked on her metal bunk and using her smock for a pillow.  Sullivan reported she was depressed related to her husband.  She also reported she had been to court but had not talked to anyone.

Dr. Cuka visited Sullivan on June 8, 2020. She reported she still wanted to die.  He validated her suffering and advised her to ask for Haldol, Benadryl injections if needed. He recommended that she remain on SP1 status.  The next day she reported to Dr. Cuka that she was worse, more suicidal, and requested Benadryl.  He added Diphenhydramine 25 mg (brand name – Benadryl) to Sullivan's medications and increased the Venlafaxine medication.  The following day she reported she was a little better but was not comfortable with lowering to SP2 status.  At the time, she was sitting naked on her bunk.

On June 12, 2020, Sullivan reported she was still very depressed.  Dr. Cuka discussed with her the recent medication change and he advised her to give it a few weeks. He again advised her to ask for Haldol, Benadryl injections if needed.  She remained on SP1 status, but the status was modified to allow a mat/mattress.  Shortly thereafter, Dr. Cuka approved, by phone, Haldol, Benadryl injections for Sullivan.

On June 16, 2020, Dr. Kent approved, by phone, a nutritional drink (Ensure), twice daily, for Sullivan for 30 days.  On June 17, 2020, he also approved, by phone, a Haldol injection for her.  The next day, he ordered Paroxetine HCL 40 mg (brand name – Paxil), with refills to be approved by Dr. Cuka.  Shortly thereafter, Dr. Cuka cancelled the

11

medicine.  On June 23, 2020, Dr. King then approved, by phone, Ciprofloxacin HCL 500 mg (brand name - Cipro) five days and NSS Solution injections.  Dr. Berk, plaintiff's expert, stated the Ciprofloxacin was for a "presumed urinary tract infection."  [Doc. # 88-1, ECF p. 5].  Medical staff continued to provide Sullivan with wound care because of pressure ulcers.

On June 19, 2020, Sullivan had complained to medical staff that the food was not very good, and jail staff had advised medical staff that she had not eaten her sandwich the day before.  A food log was started.

On June 20, 2020, mental health personnel evaluated Sullivan after she was observed scraping her wrists on the end of her bed.  She was also observed to be depressed.  In the evening of June 21, 2020, she was observed cutting her wrist with a plastic cup.  She had feces on her legs and had refused to bathe.  Feces and urine were also observed on the cell floor.  The next day, June 22, 2020, she reported to Dr. Cuka she was still suicidal.  He encouraged her to ask for extra medication when starting to feel like she wanted to hurt herself.  The next day, Dr. Cuka observed her sitting naked in her cell.  She reported she was still suicidal.  She told him she wanted Zyprexa medication for emergencies instead of the Haldol, Benadryl injections.

On June 24, 2020, Sullvan reported to Dr. Cuka that she was better but still suicidal.  He thought the increased Effexor (Venlafaxine) medication may be working better, but he encouraged her to ask for extra medication for emergencies.  He noted her weight was "too low." [Doc. #74-8, ECF p. 142].

12

That same day, Dr. King advised medical staff that he had ordered an air mattress for Sullivan for pressure sores on her hips and her shoulder. He wanted her placed on a regular hospital bed and mattress until it arrived. Later that evening she had a bowel movement on the bed. She was allowed to have adult diapers as needed. According to Dr. Berk, there was no explanation for the fecal incontinence. [Doc. #88-1, ECF p. 5].

On June 25, 2020, nursing staff reported to Dr. Cuka that Sullivan was not eating because she does not like the food in jail and she had not eaten the fruit that she had requested. At the time, she was being treated for three pressure ulcers. Medical staff ordered a Boost supplement three times a day for Sullivan. Her weight was recorded at 126 lbs., which was only an increase of 1 lb. from when she had been weighed on June 19, 2020. According to plaintiff's expert, Dr. Berk, Sullivan's weight loss corresponded to "Stage 2/Severe Malnutrition." [Doc. #88-1, ECF p. 9].

Thereafter, on Dr. King's orders, Sullivan was transported by ambulance to OU Medical Center for further evaluation. Upon arrival at the emergency room, Sullivan was evaluated for a 16-lb. weight loss and bilateral hip pressure wounds. Sullivan reported she was not eating because the jail food was not appetizing and she stated she was hungry. She also reported depression and lying in bed all day. Britta Ostermeyer, chair of the Department of Psychiatry and Behavioral Sciences at University of Oklahoma Health Sciences Center, advised Dr. King, Dr. Cuka, and others that Sullivan was in the emergency room and that they were "going to see her." [Doc. #77, ECF. p. 2, Doc. #87-4, ECF pp. 2 and 3]. She agreed with Dr. King that Sullivan was "at high risk of medical demise with

13

us in jail." [Doc. #77, ECF p. 2].[3] Psychiatry services evaluated Sullivan and thought she needed to be managed inpatient for severe depression with potential suicide thoughts. However, they determined that she did not warrant admission to "ED OBS" because she was an inmate and could be monitored in the jail under suicide precautions. They noted that she was currently followed by Dr. Ostermeyer at the jail. [Doc. #74-12, ECF p. 8].

In a "Summary" dated June 25, 2020, Dr. King stated that Sullivan's known chronic problems included severe psychosis and major depression. [Doc. #88-5]. He stated that since her arrest, Sullivan had "expressed suicidal intent and had exhibited severe apathy for self-care." *Id*. He stated that she was lying on her bunk or her floor for hours in her own feces and urine and had developed three decubitus ulcers. He also stated that she was not eating at times, and she had lost 16 lbs. (from 142 lbs. to 126 lbs.) in six weeks. He also stated medical staff had started nutritional supplements and she had gained 1 lb. in the last three days. *Id*. Further, Dr. King stated that Sullivan's medical condition was gradually declining due to her mental state and incarceration and that given her age and severe mental illness, she was "at a very high risk for sudden death." *Id*. He stated that he and Dr. Ostermeyer had requested 1:1 security staffing for Sullivan and that they were urgently requesting a third-party transfer to a mental health facility.

Dr. Winchester testified in deposition that he had seen the "Summary" and the things listed by Dr. King were correct. [Doc. #89-7, ECF p. 113]. He also specifically agreed with the statements that Sullivan's "medical condition is gradually declining due to

---

[3] *The record indicates the University of Oklahoma was previously under contract to provide mental health services at the jail. [Doc. #87-4, ECF pp. 2-3].*

her mental state and incarceration" and that given "her age and severe mental illness, she is at very high risk for sudden death." *Id*.

Dr. Cuka testified in deposition that he believed in June of 2020 Sullivan needed to be transferred to a mental health facility for inpatient treatment.  He posited that if she got to a therapeutic environment she would improve.  Both he and Dr. Winchester testified that they could not unilaterally release someone from custody to go into inpatient psychiatric treatment.  [Doc. #74-3, ECF p. 22; Doc. 75-4, ECF p. 29].  Dr. Berk also testified that a medical provider could not unilaterally release someone from custody or unilaterally admit the person into a separate facility.  [Doc. #73-23, ECF p. 9].

On June 26, 2020, Dr. Cuka noted in Turn Key's records that Sullivan had been sent to the hospital for a second opinion and was returned with no recommendations for change in care.  Upon her return, she was provided with an air mattress with tubing.  He noted she was lying naked on her mattress and did not look at him.  He also noted that eating continued to be a problem.  Medical staff noted Sullivan had refused to eat.  She talked about the good food in the hospital, but she did not like the food in the jail.

On June 29, 2020, Sullivan reported to Dr. Cuka that she was okay, but the previous day had been a bad day.  She wanted to stay on SP1 status.  Dr. Cuka noted that the medical team were following her closely for weight issues.  Later that evening, Sullivan reported that she was feeling faint and medical staff noted that she was diaphoretic and pacing in her cell.  Dr. King approved a prescription for Diltiazem HCL 30 mg (brand name – Cardizem) for Sullivan.  According to Dr. Berk, the "medication is used to treat abnormal heart rhythms (arrythmias)."  [Doc. #88-1, ECF p. 5].  Shortly thereafter, Sullivan was

found by jail staff trying to use the bed cords of the mattress to self-harm. She was given a thick mattress to replace the air mattress.

On June 29, 2020, Sullivan's counsel filed a motion for release on medical own recognizance. He attached Dr. King's "Summary" in support of the motion. Based on the "Summary," counsel stated it appeared Sullivan was "at risk of death in the jail." [Doc. #74-16].

On June 30, 2020, Sullivan affirmed to Dr. Cuka that she had tried to kill herself. She reported she was feeling better but was "still suicidal." She did not come to the cell door to talk to him. He noted the medicine team was "following for excessive weight loss BMI = 19.42, yet [the] medicine team [was] concerned about recent weight loss and her bed sores so they [were] following her closely." [Doc. # 74-8, ECF p. 158]. No changes were made to her mental health treatment.

On July 1, 2020, Dr. Cuka observed Sullivan sitting naked on her bed. During a discussion about medication with Dr. Cuka, she told him that she liked the Venlafaxine (Effexor) medication, but when he discussed increasing the dose, she asked that it be discontinued because it made her heart race. And when discussing what was available for emergencies, she requested Ativan. Dr. Cuka again discouraged the use of Ativan. He noted she was amenable to Lexapro, and he added Escitalopram 10 mg (brand name – Lexapro) and Melatonin Maximum Strength 5mg to her medications. She told him that she was "currently suicidal." [Doc. # 74-8, ECF p. 161].

On July 2, 2020, Sullivan had little of her breakfast and less than 20 percent of her lunch. She stated to medical staff that she did not like the food. She drank a Boost

supplement and was encouraged to eat fruits given to her.  She reported to Dr. Cuka that she did not feel any better.  They discussed Atenolol for Effexor-related tachycardia.

In the early morning hours of July 3, 2020, Dr. Cuka ordered by phone Zyprexa 10 mg for Sullivan's immediate use.  He was called by medical staff multiple times due to Sullivan attempting to strangle herself with her adult diaper.  She told him later that morning the medication helped "a little."  [Doc. #74-8, ECF p. 166].

On July 6, 2020, Sullivan's counsel withdrew the motion for release on medical own recognizance.  The motion had been opposed by the prosecution.  Turn Key's community coordinator informed Sullivan the motion had been withdrawn by her counsel.

On July 7, 2020, Sullivan, lying on the floor wearing only an adult diaper, reported to Dr. Cuka that her court case was "on hold" for what she thought would be an extended period, and she was thinking more of suicide.  [Doc. # 74-8, ECF p. 171].  He advised her to let them know if she wanted to self-harm, and they could get her extra medication.  The next three days, Sullivan was observed by Dr. Cuka lying naked on her mattress or lying naked but wearing an adult diaper.

On July 13, 2020, Sullivan, again lying naked on her mattress, reported to Dr. Cuka that things were worse because of bad news she had received over the weekend.  He offered Zyprexa 5 mg to her which she declined.  The next day, she reported she was the same but declined any medication changes.

On July 15, 2020, Dr. Kent approved, by phone, a Benadryl 50 mg injection for Sullivan.  The next day, Dr. Cuka approved, by phone, another injection for Sullivan after she was observed chaffing her wrist against her bed and advised that she would only accept

17

Benadryl for anxiety. She complained Haldol made her heart race. On June 19, 2020, he ordered Olanzapine 5 mg (Zyprexa) for Sullivan with a Benadryl injection. Dr. Cuka continued to regularly visit Sullivan. He observed either her lying naked on the mattress or wearing only an adult diaper.

On July 25, 2020, Sullivan was observed rubbing her wrist. She reported being anxious about her trial and stated she wanted to die. Dr. Cuka approved, by phone, Haldol, Benadryl injections for her. Thereafter, he discussed changes to her medication, but she declined any changes. He approved another two sets of Haldol, Benadryl injections for her.

On July 28, 2020, Sullivan's preliminary hearing was moved by the court to September 8, 2020. Sullivan was not present at the hearing, reportedly for not testing for COVID-19. She advised the community coordinator she had not refused the test and requested the court date be moved to an earlier date. She agreed to be tested for the COVID-19 virus that day and was reported negative for the virus. Sullivan's preliminary hearing was thereafter moved by the court to a later date, September 29, 2020.

August through November 2020

On August 2, 2020, Sullivan reported hearing voices that were telling her to kill herself. Dr. Cuka ordered, by phone, Benadryl injections for Sullivan, which she refused. When he saw her the next day, August 3, 2020, she reported her medication was working but she needed Benadryl for anxiety. On August 5, 2020, Dr. Cuka discussed increasing Escitalopram (Lexapro), but she declined the change. He continued to observe her either lying naked on her mattress or wearing only an adult diaper.

18

On August 7, 2020, Sullivan requested a blanket during a visit from Dr. Cuka. He told her a blanket was not possible (due to housing status) but talked with her about a future step down in status.

Later it was reported that Sullivan was observed on August 7, 2020, pacing in her cell and stopping intermittently to rub her wrists on the edge of her desk. Dr. Cuka approved, by phone, administration of Benadryl, but according to medical staff, she received no medication. On August 8, 2020, Sullivan was observed scratching her wrist on a cup. Thereafter, she was placed in a security restraint chair. Dr. Cuka again approved, by phone, administration of Benadryl, but she again refused the shot. She was instructed by jail staff that any further acts of self-harm would result in a loss of SP1 privileges.

Two days later, on August 10, 2020, Sullivan reported to Dr. Cuka she had had a bad weekend and had stuck her head in the toilet again. He speculated the trigger for what happened may have been their discussion about a step down in housing status. Later, he approved, by phone, Olanzapine (Zyprexa) for immediate administration.

On August 13, 2020, mental health personnel evaluated Sullivan after she had attempted to cut herself and tried to strangle herself with an adult diaper. She had also been observed by medical staff cutting her wrist on her desk. She reported to mental health personnel that voices told her she did not deserve to live. Mental health personnel discussed with Dr. Cuka about placing Sullivan with another SP1 status detainee. When asked about it, Sullivan was agreeable.

Dr. Cuka visited Sullivan the next day, and she and the new cellmate were doing well. He proposed that if they continued to do well, they would step down in status together

19

so that they could stay together.  Sullivan requested discontinuing Abilify (Aripiprazole) and for the use of Zyprexa (Olanzapine) instead.  Dr. Cuka stopped the Aripiprazole and added Olanzapine 5 mg (for psychosis) to her medications.

On August 17, 2020, Dr. Cuka observed Sullivan in the best mood he had ever seen. She reported she and the cellmate were ready to step down in status and they wanted to be in the same cell.  They requested the bean hole in the cell door remain open.  In SP1 status, the bean hole was open.  It was closed in SP2 status.  Sullivan reported that a closed bean hole would make her very anxious.  Sullivan and the cellmate were moved to SP2 status with the bean hole opened instead of closed.

On August 20, 2020, Sullivan reported to mental health personnel she wanted to move to MHO status and stay with her cellmate.  She was moved to MHO status the same day.

The next day, August 21, 2020, Dr. Cuka visited Sullivan.  She requested an increase in Zyprexa (Olanzapine).  Dr. Cuka added Olanzapine 7.5 mg to her medications.  Jail staff had reported to him that she continued to engage in self-harm, but she and her cellmate denied it.  Dr. Cuka noted she was walking around her cell and was wearing a shirt, rather than just an adult diaper.  Later, he approved, by phone, Benadryl for immediate administration, and she and the cellmate were moved to SP2 status.

Sullivan reported to mental health personnel on August 22, 2020, she had had a panic attack the night before and felt suicidal.  She requested to step down from SP2 status to MHO status, but mental health personnel wanted her to be without suicidal ideation for at least 24 hours.  Later that day, she had an altercation with her cellmate and was assaulted.

Dr. Cuka approved, by phone, a Benadryl 50 mg injection. The next day, she reported to mental health personnel that she and the cellmate were ok, and they had made up.

On August 25, 2020, Sullivan was found to have bed bug bites all over her and her mattress was removed from her cell. Thereafter, she attempted to hang herself with her pants and was placed on SP1 status.[4] Dr. King approved, by phone, Acetaminophen (brand name - Tylenol Extra Strength), Cetirizine (Zyrtec) and Hydrocortisone LB (Hytone) for her.

The next day, August 26, 2020, Sullivan advised Dr. Cuka that she had had a panic attack. She agreed with Dr. Cuka to increase the Lexapro (Escitalopram), and he added Escitalopram 20 mg to her medications. She also reported to him that her benzodiazepine regime was Ativan 0.5 mg.

On August 28, 2020, Sullivan reported to Dr. Cuka she had had a behavioral emergency and wasn't feeling well. According to medical staff, she had attempted self-harm with her adult diaper. Dr. Cuka advised her, "she [needed] to work harder on her problems than [everyone] else." [Doc. #74-8, ECF p. 283]. Three days later, she reported to Dr. Cuka she was a little bit depressed. She was wearing her suicide smock and requested a mattress. Later that night, she was observed pacing in her cell and attempting to cut wrist with her desk. The next day, she reported to mental health personnel that she was doing ok.

---

[4] *The record does not reflect that the cellmate moved to SP1 status with Sullivan. There is no indication of a cellmate for the remainder of her incarceration.*

On September 7, 2020, Sullivan reported to Dr. Cuka that she was amenable to stepping down to SP2 status with certain conditions, including that the bean hole stay open. Two days later, Dr. Cuka reported Sullivan had reported that she was ok but requested not to step down in housing status. Dr. Cuka discussed Sullivan's status with the team and decided not to step her down until she was ready to do so unconditionally. She was to have her bean hole closed and no mattress, since her pressure ulcers had resolved. The next day, September 10, 2020, Dr. Cuka advised Sullivan the team would not step her down with her stated conditions. According to Dr. Cuka, Sullivan accepted it gracefully.

On September 11, 2020, Dr. Cuka observed Sullivan lying naked on her smock. She calmly told him she was having a panic attack and requested Ativan "over and over." [Doc. #74-8, ECF p. 313]. She reported her pulse was elevated and she was sweating. She was stated she was amenable to an injection of Vistaril or Benadryl. Medical staff took Sullivan's vital signs. Because her blood pressure and pulse were low, Dr. Cuka concluded the injection could be problematic for Sullivan. He noted that she appeared to be experiencing "benzodiazepine [Ativan] cravings." *Id*.

On September 14, 2020, Sullivan advised she was not ready to step down with respect to housing status. Dr. Cuka told her that they had decided not to allow her conditions when she did step down. Two days later, she advised Dr. Cuka that she was ready to step down. At the time, she was sitting naked on her bed. He told her they would revisit it the next morning. She did not bring up the subject the next morning. Again, she was sitting naked on her bed when observed by Dr. Cuka.

On September 18, 2020, she advised Dr. Cuka she wanted to step down to SP2 status but had to have the bean hole left opened so she did not self-harm.  Thereafter, Sullivan was observed scratching her wrists.  Dr. Cuka approved, by phone, a Benadryl 50 mg injection, for immediate administration.  She refused the shot and asked for a restraint chair.  She then took the medication.  The next day, Sullivan was again observed scratching her wrists and claimed her coping skills were ineffective.  She was also observed attempting to choke herself with adult diaper and then placing her head in the toilet without submerging it.  That same day, Dr. Cuka had conferred with mental health personnel, and they believed she engaged in low-risk self-harming behaviors to attempt to gain preferred housing location, access to items, and attention.  Dr. Cuka encouraged jail officers to redirect low-risk harm behavior and intervene if the behavior escalated to high-risk behavior.  She remained on SP1 status and under 24-hour monitoring by jail staff.

For the remainder of September, Sullivan continued to advise Dr. Cuka she did not want to step down from SP1 status.  She requested a mattress, but Dr. Cuka declined.  He referred her to medical staff to request a mattress.

On September 28, 2020, Sullivan was observed pacing around her cell and scratching at her body and face.  She reported it was because she had "court tomorrow." [Doc. #88-2, ECF p. 11].

On September 29, 2020, during Sullivan's preliminary hearing, the judge found probable cause and ordered Sullivan to stand trial.

On October 5, 2020, Sullivan again advised Dr. Cuka that she was not ready to step down in housing status.  He noted that medical staff were becoming concerned about the

recurrence of pressure sores due to her lack of activity and constantly lying down. Sullivan requested a restart of the Boost supplement. Dr. Cuka advised the medical team, and they ordered it.

On October 7, 2020, medical staff ordered "dressings/padding to bony prominences PRN to maintain skin integrity[.]" [Doc. # 74-8, ECF p. 364]. Sullivan's left shoulder and bilateral hips and upper thighs were padded by medical staff "due to bruising and blanching of bony prominences." *Id*. at ECF p. 365. Her SP1 status was modified to provide for a mat/mattress.

On October 8, 2020, Sullivan reported that her heart was "flying out of her chest," but Dr. Cuka noted that she did not appear distressed or diaphoretic. [Doc. #367, ECF p. 367]. Sullivan requested Ativan and wanted to go to the hospital. Dr. Cuka advised medical staff of her condition. He noted jail staff advised had him that Sullivan had not slept during the night.

On October 14, 2020, medical staff advised Dr. Cuka that Sullivan was anxious and agitated about going to court and was refusing her medications. She later took her medications. He ordered, by phone, Zyprexa (Olanzapine) 5 mg be given to her. Dr. Cuka saw her, and she told him she was "not too good." [Doc. #74-8, ECF p. 381]. She reported she was experiencing panic attacks constantly, and "[begged] for Ativan." *Id*. She then accepted a stat dose of Zyprexa (Olanzapine), which Dr. Cuka ordered.

On October 14, 2020, the judge continued Sullivan's pretrial conference to October 29, 2020.

On October 15, 2020, jail staff reported to Dr. Cuka that Sullivan had increased insomnia with stress over her legal problems. She was constantly lying down and had developed pressure ulcers. She affirmed to Dr. Cuka that things were getting worse but declined extra medication at that time. Dr. Cuka continued to visit Sullivan regularly noting that she was observed lying naked on a mattress. Medical staff began regular wound care for Sullivan on October 19, 2020.

In an email dated October 16, 2020, Dr. Ostermeyer affirmed that Sullivan was a "growing concern as she can get septic from her sores and die. Or die due to other causes of prolonged segregation." She stated Sullivan was "at high risk of death." [Doc. #78-14, ECF p. 4]. She requested Dr. Cuka to prepare a "very strong letter" requesting the court to move Sullivan into a hospital for inpatient treatment. *Id*.

As requested, Dr. Cuka wrote a letter, dated October 16, 2020, addressed to "Honorable Judge," requesting an order for transfer of Sullivan to a psychiatric inpatient treatment hospital facility. He stated that "[d]ue to the very prolonged segregation on level 1 suicide watch, her physical health has gravely deteriorated." [Doc. #88-14]. He also stated Sullivan preferred "to remain naked in her cell and [was lying] down almost all day and night to the extent that she has developed severe pressure ulcers that have become infected, placing her at a high risk of system infection (sepsis) and death." *Id*.

On October 21, 2020, Sullivan reported that she was a little better but not confident about stepping down from SP1 status. He clarified to her that the mattress was for medical purposes and not mental health purposes.

On October 23, 2020, Sullivan advised she was amenable to staying on SP1 status. Dr. Cuka, however, pointed out that she had not needed extra medication for several weeks and that she was coping better.

On October 29, 2020, the judge continued Sullivan's pretrial conference until December 2, 2020 to work toward a mental health solution.

That same day, Sullivan was observed with an adult diaper around her neck. She reported being a little depressed at the time. The next day, she reported no distress.

On November 4, 2020, medical staff ordered Famotidine 20 mg (brand name – Pepcid), Oyster Shell Calcium 500 mg, One A Daily Multi-Vitamin, Vitamin C 500 mg, and Zinc Gluconate 100 mg for Sullivan.

On November 5, 2020, Sullivan, while standing naked by her cell door, reported to Dr. Cuka that she was having a panic attack. She did not appear to be in distress to him. She was agreeable to extra medication. Medical staff reported to Dr. Cuka that she had recently wrapped a smock around her neck, but she was able to be talked down. Dr. Cuka approved immediate administration of Olanzapine (Zyprexa).

By November 5, 2020, Sullivan's pressure ulcers had healed, and no wound care was required.

On November 9, 2020, Dr. Cuka ordered Sullivan's Olanzapine 15 mg be given at night so she might be less tired during the day.

On November 10, 2020, Dr. King wrote a "Confidential Medical Summary" addressed, "To whom it may concern[.]" [Doc. #88-24]. He stated that "for greater than 6 months [Sullivan] has been in a smock and unable to wear any clothes" and was

26

"suffering from poor intake, confusion, bed sores due to inactivity and disorientation." He also stated that she frequently required "24-hour observation for safety, bathing, and hygiene assistance daily" and was "usually incontinent as well." *Id*. He stated that she was "cooperative at time and oriented and confused to catatonic at other times." *Id*. He stated that she was "continuing to decline physically due to her severe mental illness and has become unfit to continue at [the jail]." *Id*. Further, he stated she was "extremely high risk for complications including sudden death" and requested "suitable arrangements be made by the court and her case expedited if possible." *Id*.

On November 10, 2020, the judge in Sullivan's criminal case granted an application for the determination of Sullivan's competency and ordered that she to be transported to Oklahoma Forensic Center for observation and evaluation.

On November 11, 2020, Sullivan was observed pacing in her cell. She reported she was anxious and requested adult diapers. Sullivan reported to mental health personnel that she could not tell if the change in medication was working. Medical staff advised mental health personnel that she had been asking for adult diapers even though she did not need them. The next day, on November 12, 2020, Sullivan reported to Dr. Cuka the change to administration of Zyprexa at night was helpful.

On November 20, 2020, Dr. Cuka noted that Sullivan appeared to be "distressed." [Doc. #74-8, ECF p. 455]. She was walking around her cell naked. She calmly complained of panic attacks and wanted Ativan. The nurse took Sullivan's vital signs and advised they were unremarkable. Sullivan asked Dr. Cuka if he couldn't "order [the Ativan] at all or do a [non-formulary] request." *Id*. She also reported auditory hallucinations. After a

27

discussion, she was amendable to a small dose of Haldol in the morning in addition to the Zyprexa at night. Dr. Cuka added Haloperidol 5 mg (Haldol) to her medications. He noted Sullivan might be a candidate for Clozapine. Thereafter, she was administered Haldol, Benadryl injections. Three days later, she reported the addition of Haldol was very helpful and took it as needed. She also agreed to an increase of Zyprexa (Olanzapine) and Dr. Cuka added Olanzapine 20 mg to her medications. On November 28, 2020, she was given Haldol, Benadryl injections.

On November 30, 2020, Sullivan had an episode of self-harm by scratching her wrists with a "spork." [Doc. #74-8, ECF p. 851]. She reported to mental health personnel the next day that nothing was wrong. She stated that she did not want Haldol as routinely scheduled because she said it affected her heart rate. She could not describe to mental health personnel how it affected her heart rate.

On December 2, 2020, the judge continued Sullivan's pretrial conference to February 3, 2021 so that Sullivan could be transported for a competency review.

On December 15, 2020, Sullivan advised Dr. Cuka she was doing ok, and he praised her for going an extended time without extra medication. Three days later, Sullivan asked if her anti-depressant could be increased. Dr. Cuka advised that she was maxed out on both of her medications and that they were working well. He advised her to learn an improved coping skill.

On December 22, 2020, Dr. Cuka observed Sullivan in the exact same position as the day before (lying on her mattress wearing her smock and not looking at him). She said she had not moved since yesterday but then moved a little and said she had just moved. He

28

encouraged physical activity, and she denied an overdose of "psych meds." [Doc. #74-8, ECF p. 523].

The next day, December 23, 2020, Dr. Cuka found Sullivan in the exact same position. He questioned whether he was overmedicating her, and she responded "no." *Id*. at ECF p. 526. She said she moved to use the bathroom and to eat. He encouraged her to move more. Later that day, Sullivan had an unidentified behavioral emergency, and Dr. Cuka approved, by phone, Aripiprazole 15 mg (Abilify), for immediate administration.

On December 24, 2020, Dr. Cuka noted Sullivan was in a different position and the Abilify was effective for her behavioral emergency. She requested an additional Boost supplement, and he referred her to the medical staff.

On December 29, 2020, Sullivan reported to Dr. Cuka "nothing new." [Doc. #74-8, ECF p. 537]. He encouraged her to get up and move around. She moved her head to look at him. She affirmed that her "psych meds" were slowly working better. *Id*. Medical staff found a wound on her right buttocks.

On December 30, 2020 and December 31, 2020, Sullivan did not move to look at Dr. Cuka. He noted that she "seem[ed] stabilized as well as possible on current regimen," but he would like to see if she could do better. [Doc. #74-8, ECF p. 542]. He decided to offer her Clozapine.

January 2021 through March 2021

On January 4, 2021, Dr. Cuka offered Clozapine to Sullivan. He noted she was not interested because of the blood work required. The next three days, she reported no change or nothing new to Dr. Cuka.

29

On January 7, 2021, she did not move to look at Dr. Cuka.  He offered Clozapine again, but she was not interested.

On January 11, 2021, Sullivan was observed walking around her cell naked with intermittent screaming.  She reported to Dr. Cuka she was having a panic attack and requested Ativan.  She declined Abilify, which Dr. Cuka noted had worked previously.  Thereafter, she accepted Abilify and he approved administration of Aripiprazole 15 mg for immediate administration.  He later observed that she was no longer in distress.

That same day, Sullivan began receiving wound care for a newly formed pressure ulcer on her right buttocks.  She later received wound care for her shin.

On January 13, 2021, Dr. King noted about following Sullivan for hyperthyroidism. He also noted she was taking Propranolol for shaking.

On January 15, 2021, Dr. Cuka observed Sullivan lying down in the same position as the day before and she did not move to look at him.  She told him everything was ok, but she did not know when she might leave.  He advised her to ask for extra medication if needed.

On January 19, 2021, Dr. Cuka observed Sullivan lying down in the same position as the day before and she told him she was ok and there was nothing new.   The next day, January 20, 2021, Dr. Cuka found her lying in the same position and she did not move to look at him.  He noted that she had an episode the day before with brief screams and she responded well to Abilify.

On January 20, 2021, Dr. King wrote an email to notify the public defender's office and jail administration that Sullivan, "a severely mentally ill patient[]," continued to

decline physically, and stated that any "assistance in advancing [her case] or alternate healthcare placement would be appreciated and should be considered urgent." [Doc. # 78, ECF p. 5].

On January 21, 2021, Sullivan came to the cell door to see Dr. Cuka, and she was not wearing her smock. She requested something else for panic attacks, and they discussed Abilify and early intervention. He noted the Abilify had been very helpful, but she was in "denial about this." [Doc. #74-8, ECF p. 585].

On January 23, 2021, Sullivan reported she had fallen. She had a small laceration on spine and bruises on both shoulders. She told medical staff she had sat up quickly, became dizzy and was nauseous. The next day, medical staff reported to mental health personnel that Sullivan's food had to be removed from her cell because she used it to self-harm her groin and wrist/hand.

On January 29, 2020, Dr. Cuka observed Sullivan walking around her cell naked. After he greeted her, she said, "you lied to me. [Y]ou have [Ativan] here[,] a nurse told me." [Doc. #74-8, ECF p. 604]. Dr. Cuka advised her Ativan was not on the psychiatric formulary. He asked her what she had been thinking of to work herself up and she responded her "court case." *Id*. Later that day, Sullivan was reported to be digging her fingernails into her skin. Dr. Cuka ordered Aripiprazole 15 mg (Abilify) for her.

On February 1, 2021, Sullivan reported to Dr. Cuka that everything was ok, but she requested a pivot from Lexapro to Prozac. Dr. Cuka agreed and added Fluoxetine HCL 20 mg (Prozac), for depression and anxiety, to her medications.

31

On February 2, 2021, the court handling Sullivan's criminal case received a letter, dated January 20, 2021, from Peter Raush, Ph. D, a forensic psychologist with the Oklahoma Department of Mental Health and Substance Services—Oklahoma Forensic Center (OFC).  Although Sullivan had been ordered by the court to be transferred to OFC for evaluation, Dr. Raush advised that he had conducted the evaluation via Zoom for Healthcare on January 7, 2021.  He advised that her current mental state would impede her ability to rationally assist her counsel but that following a course of psychiatric treatment, she was highly likely to be functioning at a level where she could be competent for adjudication.

The next day, the court scheduled a competency review for Sullivan for May 5, 2021.

On February 6, 2021, Sullivan was observed with a paper spoon digging into her wrist.

On February 8, 2021, Dr. Cuka observed Sullivan in the exact same position when he saw her on February 5, 2020.  He asked if Prozac was working better and she said "maybe" and reported that overall things were ok.  [Doc. #74-8].  The next day, she was lying in the same exact position and he encouraged activity.  Sullivan affirmed that she had not done self-harm for several weeks and reported that Prozac may be working better than Lexapro.

On February 19, 2021, Sullivan reported to Dr. Cuka that everything was ok, and she was "waiting to go to Vinita." [Doc. #74-8, ECF p. 640].  In the early hours of February 20, 2020, it was reported that Sullivan had been anxious and agitated but had calmed down

and allowed medical staff to do wound care on her left wrist.  Later that morning, she requested Ativan from mental health personnel for her anxiety.  At the time, she was pacing and was agitated.  She reported her medications were not effective on her symptoms.  The next day, February 21, 2021, she reported her medications were now effective on her symptoms.

On February 22, 2021, Sullivan reported to Dr. Cuka that she was ok.  She was lying on her left side facing the wall and did not move to look at him.  She reported she had not heard anything about going to Vinita.  The next two days, he observed her in the same position.  She told him on February 23, 2021, she was waiting to go to "OFC."  [Doc. #74-8, ECF p. 648].  And she told him on February 24, 2021, she had heard nothing from "OFC."  [Doc. #74-8, ECF p. 650].

In the early morning hours of February 25, 2021, Sullivan was placed in a security restraint chair by "security" after digging into her wrists to open a wound.  She was thereafter cooperative but was very anxious and stated she wanted to die. [Doc. #74-8, ECF p. 853].  An hour later, medical staff reported she was "panicking all night, digging at skin, and hurting her wrist while in restraint chair."  *Id*.  She stated her medicine "isn't helping me[,] can [I] talk to Dr. Cuka."  *Id*.  Later that morning, Dr. Cuka observed she was acutely distressed and was walking around her cell naked.  Nursing staff reported to him she had had a negative interaction with jail staff the night before.  He noted she intermittently gave short screams and demanded Ativan.  He ordered the nurse to immediately give her Abilify 15 mg, noting that it had helped her in the past.

33

The next day, February 26, 2020, Dr. Cuka observed Sullivan in a different position, lying on her right side facing into the cell. She did not move to look at him. Nursing staff had reported she had not eaten or taken Boost supplements in several days. She again requested Ativan. He noted in the records Ativan was not in his formulary, and "is her addiction anyway so not appropriate for her." [Doc. # 74-8, ECF p. 655]. She declined Abilify.

On February 28, 2021, a Sunday, Sullivan complained to medical staff of bilateral hip pain, with redness observed to the areas. Ibuprofen (brand name – Advil) was administered to Sullivan. She was advised to turn from side to side every two hours. Medical staff provided wound care the next day.

Sullivan reported to Dr. Cuka, on March 1, 2021, her weekend was "not too good." [Doc. #74-8, ECF p. 661]. She clarified that she was dizzy. Dr. Cuka advised her to notify the "medicine team." *Id*.

In the early morning hours of March 2, 2021, Sullivan was observed pacing all night and was shaking and falling. Medical staff called and received an order, by phone, of Hydroxyzine 50 mg (Vistaril) to be given to her. Several hours later, different medical staff called Dr. Winchester, who was then Turn Key's medical director, and reported a rapid decline in Sullivan's mental and physical condition. She reported to him that Sullivan was refusing to eat and had not slept for two to three days. She also reported that Sullivan was "unable to stand unaided without falling" and she was "failing to thrive." [Doc. # 74-8, ECF p. 853]. Dr. Winchester agreed Sullivan needed to be evaluated and treated in the emergency room. He ordered Sullivan to be sent to SSM Health St. Anthony Hospital.

34

Prior to her leaving for the hospital, Dr. Cuka observed Sullivan in an exam room. He saw bruising and open sores on all her extremities. Medical staff reported to him she had not been eating, and she was not cooperating with her wound care. She remained silent and appeared to be angry. He noted that she was somewhat physically resistant to the nurses, and she would not answer his questions.

Subsequently, Sullivan was transported to the hospital and admitted for medical care on March 2, 2021. She reported to hospital staff, "I can't eat. I don't know." [Doc. #73-4, ECF p. 107]. She reported she had suicidal ideation with a plan to cut her wrists. She remained in the hospital for three days. Her admission weight was reported as 115 lbs. During her stay, Sullivan ate well, but she engaged in self-harm to her wrists and was placed in soft restraints. The hospital records indicated episodes of incontinence. They also indicated there were no current facility-administered medications on file, but there were outpatient medications on file that included Ativan 0.5 mg. [Doc. #73-4, ECF p. 109]. The records also indicated that she was allergic to Codeine and Haloperidol (Haldol). *Id*.

Sullivan was discharged on March 5, 2021. Her reported discharge diagnoses on March 5, 2021 included failure to thrive in adult (principal), dehydration, acute kidney injury, generalized anxiety disorder, schizophrenia, suicidal ideation, bipolar affect-depressed, and non-traumatic rhabdomyolysis. As to the failure to thrive diagnosis, the doctor noted that Sullivan had eaten very well—often four to five times daily and had expressed nothing but hunger. She noted concerns regarding abuse or neglect in the jail setting. She noted Sullivan had denied abuse or neglect, but she also noted a guard had been present during all discussions with her. She further noted concerns about abuse

35

because of Sullivan's wounds.  The dehydration and acute kidney injury diagnoses were noted as resolving or resolved.  The non-traumatic rhabdomyolysis was noted as trending down.  During her stay, Sullivan had been given Ativan 0.5 mg injections for anxiety, agitation, and psychosis.  She also received on the first day of admission, two Ativan 1 mg injections.  Home medication instructions included taking Ativan 0.5 mg twice daily for anxiety.

Two days after her discharge from the hospital, Sullivan urinated on the cell floor, slipped on the urine, and hit her head causing a laceration.  She was transported back to the St. Anthony hospital.  She was admitted into the hospital as a patient because of acute respiratory failure caused by holding her breath.  She was placed on BiPAP and restraints.  She was reported to have uncontrolled schizophrenia and refusing her psych meds and treatment while in the jail.  Her admission weight was recorded at 115 lbs., and she had a low BMI of 18.01.  According to Dr. Berk, Sullivan's weight from 129 lbs. on January 24, 2021 to 115 lbs. corresponded to "Stage 2/Severe Malnutrition" and was "life-threatening." [Doc. #88-1, ECF pp. 9, 26].  He also opined her reported BMI classified her "as clinically underweight." *Id*.

On March 8, 2021, the judge entered an order committing Sullivan to OFC for treatment.  The State of Oklahoma and defense counsel both stipulated to the finding that Sullivan was incompetent.

Sullivan was discharged from the hospital on March 10, 2021.  According to St. Anthony's records, she was to be discharged to jail or inpatient psychiatry.  Her reported discharge diagnoses were acute respiratory failure (principal) and schizophrenia.  It was

noted that after a few days of restarting her medications, she was doing much better. The hospital records indicated she had eaten well. The records also indicated that she was anxious and was given Ativan 1 mg injections and Ativan 0.25 mg tablets as part of her medications. The discharge medications for Sullivan were not indicated in St. Anthony's records.

The next day, on March 11, 2021, Sullivan was found with urine on her bed and smock. That evening Dr. Winchester assessed Sullivan and noted that she was a very depressed female with an adult failure to thrive, and she had returned from hospital stay for weight loss, not eating, and low BMI. He noted that she was fatigued, naked lying on her side, had poor hygiene overall, and had small pressure ulcers with "over bony prominences excoriated appearance without drainage or signs of infection." [Doc. # 88-6, ECF p. 2]. His assessment was that she had severe depression, emaciation, and pressure ulcers. He noted he spoke with Dr. Cuka to coordinate care.

On March 11, 2021, Dr. Cuka also saw Sullivan. He noted she had been in four-point restraints at the hospital due to behavior problems. He noted he would consider asking if she preferred a trial of Cymbalta over Prozac. The next day, March 12, 2021, she reported "nothing new." [Doc. #74-8, ECF p. 675]. She did not move to look at him. On March 16, 2021, she also reported "nothing new." *Id*. at 683. She was lying naked on her mattress and did not move to look at him.

On March 18, 2021, Dr. Cuka noted that "treatment team has decided to leave her on SP1 [until] release due to severity of her condition and repeated suicide attempts." She reported to him that there was "nothing new." [Doc. #74-8, ECF p. 687].

37

On March 18, 2021, Dr. Winchester again assessed Sullivan at medical staff's request. He noted that she appeared to continue to deteriorate physically, slept most of the time, and interacted verbally minimally. He also noted muscle wasting on extremities. His assessment was "depressed affect, severe adult failure to thrive seems at a high risk of poor outcome[.] I have discussed her case with psyche, nursing and wound care and do not see any likely to succeed interventions in this setting. She does not seem competent by any behavioral parameter that I can see. [I] [w]ill rediscuss options with Dr. Cuka and [William Cooper, M.D.]." [Doc. #89-16].

Thereafter, Dr. Winchester met with Dr. Cuka and Dr. Cooper to discuss Sullivan. In deposition, Dr. Winchester admitted that as of March 18, 2021, it was clear Sullivan "could not receive adequate treatment in the jail setting[.]" [Doc. #89-7, ECF p. 27]. He testified she would have benefited by a move to treatment in a different setting. *Id.* at ECF p. 28. He also testified he was very concerned "that all of the options that [he] knew of in this setting" had already been tried "multiple times." *Id.* He testified her bail was $10,000, which meant her family would have to come up with $1,000 for a bond for her to be released from jail. *Id.* He was told during the meeting with Dr. Cuka and Dr. Cooper, "they didn't know how involved the family was with her; that she had stabbed her husband, and either they couldn't or wouldn't take on the responsibility for getting her out of there." *Id.* at ECF pp. 28-29. He also testified he did not move her out to the hospital at that time because he "didn't see an acute event or acute change that an ER would do anything but look at her and send her back." *Id.* at ECF p. 29.

38

On March 19, 2021, Dr. Cuka observed Sullivan lying on her cot and she did not move to look at him. She again said, "nothing is new." [Doc. # 74-8, ECF p. 690]. That afternoon, jail staff requested Dr. Cuka speak to Sullivan. She was sitting at the bean hole and reported she was distressed "over not going to 'Vinita.'" *Id*. She declined Abilify. He noted she chuckled when he told her that talking to her attorney to clarify her status would be more effective for her than Abilify. *Id*.

On March 21, 2021, Dr. Cuka ordered the immediate administration of Haldol, Benadryl injections. Earlier in the month, the hospital had documented an allergy to Haldol. And after the hospital visit, Turn Key's records also documented an allergy to Haldol. According to Dr. Cuka, the Haldol allergy was an error. Doc. # 101-4, ECF p. 9]. However, Dr. Berk testified, "there was no documented discussion to reconcile the new allergy information or determine whether it was a true allergy. Despite this serious note in her medical chart, [Haldol] continued to be administered without discussion or justification[.]" [Doc. #87-1, ECF p. 25].

In the early morning hours of March 22, 2021, medical staff noted Sullivan had been "sabotaging" wound care bandages for the past two nights and was refusing medications. [Doc. #74-8, ECF p. 854]. Later, medical staff reported she was scratching at her legs and there was blood on the bean hole from her digging at her arms and legs. Thereafter, Sullivan requested to correspond with her attorney for an update on her status at OFC.

Later that day, Dr. Cuka sent an email to Dr. Juan Lewis, Turn Key's psychiatric director, advising that Sullivan was "chronic SP1" and Dr. Winchester was recommending that they restart a low dose benzodiazepine regiment for her. [Doc. # 88-17]. He reported

39

he agreed with Dr. Winchester, and he stated, "her symptoms are textbook catatonia and the treatment for catatonia is low dose benzodiazepine." *Id*. He stated that Sullivan had reported being prescribed Ativan 0.5 mg "on the outside[,]" that Dr. Winchester was thinking Tranxene 7.5 mg would work well, and that he was "of the mind to do Librium 25 mg[.]" *Id*. Dr. Lewis agreed with the recommendation if that was what Dr. Cuka thought Sullivan needed.

On March 23, 2021, Dr. Cuka noted in Turn Key's records he informed Sullivan that he and Dr. Winchester had discussed "a small medication change to address her provisional diagnosis of catatonia and she [was] amendable to this." [Doc. #74-8, ECF p. 699]. That day, he made an off-formulary order for Lorazepam 0.5 mg (Ativan), one tablet twice daily, for catatonia. Sullivan's supply of Ativan was 30 days. [Doc. # 88-4, ECF p. 18].

When questioned in deposition why he prescribed Ativan after Sullivan had repeatedly asked for it and he had discouraged it, Dr. Cuka testified they were "very desperate about her physical deterioration" and they were prescribing it "for the catatonia." [Doc. #88-4, ECF pp. 10, 13]. Dr. Cuka testified the catatonia was "the decreased psychomotor activity, the apathy, all that[.]" *Id*. at ECF p. 13. He testified he "simply restarted her outpatient regimen." *Id*. at ECF p. 10. According to Dr. Cuka, "[t]ypically you start low and go slow. This is an elderly patient. She's over 50. So a little more fragile than usual." [Doc. #74-3, ECF p. 20].

When asked in deposition at what point did he believe Sullivan became catatonic, he responded, "[r]ight from the beginning." [Doc. #88-4, ECF p. 14]. And when asked

40

was it clear to him it was catatonia the whole time, he testified, "[i]t was depression. That's what [he] wanted to treat was her depression." *Id*. And he agreed that catatonia, "at that point" was a symptom of the depression. *Id*. He also testified, as to potential treatments for catatonia, "treating the underlying mental or physical disorder was the preferable thing to do. But as a symptom, [] benzodiazepines have been used[,]" and "[s]ome sources say Ativan is the best. . . [o]ther benzodiazepines should not be ruled out." *Id*.

According to Dr. Berk, Sullivan should have been transferred to an acute care hospital when she "had a diagnosis of catatonia, that it was clear no one felt comfortable treating." [Doc. #88-3, ECF p. 7]. He opined a "higher level of care was critical for managing her catatonia. . . patients with catatonia generally require hospitalization to properly treat the condition and avoid potentially fatal complications." [Doc. #88-1, ECF. p. 27].

Also, on March 23, 2021, Sullivan was advised by her attorney that she was currently awaiting an open bed at OFC for "competency review" and was scheduled for a "court hearing for determination" on May 5, 2021. [Doc. # 74-8, ECF p. 698]. Turn Key's community coordinator confirmed that information for Sullivan from the court docket. *Id*.

On March 25, 2021, Sullivan began receiving the prescribed doses of Ativan. [Doc.. #74-8, ECF p. 836]. Also, that day, she was observed pacing her cell, refusing to take her medications, or drinking her Boost supplement. According to medical staff, Sullivan was highly agitated and picking at her wounds because the jail employee, who was responsible for watching her, had been screaming and cussing at her. The next morning, she was observed by medical staff pacing around her cell and then falling. Vital signs were taken.

41

Sullivan stated she needed to go to the hospital. Medical staff told her that her blood pressure was ok and they would revisit it again.

When Dr. Cuka observed Sullivan on March 26, 2021, she was lying naked on her cot, and she did not move to look at him. He noted in the records medical staff reported she had fallen, and Sullivan stated she has "lots of falls like this." [Doc. #74-8, ECF p. 706]. He noted he discussed it with the medicine team. Dr. Cuka testified there was a concern that Ativan was causing her to fall. [Doc. #88-4, ECF p. 22]. Further he noted in the records there was "no clear response to the lorazepam [Ativan] yet." [Doc. #74-8, ECF p. 706].

On March 29, 2021, Dr. Cuka observed Sullivan lying naked on her cot and she did not move to look at him. The first thing she said to him was "thank you for the [Ativan]." [Doc. #74-8, ECF p. 711]. He told her Ativan was to relieve the catatonia so she was more physically active. Medical staff reported she was picking at her sores less, and she was slightly more cooperative with wound care and eating.

On March 30, 2021, Dr. Cuka observed Sullivan lying in the "exact position" as the day before. [Doc. # 74-8, ECF p. 714]. They discussed the Ativan was supposed to allow her to be more active, and he noted he would give it another week. The next day he found her in "almost the same exact position," and she did not move to look at him. *Id*. at ECF p. 716. She told him she was better. He asked her if she was moving around and she affirmed that she was.

April 8 through April 13 2021

Although other mental health staff visited Sullivan, Dr. Cuka did not see Sullivan again until April 8, 2021. That morning, he observed her in "her usual position, laying on mattress facing the wall; does not move to look at [him]." [Doc. # 74-8, ECF p. 733]. She reported she was doing better and moving around more, but the "report is that she is not moving around more." *Id*. Dr. Cuka again documented in Turn Key's records Sullivan's symptoms were "[s]evere" and had a "[m]arked impact on [her] ability to function satisfactorily in the current setting." *Id*. at ECF p. 734.

On the afternoon of April 12, 2021, Dr. Cuka observed Sullivan in distress, walking around naked in her cell. She was not making the "usual screams," but she requested an increased dose of Ativan. [Doc. #74-8, ECF p. 741]. He noted in the records that Sullivan "may have a problem as the dose is already reasonable for catatonia." *Id*. In deposition, Dr. Cuka testified that at this time, he did not look "at any literature or studies to see what recommended dose ranges of Ativan were for catatonia." [Doc. #88-4, ECF pp. 28-29].

Dr. Cuka also noted in Turn Key's records that he had discussed the matter with Dr. Winchester and he shared Dr. Cuka's concern that she may have an addiction problem with Ativan. Dr. Winchester advised they should consider a longer-acting benzodiazepine. Dr. Cuka further noted that Sullivan had declined to have Abilify 15 mg given to her immediately.

In deposition, Dr. Cuka admitted the Ativan he prescribed "was ineffective" because Sullivan "did not move around more" and "she did not engage more." [Doc. #88-4, ECF p. 10]. When asked why he did not begin titration of Ativan when he did not see a reduction in the catatonia after the first week, Dr. Cuka testified he "was just going to let the supply

43

expire" before he reassessed and considered "ordering more or none." *Id*. at ECF p. 28. When he was questioned if that was how titration was typically done, Dr. Cuka testified that if Sullivan were in a psychiatric hospital, "you could go from day-to-day" but in jail "she has her supply, and it's kind of locked in." *Id*. He additionally testified that often with someone experiencing catatonia, titration would be happening "probably daily." *Id*.

Dr. Cuka also testified that inside the jail, Sullivan was treatment resistant. He further testified he "[didn't] think [the] treatments could work" because they "were battling the jail" a "non-therapeutic environment." [Doc. #73-3, ECF pp. 9-10]. According to Dr. Cuka, he could not give enough medicine "for a bad job or a bad marriage or bad living conditions." *Id*. at ECF p. 9.

Dr. Berk, plaintiff's expert, testified that the standard of care for catatonia would be a first dose of Ativan of "1 milligram intravenously" and then "titration relatively rapidly," "anywhere from 10 milligrams to 20 milligrams" and as high as "30 milligrams." [Doc. #88-3, ECF p. 15]. He opined the dosage prescribed by Dr. Cuka was "below the standard initial treatment" and "far below the typical amount needed for individuals with catatonia (6 to 21 mg daily) to achieve full remission." [Doc. #88-1, ECF p. 20]. According to Dr. Berk, there was no clinical response to the Ativan prescribed dose for 19 days. *Id*. at ECF p. 4. There was also no discussion of medical titration or alternative treatments if symptoms did not improve as well as no consideration of treatment escalation after one week with no improvement of symptoms. *Id*. at ECF pp. 13, 20. Dr. Berk's "criticisms" of Dr. Cuka are the dose of Ativan he selected and the delay in its initiation. [Doc. #88-3, ECF p. 16].

44

In his expert report, Dr. Berk also opined that Sullivan's symptoms were consistent with catatonia. He stated that she was noted many times to have extremely limited movement and her immobility was so frequent that it was "normalized" in the medical documentation. [Doc. 88-1, ECF p. 23].

Dr. Berk additionally testified that a very common treatment for depression and catatonia was electroconvulsive therapy (ECT). [Doc. #88-3, ECF p. 9]. He opined Sullivan's mental health care treatment was limited, in part, because there was no documented consideration of ECT. In deposition, Dr. Cuka testified that ECT was recognized as a therapy for resolving catatonia that is the result of schizophrenia or major depression. He also testified the therapy wasn't available at the jail and he would need to have court approval because of the number of treatments that would be required.

In the early morning hours of April 13, 2021, medical staff noted Sullivan complained of pain to her right leg. [Doc. #74-8, ECF p. 855]. According to staff, Sullivan was walking around cell with normal gait and no visible signs of injury. Sullivan reported that it felt like she was injured, but she denied any incidents or accidents. She reported she could not walk or sit down.

Late in the afternoon on April 13, 2021, at 5:21 p.m., Sullivan told a nurse her "L leg hurts" and she "can't get up." [Doc. #74-8, ECF p. 746]. The nurse noted she was having difficulty getting up and down, she was very weak, and she was unsteady on her feet. *Id*. The nurse took Sullivan's temperature on her forehead, which read 99.8. She took another temperature on Sullivan's body, which the nurse noted was very warm, and it recorded 103.8. The nurse then noted "uncovered pt and re checked later it was 98.0." *Id*.

45

She also noted she had Dr. Winchester see Sullivan and he gave new orders for "antibiotic[s] UA [if] possible." *Id*. She also noted she was to encourage extra fluids and give Sullivan extra Boost for calories. She further noted that Sullivan's skin was "breaking down more." *Id*.

Dr. Winchester ordered Sulfamethoxazole-TMP DS (Bactrim) tablets and Ceftriaxone Sodium (Rocephin) injection with Lidocaine for Sullivan. He also ordered the Ativan medication be held for 2 days and then re-evaluated. He further ordered a "UA dip stick if possible May straight cath." [Doc. # 74-8, ECF at p. 746].

The nurse noted she helped Sullivan to the bathroom, but she was unable to void. In addition, the nurse noted she had an order to do "straight cath" but she was "[u]nable to get it in and cath[.]" [Doc. #74-8, ECF p. 746]. The nurse further noted the plan was to continue to monitor Sullivan.

A little over three hours later, at 8:53 p.m., a jail employee monitoring Sullivan noticed her arm drop and hit the floor. He attempted to see if she was breathing, knocked on her cell window a few times, and called out her name. He then yelled into her open bean hole and received no response. He ran to get medical staff, who thereafter entered the cell, and called for a nurse and gurney. As requested, additional medical staff came and began life saving efforts on Sullivan. Other jail employees also came to the cell. EMSA arrived and continued life-saving efforts. Sullivan was pronounced dead at 9:40 p.m.

At the time of her death, Sullivan was 65 years old, weighed approximately 115 lbs., and had been detained at the jail for almost one year.

Post-April 13, 2021

The day following Sullivan's death, Dr. Winchester made additional notes regarding Sullivan.  In the morning, he noted he had seen Sullivan at nursing request.  [Doc. #74-8, ECF p. 747].  He noted Sullivan had lethargy, weakness, and was not as talkative.  *Id*.  He also noted she was not initiating conversation but was awake and answering questions appropriately.  *Id*.  He further noted she had a "low fever," had fallen more than once in the "last 1-2 days," and she had complained of right lower leg pain.  *Id*.  Later in the day, he added that Sullivan's fever was 99.8 at forehead and she had mild bradycardia.  [Doc. # 74-8, ECF p. 748].  He also noted she asked for and was given a "nutrition drink."  *Id*.  He noted his assessment as "[f]ever unknown origin—nursing unable to obtain UA void or by quick cath" and "considering low grade fever and weakness, lethargy and mild mental status change."  [Doc. #74-8, ECF p. 750].  He noted he would treat with Rocephin to "cover likely possibility of UTI[.]" *Id*.  He also noted it was appropriate for initial treatment of "pneumonia and other possible infection sources[.]"  *Id*.  He further noted he held the Ativan medication because it could add to fall risk.  *Id*.  Finally, he noted he would "re-evaluate in the [morning] for improvement" and "follow closely overnight" and consider "ED" evaluation in the morning "if not improved."  *Id*.

In deposition, Dr. Winchester testified "he didn't see on the exam or feel on the exam a pneumonia, but from experience, I know that it was possible."  [Doc. #73-19, ECF 14].  He also testified he was not concerned that Sullivan had sepsis.  *Id*.  He testified, "[s]he's got wounds.  She's not mobile.  There [are] a lot of things that it could be.  But

47

going on what I saw on the exam and the history and the physical findings and the bigger picture, I didn't see a way to call it sepsis at that point." *Id*.

Dr. Berk testified that Sullivan did not receive an appropriate diagnostic work-up from Dr. Winchester. He testified the medication prescribed by Dr. Winchester for Sullivan was "for perhaps a presumed urinary tract infection" and that "would be reasonable for a urinary tract infection[.]" [Doc. #88-3, ECF p. 13]. However, he also testified that "[t]hey were unable to collect urine on her so that would be an inappropriate treatment for just fever of unknown origin." *Id*. He also testified that "[t]hey didn't draw blood" and [t]hey didn't check to see if she was septic." *Id*. In addition, he testified that his differential diagnosis would have included "something like sepsis or a broad infection." [Doc. #88-3, ECF p. 17]. Further, he testified that he "would definitely be concerned about malignant catatonia," which he defined as fever with catatonia. *Id*.; *see also* [Doc. #88-3, ECF p. 13]. He testified that malignant catatonia is "an acute emergency" which would "warrant going to the emergency room." *Id*. Dr. Berk further testified that he "would be worried certainly about urinary tract infection or pneumonia or any other infection." *Id*. at ECF p. 17.

When questioned in deposition about an opinion of the "cause of that alleged documented fever[,]" Dr. Berk testified, "I would say at the time it would be difficult to assess . . . It would be impossible almost to assess at the time." [Doc. #89-3, ECF p. 18]. He then testified, "but I would say that if I was there, without any hindsight, in a patient that was doing poorly, diagnosed with catatonia, they would have immediately gone to the emergency room. That would have been an acute emergency." *Id*.

48

After Sullivan's death, Karen Walker, a member of jail staff who monitored her, reported to an investigator that she had watched Sullivan deteriorate to a "bag of bones." [Doc. #88-8, ECF p. 3]. Captain Kevin Wagner, another member of jail staff, reported to the investigator that Sullivan had been "wasting away for quite some time" and looked like a "skeleton." [Doc. #88-9, ECF pp. 7-8].

Captain Wagner also filed a report later in the evening after Sullivan died, stating that at 8:55 p.m., a jail employee had radioed him to come to Sullivan's floor and to call Emergency Medical Services Authority (EMSA). He reported that another jail employee, who was with him at the time, called EMSA on its direct line. They were told to tell EMSA that Sullivan was "possibly septic." [Doc. #88-23]. In deposition, he testified he had been advised Sullivan was septic, but he did not recall who advised him.[5] [Doc. #88-9, ECF p. 5].

The Office of the Chief Medical Examiner conducted an autopsy and reported the probable cause and manner of Sullivan's death as "Undetermined." [Doc. 73-22]. The toxicology reports indicated Codeine (0.31 mcg/ml), among other drugs, in her femoral blood. And according to Turn Key's records, Sullivan was allergic to Codeine. However, according to Dr. Berk, there was no explanation or justification for the presence of Codeine in her system. Dr. Berk determined that the autopsy report was also notable for "pulmonary

---

[5] *In her papers, plaintiff also cites deposition testimony of Ms. Walker regarding her thoughts and observations about Sullivan and statements made by Dr. Winchester. However, the testimony is not part of the record.*

emboli, 7 sores and abrasions, and noted other chronic disease processes (e.g., coronary artery atherosclerosis)." [Doc. #88-1, ECF p. 4].

In deposition, Dr. Berk testified that Sullivan death was caused by "severe depression, causing catatonia, leading to medical complications, including malnutrition [that] corresponds to a very high mortality rate." [Doc. #88-3, ECF p. 19]. And according to Dr. Berk, "those were also linked from the lack of medical treatment of her underlying conditions." *Id*. He opined Sullivan "received minimal access to appropriate qualified healthcare professionals, seeing a physician only 4 times during the course of her clinical deterioration." And that the "lack of coordination between the patient's severe mental health and medical sequalae was ultimately a primary contributor to [Sullivan's] cause of death." [Doc. #88-1, ECF p. 22].

On May 5, 2021, Sullivan's criminal case was dismissed by the state.

On or about June 25, 2021, the Oklahoma State Department of Health, upon receipt of a complaint of inadequate medical care, investigated Sullivan's death. It concluded that the allegation was "Substantiated." [Doc. 88-32]. In the comments section of the report dated July 12, 2021, DHS set forth Sullivan's weight during her detention (142 lbs. on April 27, 2020, 124 lbs. on June 28, 2020, 121 lbs. on October 30, 2020, 119 lbs. on December 5, 2021, and 115 lbs. on March 23, 2021). It quoted portions of Dr. King's medical referral for Sullivan's transfer on November 5, 2020 that included that the transfer was due to "medical and psychiatric necessity," and pointed out additional medical referrals that were made, but stated that "[a] review of the record showed no documentation of follow up." *Id*.

50

In deposition, Ezekiel Holloway, a former jailer, testified that he heard nurses and other officers call Sullivan "crazy bitch[] and stuff like that" for "her acting out." [Doc. #87-46, ECF p. 5].[6]  He also testified that it seemed to be a "common kind of culture" at the jail for medical staff and jail staff to think that inmates were "faking illness." [Doc. #87-46, ECF p. 6].  In addition, he testified that medical staff at times made up excuses not to have a person transported to the hospital.  *Id*. at ECF p. 10.  He testified that medical staff denied sending inmates with chest pains to the hospital, saying their chest pains were due to "working out" or they were "faking it."  *Id*.  He testified that they would check their "02" and if "their 02 [was] above 92, [they] were going back to their [cell]."  *Id*. at ECF p. 11.  Holloway agreed that it was "kind of an unspoken standard."  *Id*.  He additionally testified that there were times that "understaffing was so bad that med pass just couldn't get done."  *Id*. at ECF p. 8.  He testified that there were nights "when [they would] do a med pass till 5:00 in the morning" and "the next shift [was] in an hour," resulting in inmates receiving "double doses."  *Id*. at 9.  Further, Holloway testified that mental health assessments, checks, or encounters were commonly conducted through the bean hole of the cell.  *Id*. at ECF p. 12.  He testified that Dr. Cuka was one of the individuals who did that.  *Id*. at ECF p. 13.  He also testified that there were times when inmates who were under 24-hour observation were "just not monitored."  *Id*. at ECF p. 14.  Lastly, Holloway testified that as a jail employee, he was not empowered to call paramedics or 911 in

---

[6] *In its papers, Turn Key objects to Holloway's testimony on hearsay grounds.  The court, however, concludes the testimony is admissible evidence as Leddy is not proffering the statements of nurses and other officers for the truth of the matter asserted.*

51

emergency situations involving inmates.  It was up to Turn Key to make the decision.  *Id.* at ECF p. 15.

A "Final Report" of the Nineteenth Multicounty Grand Jury of Oklahoma was filed on March 23, 2023 regarding an investigation into the Oklahoma County Criminal Justice Authority and the administration of the jail.  According to the report, there were "37 inmates who [had] died or became ill and died in the jail since July 1, 2020."  [Doc. #87-48, ECF p. 8].  The report stated that "many of the deaths were preventable."  *Id.*  According to the report, "three (3) major issues led to deaths in the jail - inadequate controlled dangerous substance interdiction, inadequate health screening during intake process, and the failure of detention officers to conduct proper site checks on inmates."  *Id.*  The report stated that "[I]llness is the predominant cause of death in the jail."  *Id.*

Dr. Cooper, Turn Key's Chief Medical Officer, testified in deposition that Turn Key did not keep track of preventable deaths.  He thought it would "[p]robably be a good idea."  [doc. no. 87-47, ECF p. 19].  However, he testified that he would want to "think it over" before starting a log of preventable deaths, and one of the things he would like to think over was "[w]hether it was going to put [him] at higher liability risk or not."  *Id.* at ECF p. 23.  He testified that he had recognized three preventable deaths at Turn Key, but he could not remember who these individuals were or the circumstances of their death.  *Id.* at ECF pp. 25-27.  And he could not remember if he changed anything in response to the deaths.  *Id.* at ECF p. 28.  He testified that he had no written record where he educated his staff on what they did wrong.  *Id.* at ECF p. 25.

*Analysis*

Deliberate Indifference

"The right to custodial medical care is well settled." Estate of Beauford v. Mesa County, Colorado, 35 F.4th 1248, 1261 (10th Cir. 2022). "'A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.'" Lucas v. Turn Key Health Clinics, LLC, 58 F.4th 1127, 1136 (10th Cir. 2023) (quoting Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000)). "The deliberate indifference standard applies to pretrial detainees, such as [Sullivan], through the Fourteenth Amendment." *Id*. (citing Paugh v. Uintah County, 47 F.4th 1139, 1153-54 (10th Cir. 2022)). This standard has both an objective and a subjective component. *Id*.

"Under the objective component, the alleged deprivation must be 'sufficiently serious' and pose 'substantial risk of serious harm.'" Estate of Hurtado by and through Hurtado, 119 F.4th 1233, 1236 (10th Cir. 2024) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). "A medical condition is 'sufficiently serious' when 'the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Prince v. Sheriff of Carter County, 28 F.4th 1033, 1044 (10th Cir. 2022) (quoting Al-Turki v. Robinson, 762 F.3d 1188, 1192-93 (10th Cir. 2014)). "Under the subjective component, the official must have a 'sufficiently culpable state of mind.'" Hurtado, 119 F.4th at 1236 (quoting Farmer, 511 U.S. at 834). Specifically, "[t]he official must 'know[] of and disregard[] an excessive risk to inmate health or safety.'" *Id*. (quoting Farmer, 511 U.S. at 537). The "official's state of mind can be inferred from circumstantial evidence." Prince, 28 F.4th at 1045.

53

"The Supreme Court has explained that 'deliberate indifference entails something more than mere negligence.'" Paugh, 47 F.4th at 1154 (quoting Farmer, 511 U.S. at 835). "But 'it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Id. "Thus, the Court has equated deliberate indifference to 'recklessness,' in which 'a person disregards a risk of harm of which he is aware.'" Paugh, 47 F.4th at 1154 (quoting Verdecia v. Adam, 327 F.3d 1171, 1175 (10th Cir. 2003) (quoting Farmer, 511 U.S. at 836-37).

Under Tenth Circuit precedent, two types of conduct constitute deliberate indifference. Paugh, 47 F.4th at 1154. "The first applies when medical professionals "fail to treat a serious medical condition properly.'" Id. (quoting Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000). "This may occur, for example, when a medical professional 'fails to treat a medical condition so obvious that even a layman would recognize the condition,' 'completely denies care although presented with recognizable symptoms which potentially create a medical emergency,' or 'responds to an obvious risk with treatment that is patently unreasonable.'" Id. (quoting Self v. Crum, 439 F.3d 1127, 1232 (10th Cir. 2006)).

"But, at the same time, a medical professional has not acted with deliberate indifference if he or she merely negligently treats or diagnoses an inmate—even if that provided care would constitute medical malpractice." Paugh, 47 F.4th at 1154. "The subjective component of a deliberate indifference claim 'is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment.'" Hurtado, 119 F.4th at 1238 (quoting Self, 439 F.3d at 1232). "So long as a

54

medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." Self, 439 F.3d at 1233.

The subjective component of deliberate indifference may also be satisfied "under a 'gatekeeper' theory—that is, when a defendant 'prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment.'" Johnson v. Sanders, 121 F.4th 80, 94 (10th Cir. 2024) (quoting Lucas, 58 F.4th at 1137) (citing Sealock, 218 F.3d at 1211).  "Thus, 'when a jail official knows, or "refuse[s] to verify underlying facts that he strongly suspected to be true, or decline[s] to confirm inferences of risk that he strongly suspected to exist" about an inmate's serious medical need, the official's failure to obtain medical assistance constitutes deliberate indifference.'" Id. (quoting Paugh, 47 F.4th at 1159) (quoting Farmer, 511 U.S. at 843 n. 8). "When this subjective element is present, the 'inquiry under a gatekeeper theory is . . . whether [defendants] fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs." Id. (quoting Lucas, 58 F.4th at 1139).

"That a defendant provides medical care does not foreclose gatekeeping liability: medical professionals 'can occupy both positions of gatekeeper and provider simultaneously.'" Johnson, 121 F.4th at 94 (quoting Lucas, 58 F.4th at 1143 n. 5). "Thus, gatekeeping liability "'can apply to medical professionals when the professional knows that his or her role in a medical emergency is solely to refer the patient to another.'" (quoting Lucas, 58 F.4th at 1137).

55

Claims Against Dr. Cuka and Dr. Winchester

Defendants seek summary judgment, asserting Leddy lacks evidence from which a jury could reasonably conclude that Dr. Cuka and Dr. Winchester were deliberately indifferent to Sullivan's serious medical needs. Specifically, defendants contend the record evidence is insufficient to raise a genuine issue of material fact as to the subjective component of the deliberate indifference claim against them. That is, they assert the evidence fails to support that they consciously disregarded Sullivan's serious medical needs.

*Dr. Winchester*

Viewing the evidentiary record in a light most favorable to Leddy, the court concludes it contains insufficient evidence from which a jury could reasonably infer conscious disregard by Dr. Winchester.

The court acknowledges Dr. Berk's criticism of Dr. Winchester's treatment of Sullivan for a "fever of unknown origin." However, Dr. Berk's testimony and expert opinion, and other evidence in the record, are not sufficient to raise a genuine issue of material fact that the treatment chosen by Dr. Winchester was patently unreasonable or exhibited an extraordinary degree of neglect. Dr. Berk acknowledged that as part of his differential diagnosis he would certainly have been worried about a urinary tract infection. He also acknowledged that the treatment provided by Dr. Winchester was appropriate for a urinary tract infection. Dr. Berk testified that he would have been worried about pneumonia or other infections. The evidence indicates that upon examination of Sullivan, Dr. Winchester did not conclude she had pneumonia, but he knew it could be possible and

56

that the medication prescribed for Sullivan would also be appropriate for pneumonia and other possible infection sources. While Dr. Berk testified that his differential diagnosis would have included sepsis or a broad infection and that he would have been concerned about malignant catatonia, the court concludes that the evidence is not sufficient to support a reasonable inference that Dr. Winchester consciously disregarded the possibility of sepsis or malignant catatonia. Dr. Winchester testified that at the time of his examination, he was not concerned with Sullivan having sepsis.[7] He also gave medication for other possible infection sources. The court further concludes the evidence is not sufficient for a reasonable jury to infer that Dr. Winchester at the time of examination was aware of either the possibility of sepsis or the possibility of malignant catatonia or that those conditions were an "obvious risk." Notably, Dr. Berk acknowledged the cause of Sullivan's documented fever would have been difficult to assess at the time. [Doc. #89-3, ECF p. 18].

Additionally, the factual circumstances of this case are dissimilar to the circumstances where the Tenth Circuit has found medical treatment so patently unreasonable or woefully inadequate as to constitute deliberate indifference. Lucas, 58 F.4th at 1140-41 (doctor, over an extended period, treated patient suffering from chlamydia, ongoing and abnormal vaginal discharge and bleeding, and E. Coli. growth, with Tylenol

---

[7] *Leddy has proffered evidence through Captain Wagner that when told to call EMSA, jail employees were told Sullivan was possibly septic. However, he did not recall who told him she was possibly septic. There is no evidence that such information was provided by Dr. Winchester or any nursing staff involved with Sullivan at the time of her examination by Dr. Winchester. In briefing, Leddy has also referenced testimony by Ms. Walker, a jail employee, of recognizing the need for emergent transfer of Sullivan, statements made by Dr. Winchester to her about Sullivan and reports that Sullivan was septic, but the testimony is not in the record.*

and Ibuprofen); Oxendine v. Kaplan, 241 F.3d 1272, 1278-79 (10th Cir. 2001) (doctor treated an inmate's gangrenous finger, that had turned "jet black" and was decaying rather than healing, with Tylenol); Smith v. Allbaugh, 987 F.3d 905, 911 (10th Cir. 2021) (medical staff, when presented with severe symptoms of abdominal pain, prescribed treatment in the form of Pepto-Bismol, a laxative, Ibuprofen, and fibrous foods). Further, there is no evidence that Dr. Winchester was dismissive of or unsympathetic towards Sullivan. Cf. Lucas, 58 F.4th at 1141; Sealock, 218 F.3d at 1210-11.

At best, the evidence in the record, when viewed in Leddy's favor, indicates that Dr. Winchester, when exercising his medical judgment, was negligent in diagnosing or treating Sullivan's medical condition. However, as stated above, negligence is not sufficient to satisfy the subjective component. *See* Sealock, 218 F.3d at 1208, 1211, 1212 n. 7 (affirming summary judgment to a nurse who misdiagnosed the inmate's chest pains as the flu rather a heart attack); *see also* Verdecia, 327 F.3d at 1175 ("Deliberate indifference requires more than a showing of simple or heightened negligence.").

As stated, the subjective component of deliberate indifference may also be satisfied under a "gatekeeper" theory. Johnson, 121 F.4th at 94. Leddy contends that Dr. Winchester's refusal to send Sullivan to the hospital in light of the symptoms she presented on April 13, 2021 and his prior assessments of her health on March 11 and 18 of 2021. The court, however, concludes the record evidence, viewed in Leddy's favor, is not sufficient for a jury to reasonably conclude Dr. Winchester's failure to send Sullivan to the hospital constituted deliberate indifference. Although Dr. Berk testified and opined that he would have sent Sullivan, "who was doing poorly and diagnosed with catatonia," to the

58

hospital because an "acute emergency" existed [Doc. #89-3, ECF p. 18],  the court concludes the evidence is not sufficient for a reasonable jury to infer that Dr. Winchester was aware at the time of his examination she needed to go to the hospital or that it was obvious she then needed the additional medical care that an emergency medical team could provide.  *See* Sealock, 218 F.3d at 1208, 1211-12 (reversing summary judgment in favor of physician assistant on deliberate indifference claim where he testified that, had he known about an inmate's chest pain, he would have called an ambulance immediately, and conflicting evidence existed about his knowledge); Lucas, 58 F.4th at 1142-43 (reversing dismissal of deliberate indifference claim against doctor where the need to refer an inmate to an obstetrician was obvious based on serious symptoms of excessive vaginal bleeding, discharge, and pain, and based on evidence that a nurse, with knowledge of symptoms, referred inmate to obstetrician); Prince v. Sheriff of Carter County, 28 F.4th 1033, 1046 (10th Cir. 2022) (reversing summary judgment on qualified immunity grounds where nurse failed to order an inmate transferred to hospital when she was on notice he communicated using only incoherent phrases, had been moved to an isolated cell due to fetal incontinence and she could not have concluded his symptoms were the result of his bipolar disorder or malingering, she was unqualified to render psychiatric diagnoses, knew he had made multiple medical requests and taken to emergency room three times and one medical request reflected another inmate's concern he might die, received doctors' orders that inmate see a neurologist, a psychiatrist, and primary care physician and one doctor noted that inmate risked death if not provided follow-up treatment, and another inmate had died seven months earlier upon exhibiting similar symptoms, and she failed to follow jail plan

which classified a sudden onset of bizarre behavior as a medical emergency).  Here, there is insufficient evidence in the record to raise a genuine issue of material fact that Dr. Winchester had a duty at the time of his examination of Sullivan to act as a gatekeeper and refer her to medical personnel capable of treating her condition.

In sum, the court concludes Leddy has failed to raise a genuine issue of material fact on the subjective component of her deliberate indifference claim against Dr. Winchester. Therefore, the court concludes Dr. Winchester is entitled to summary judgment on the claim.

*Dr. Cuka*

Viewing the record evidence in a light most favorable to Leddy, the court also concludes the factual record contains insufficient evidence from which a jury could reasonably infer conscious disregard by Dr. Cuka.

There is no dispute between the parties that Sullivan had severe mental illness and was suffering from major depression, schizophrenia, and anxiety, while incarcerated. There also is no dispute that she experienced catatonic symptoms, and Ativan was a medication to treat the symptoms.  However, Dr. Berk is critical of Dr. Cuka for the dose of Ativan he selected for Sullivan and the delay in its initiation.  [Doc. #88-3, ECF p. 16]. As to dosage, the evidence shows Dr. Cuka restarted Sullivan on the Ativan dosage, 0.5 mg, that she had taken on the "outside."  In doing so, he considered her age and that she was "more fragile than usual."  In addition, he discussed the matter with Dr. Winchester who recommended a low-dose benzodiazepine, and he consulted with Dr. Lewis, Turn

60

Key's psychiatric director.  Therefore, the record demonstrates that Dr. Cuka in prescribing the dosage of Ativan exercised his medical judgment.

Dr. Berk, however, testified and opined that Dr. Cuka's prescribed dosage was contrary to the basic standard of care.  According to Dr. Berk, the initial dosage should have been 1 mg intravenously and then titrate relatively rapidly.  *Id*. at ECF p. 15.  He also opined that the dosage was "far below the typical amount needed for individuals with catatonia (6 to 21 mg daily) to achieve full remission." [Doc. #88-1, ECF p. 20].  Dr. Berk further opined that Sullivan received "subtherapeutic dosing" of Ativan for 20 days and the medical team did not consider treatment escalation after one week without symptoms improvement.  *Id*.  He also opined there were no discussions of medical titrations and/or alternative treatments such as ECT, if no improvement in symptoms.  *Id*. at ECF p. 13.

Leddy also proffered evidence that Dr. Cuka did not check medical literature for the recommended dose of Ativan for catatonia and that even though Dr. Cuka did not see any clinical improvement for 19 days, he did not titrate the medication because he was waiting for her 30-day supply to expire before reassessing and considering ordering more or none.

The court, however, concludes that Dr. Berk's testimony and opinion, as well as other evidence proffered by Leddy, is not sufficient to raise a genuine issue of material fact that Dr. Cuka, in exercising his medical judgment, exhibited an extraordinary degree of neglect.  The court also concludes that the record is insufficient to raise a genuine issue of material fact that his treatment was patently unreasonable or woefully inadequate.  Again, the facts of this case are dissimilar to circumstances in which the Tenth Circuit has determined medical treatment so patently unreasonable or woefully inadequate as to

constitute deliberate indifference. In those cases, doctors were responding to obvious serious conditions with obvious inadequate treatments. Lucas, 58 F.4th at 1140-41 (treating patient suffering from chlamydia, ongoing and abnormal vaginal discharge and bleeding, and E. Coli. growth with Tylenol and Ibuprofen); Oxendine v. Kaplan, 241 F.3d 1272, 1278-79 (10th Cir. 2001) (treating a decaying, jet-black, gangrenous finger with Tylenol); Smith v. Allbaugh, 987 F.3d 905, 911 (10th Cir. 2021) (treating severe symptoms of abdominal pain with Pepto-Bismol, a laxative, Ibuprofen, and fibrous foods). Here, the court concludes the evidence, even viewed in Leddy's favor, does not support such determination. And notably, "inadvertent failure to provide adequate medical care" and mere disagreement with "a prescribed course of treatment" are not sufficient to establish a constitutional violation. Self, 439 F.3d at 1230; Johnson, 121 F.4th at 89. Furthermore, the record is devoid of any evidence that Dr. Cuka was dismissive of or unsympathetic towards Sullivan. Cf. Lucas, 58 F.4th at 1141; Sealock, 218 F.3d at 1210-11.

While Dr. Berk also complained that Dr. Cuka did not consider alternative treatments such as electroconvulsive therapy (ECT), the court concludes that Dr. Cuka's failure to consider any alternative treatments such as ECT was not patently unreasonable or woefully inadequate. The evidence reveals ECT was not available at the jail. And Dr. Cuka did not have the ability to have Sullivan admitted to a facility for such treatment. Rather, he would have had to secure court approval for such treatment. Additionally, there is no evidence to reasonably infer that Dr. Cuka was aware of the ability to prescribe ECT as a treatment for Sullivan and he ignored it.

62

The court concludes that with respect to prescribing the Ativan dosage, Leddy has made a case, at most, for negligence on the part of Dr. Cuka. *See* Estelle v. Gamble, 429 U.S. 97, 105-06 (1976) (negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation); *see also* Verdecia, 327 F.3d at 1175 ("Deliberate indifference requires more than a showing of simple or heightened negligence."). Based on the record, the court concludes that no reasonable jury could characterize Dr. Cuka's treatment decision as consciously disregarding Sullivan's serious medical needs.

As to Dr. Cuka's failure to titrate the Ativan for Sullivan in the 19 days between the start of Ativan and her death, the court also concludes the evidence is insufficient to raise a genuine issue of material fact that Dr. Cuka exhibited an extraordinary degree of neglect. While Dr. Cuka admitted the Ativan was ineffective because Sullivan was not more active and engaging and he testified he did not titrate the Ativan after the first week because he was going to let her 30-day supply expire before he reassessed and considered ordering more or none and that titration in psychiatric hospital would typically occur day-to-day, the court concludes that the evidence, even viewed in Leddy's favor, is not sufficient to raise a genuine issue of material fact that Dr. Cuka consciously disregarded Sullivan's serious medical needs. At most, the evidence shows that Dr. Cuka was negligent in failing to titrate Sullivan's Ativan after observing no response to the medication, which is insufficient to establish a constitutional violation. The record does not show Dr. Cuka was dismissive or ignoring Sullivan. On the day before she died, he observed her in distress and not making the "usual screams." She requested an increased dose of Ativan from him.

63

At that time, he noted she "may have a problem as the dose is already reasonable for catatonia." [Doc. #74-8, ECF p. 741]. He then discussed the matter with Dr. Winchester, who shared Dr. Cuka's concern Sullivan may have an addiction problem with the Ativan. Dr. Winchester advised they should consider a longer-acting benzodiazepine. On the same day, Dr. Cuka also offered Sullivan Abilify 15 mg which she declined.

With respect to delay in initiation in Ativan,[8] Dr. Berk opined Sullivan demonstrated signs consistent with catatonia at multiple times of her incarceration. He opined that Sullivan was noted to have "extremely limited movement" and "immobility was so frequent that it was 'normalized' in the medical documentation." *Id*. at ECF p. 23. Further, Dr. Cuka admitted in deposition that Sullivan was catatonic "[r]ight from the beginning." [Doc. #88-4, ECF p. 14]. The court, however, concludes that Dr. Berk's testimony and other evidence in the record showing Dr. Cuka's awareness of catatonic symptoms "[r]ight from the beginning" does not raise a genuine issue of material fact that Dr. Cuka, in delaying prescribing Ativan for Sullivan, was consciously disregarding her serious medical needs. The evidence indicates Ativan was not in Turn Key's psychiatric formulary, it is a controlled substance which is addictive, and Dr. Cuka believed Sullivan may have had an addiction to it. Dr. Cuka testified the potential treatments for the catatonia were treating the underlying mental or physical disorder and using benzodiazepines. The record shows that while Dr. Cuka did not prescribe Ativan until late in her incarceration when they were

---

[8] *"A prisoner may satisfy the subjective component by showing that defendant[']s delay in providing medical treatment caused either unnecessary pain or a worsening of her condition. Even a brief delay may be unconstitutional." Mata v. Saiz, 427 F.3d 745, 755 (10th Cir. 2005).*

"very desperate about her physical deterioration," he was prescribing medications to treat her underlying mental or physical disorders and discussing those medications and adjusting her medications at various times.  Although he noted in December 2020, she "seem[ed] stabilized as well as possible on current regimen," Dr. Cuka noted he wanted her to do to better.  He offered her Clozapine in December of 2020 and January of 2021, which she declined.  At her request in February of 2021, he agreed to pivot her from Lexapro to Prozac.  In March of 2021, he considered offering her Cymbalta instead of Prozac.  After Sullivan's hospital visits, Dr. Cuka prescribed the Ativan.  The court concludes that a rational jury could not reasonably infer that Dr. Cuka consciously disregarded Sullivan's serious medical needs.

Leddy also maintains the subjective component of the deliberate indifference claim against Dr. Cuka can be satisfied based on the "gatekeeper" theory.  Johnson, 121 F.4th at 94.  According to her expert Dr. Berk, Sullivan should have transferred Sullivan to an acute care hospital when she "had a [catatonia] diagnosis, that it was clear no one felt comfortable treating."  [Doc. #88-3, ECF p. 7].  The court, however, concludes the evidentiary record is not sufficient for a jury to reasonably infer that Dr. Cuka recognized, at the time of diagnosis, that he couldn't treat Sullivan's catatonia symptoms.  Notably, Dr. Cuka had specialized knowledge because he is a board-certified psychiatrist.  There is also insufficient evidence to show that at the time he gave Sullivan the provisional catatonia diagnosis, Dr. Cuka was aware she needed to go directly to acute care hospital or that it was obvious she then needed additional medical treatment from or referral to an acute care hospital.  *See* Sealock, 218 F.3d at 1208, 1211-12; Lucas, 58 F.4th at 1142-43; and Prince,

28 F.4th at 1046. On this record, the court concludes there is insufficient evidence to raise a genuine issue of material fact that Dr. Cuka had a duty at the time his provisional catatonia diagnosis to act as a gatekeeper and refer her to an acute care hospital.

According to the record, Dr. Cuka, along with other medical staff, believed as early as June of 2020, Sullivan needed to be transferred to a mental health facility for inpatient treatment. And he wrote a letter in October in 2020 indicating she needed to be transferred to an inpatient facility. However, it is undisputed that Turn Key's medical and mental health staff could not unilaterally release her from custody to go into inpatient psychiatric treatment. [Doc. #74-3, ECF p. 22; Doc. 75-4, ECF p. 29]. Indeed, Dr. Berk agreed that a medical provider could not unilaterally release someone from custody or unilaterally admit the person into a separate facility. [Doc. #73-23, ECF p. 9]. While the Oklahoma State Department of Health concluded there was not an attempt to follow-up after medical referrals for Sullivan, the court concludes that such failure is not sufficient to show conscious disregard. The court concludes that a rational jury could not conclude that Dr. Cuka failed to fulfill any gatekeeper role to refer Sullivan to a mental health facility for inpatient treatment.

Based on the record, the court concludes Leddy has failed to produce evidence sufficient to raise a genuine issue of material fact as to the subjective component of her deliberate indifference claim against Dr. Cuka. Therefore, the court concludes Dr. Cuka is entitled to summary judgment on the claim.

Municipal Liability For Turn Key

Under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690 (1978), a plaintiff may sue a local governing body, directly under § 1983, for a constitutional violation pursuant to the body's policies. Lucas, 58 F.4th at 1144. Monell liability has also been extended to a private entity acting under color of law, such as a medical contractor, like Turn Key. *Id*. (citing Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003)) (other citation omitted).

"Municipal liability requires an underlying constitutional violation." Buchanan v. Turn Key Health Clinics, LLC, No. 22-7029, 2023 WL 6997404, at *7 (10th Cir. Oct. 24, 2023) (unpublished). "'A core principle of *Monell* liability is that municipal entities are liable for only their own actions and not vicariously liable for the actions of their employees.'" *Id*. (quoting Crowson v. Washington County Utah, 983 F.3d 1166, 1191 (10th Cir. 2020)). "But '[b]ecause municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Id*.

The Tenth Circuit has recognized "a 'limited exception' to the requirement of individual unconstitutional action '[w]here the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable [; i.e.,] the municipality may not escape liability by acting through twenty hands rather than two.'" Buchanan, 2023 WL 6997404, at *7 (quoting Crowson, 983 F.3d at 1191). "Thus, 'municipal liability may exist without individual liability; for example, for a systemic failure of medical policies and procedures.'" *Id*. (quoting Lucas, 58 F.4th at

67

1144).  "A systemic failure in policymaking alone, though, is not enough, because 'there must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable.'" (quoting Crowson, 983 F.3d at 1191).

In addition to the constitutional violation, the plaintiff must satisfy three elements to succeed on a Monell claim: "'(1) an official policy or custom, (2) causation, and (3) deliberate indifference.'"  Buchanan, 2023 WL 6997404, at *7 (quoting Lucas, 48 F.4th at 1145).  An official policy or custom may include "'an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'"  Id. (quoting Lucas, 48 F.4th at 1145).  For causation, the challenge policy or practice must be closely related to the violation of plaintiff's federally protected right.  Id. at *8.  "The policy or custom must be 'the moving force behind the injury alleged.'"  Buchanan, 2023 WL 6997404, at *8 (quoting Schneider v. City of Grand Junction Police Dept., 717 F.3d 760, 770 (10th Cir. 2013)).  As to deliberate indifference, it is "an objective standard that may be satisfied if the risk is so obvious that the official should have known of it."  Id. (quoting Barney v. Pulsipher, 143 F.3d 1299, 1307 n. 5 (10th Cir. 1998)).

Here, the court has concluded that the evidence fails to raise a genuine issue of material fact that Dr. Winchester and Dr. Cuka acted with deliberate indifference to Sullivan's serious medical needs.  Nonetheless even if the court were to conclude Dr. Winchester or Dr. Cuka were deliberately indifferent to Sullivan's medical needs or to conclude that the sum of all Turn Key medical and mental staff's actions were sufficient to establish deliberate indifference of Sullivan's medical needs, the court nonetheless

68

concludes Leddy has failed to proffer sufficient evidence of the existence of a Turn Key policy or custom that was the moving force behind the alleged constitutional violation.

Leddy points out that this court, in denying Turn Key's Fed. R. Civ. P. 12(b)(6) motion, concluded the "complaint's factual allegations are sufficient to support an informal practice by Turn Key of under-treating persons with serious and complex mental and medical needs." Leddy v. Oklahoma County Criminal Justice Authority, Case No. CIV-23-295-HE, 2023 WL 11763776, at *4 (W.D. Okla. Oct. 23, 2023). According to Leddy, the evidence in record is likewise sufficient to support the existence of such informal practice. The court disagrees.

The evidentiary record, including Officer Holloway and Dr. Cooper's testimony and the grand jury report, even when viewed in Leddy's favor, is insufficient to raise a genuine issue of material fact as to the existence of an informal practice of under-treating persons with serious and complex mental and medical needs. The evidentiary record falls far short of demonstrating a "widespread practice" of under-treating persons with serious and complex mental and medical needs, much less a practice "so permanent and well settled as to constitute a custom or usage with the force of law." Bryson v. City of Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010).

In her papers, Leddy relies upon judicial findings in prior cases involving Turn Key medical personnel, specifically, Spray v. Board of County Commissioners of Oklahoma County, No. CIV-20-1252-R, 2023 WL 5439759, at *4 (W.D. Okla. Aug. 23, 2023), and Brothers v. Board of County Commissioners of Oklahoma County, No. CIV-21-418-SLP, 2023 WL 4041854, at *10 (W.D. Okla. June 15, 2023), to support the existence of the

69

informal practice and systematic failures.  However, "[t]he evidence [Leddy] relies upon is hearsay.  It is an out-of-court written statement by a judge now offered to prove the truth of the matter asserted . . . It is therefore inadmissible unless it falls within one of the hearsay exceptions." Herrick v. Garvey, 298 F.3d 1184, 1191 (10th Cir. 2002).  While Leddy notes that at the summary judgment stage, evidence need not be in a form that would be admissible at trial, she nonetheless has not demonstrated how the content or the substance of the judicial findings or the evidence upon which those findings are based would be admissible at trial.  As such, the court declines to consider the judicial findings in establishing the existence of an informal practice.

Even if Leddy proffered sufficient evidence to establish an informal practice as articulated by the court, she has not presented sufficient evidence for a reasonable jury to find a causal connection between the informal practice and the alleged constitutional violation.  Further, on the record before the court, there is insufficient evidence from which a rational jury could reasonably infer Turn Key acted with deliberate indifference by creating the informal practice. *See* Barney, 143 F.3d at 1307 ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm . . . In most instances, notice can be established by proving the existence of a pattern of tortious conduct. . . In a 'narrow range of circumstances,' however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction[.]").

70

In sum, the court concludes that Turn Key is entitled to summary judgment on the Monell liability claim.

*Conclusion*

Accordingly, for the reasons stated, defendants' summary judgment motions [Doc. Nos. 73, 74, and 75] are **GRANTED**.

A separate judgment will be entered.

**IT IS SO ORDERED**.

Dated this 31st day of March, 2026.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

71